IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | |
|---|---|
| DOE 1, by Doe 1's next friend and parent, DOE 2, who also sues on Doe 2's own behalf, Plaintiffs, v. SCHOOL BOARD OF GILES COUNTY, Defendant. | Case No. 7:11-cv-00435 |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO PROCEED USING PSEUDONYMS AND FOR PROTECTIVE ORDER

### BACKGROUND

This lawsuit challenges the policy and practice of the School Board of Giles County ("School Board") to publicly display a copy of the Ten Commandments in Giles County's public schools. The plaintiffs contend that the display violates the Establishment Clause of the First Amendment to the United States Constitution. The plaintiffs, a Giles County public school student and the student's parent, seek a declaration that the policy and practice of posting the Ten Commandments in the public schools is unconstitutional, an injunction requiring the Ten Commandments to be removed from the public school walls, and nominal damages. Due to the highly personal and sensitive matters involved in Establishment Clause cases, the age of the student plaintiff, the publicity surrounding the School Board's action, and the animus expressed

by the public regarding this case, the plaintiffs request an order permitting them to proceed under pseudonyms.

## ARGUMENT

Though there is a presumption of openness for judicial proceedings, the Fourth Circuit has held that under appropriate circumstances, pseudonyms may be permitted when privacy or confidentiality concerns warrant anonymity. *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). The Fourth Circuit identified the following five non-exhaustive factors for district courts to consider in deciding whether to allow a party to proceed anonymously:

> Whether the justification asserted by the requesting party is merely to avoid the annoyance or criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Jacobson*, 6 F.3d at 238.

Applying these five factors, district courts in the Fourth Circuit have granted the use of pseudonyms when necessary to protect the plaintiffs' anonymity. *See, e.g. Nelson v. Green*, No. 3:06cv00070, 2007 U.S. Dist. LEXIS 23125 (W.D. Va. Mar. 28, 2007) (granting use of pseudonyms to plaintiffs challenging a determination that the plaintiff sexually abused his daughter); *Yacovelli v. Moeser*, No. 1:02cv596, 2004 U.S. Dist. LEXIS (M.D.N.C. May 20, 2004) (granting use of pseudonyms in a challenge by students of University's orientation program as violating the Establishment Clause and the Free Exercise Clause).

In this case, each of the factors weighs heavily in the plaintiffs' favor.

**I. Religious Beliefs are a Highly Personal and Sensitive Matter**

Religious beliefs are "quintessentially private" matters. *Yacovelli v. Moeser*, No. 1:02cv596, 2004 U.S. Dist. LEXIS 9152 (M.D.N.C. May 20, 2004) (citing *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir 1981). The "preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere." *Lee v. Weisman*, 505 U.S. 577, 589 (1992). Disclosing the plaintiffs' identities will exposes these sensitive and highly personal matters.

While the plaintiffs' own religious and personal views may not be germane to the Establishment Cause issues in this case, unless granted anonymity, the nature of the controversy in this small community will publicize either the plaintiffs' privately held religious beliefs, or the public's speculations about the plaintiffs' religious faith. Even if the plaintiffs do not have to "directly state their religious affiliations, or lack thereof," plaintiffs will nonetheless have to explain their injuries—a requisite element to prove standing—which will necessarily "require [them] to reveal [their] beliefs concerning the proper interaction between government and religion" *Doe v. Barrow County*, 219 F.R.D. 189, 193 (N.D. Ga 2003). "The court recognizes that such concerns can implicate privacy matters similar to those associated with actual religious teachings and beliefs." *Id.* at 193.

Even if the plaintiffs' religious beliefs are not disclosed in litigation, comments by the individuals in email correspondence and on blog posts suggest that the public will speculate in this most private of matters. *See*, *e.g.* Ex. 5 (e-mail from "Mark Brittain," MBrittain@cox.net to ACLU of Virginia, sent January 21, 2011) ("Your position is nothing more than an atheist position").

## II. Disclosing Plaintiffs' Identities will Place them at Risk of Retaliatory Harm

### A. Establishment Clause Plaintiffs Routinely Face Harassment and Other Forms of Retaliation, Including Physical Violence

The Plaintiffs in this case face a unique risk inherent in Establishment Clause cases. There is an alarming history of violence and threats of violence against Establishment Clause plaintiffs. For example, after Vashti McCollum brought a suit in 1945 objecting to the practice of allowing public school students to attend religious classes held in public school classrooms (*see Illinois ex rel. McCollum v. Bd. Of Educ.*, 333 U.S. 203 (1948)), her house was vandalized, she received hundreds of pieces of hate mail, and her sons were physically attacked (*see* Robert S. Alley, WITHOUT A PRAYER: RELIGIOUS EXPRESSION IN PUBLIC SCHOOLS 84-89 (1996)).

In 1981, Joann Bell and Lucille McCord filed suit to block religious meetings and the distribution of Gideon Bibles in their children's schools. *See Bell v. Little Axe Indep. Sch. Dist. No. 70,* 766 F.2d 1391 (10th Cir. 1985). The plaintiffs' children were consequently branded as "devil worshipers." Alley, *supra*, at 106. "An upside-down cross was hung on thirteen-year-old Robert McCord's locker," *Id.,* and the Bells received threatening telephone calls. "More than once a caller said he…was going to break in the house, tie up the children, rape their mother in front of them, and then 'bring her to Jesus.'" *Id.* at 107-08. The threats were far from empty: The Bells' home was burned down. *Id.*

In 1994, Lisa Herdahl brought an action challenging prayer practices in her children's schools. *See Herdahl v. Pontotoc County Sch. Dist.*, 887 F. Supp. 902 (N.D. Miss. 1995). As a result, her children were called "atheists and devil worshipers" by their classmates. Stephanie Saul, *A Lonely Battle in Bible Belt: A Mother Fights to Halt Prayer a Miss. School*, NEWSDAY, Mar. 13, 1995, at A8. Other children were threatened with beatings by their parents if they were caught talking to, or playing with, the Herdahl children. Alley, *supra*, at 177. There were

-4-

reports that a boycott would be organized against the convenience store where Lisa Herdahl worked. Saul, *supra*, at A08. Herdahl gave up her job "because of threats against her children." Alley, *supra*, at 182. And she received death threats and threats that her home would be firebombed. *Id.* at 186.

Similarly, the children of one of the plaintiffs in *School District v. Schempp*, 374 U.S. 203 (1963) (in which Bible reading in the public schools was held unconstitutional), were beaten on their way home from school, and their house firebombed. Alley, *supra*, at 98. The son of the plaintiff in *Chandler v. Siegelman*, 230 F.3d 1313 (11th Cir. 2000) (a challenge to prayer at school-related events), was "harassed at school almost daily." Jonathan Ringel, *Alabama Claims U.S. Court Order Denies Students' Right to Pray,* FULTON COUNTY DAILY REP., Dec. 4, 1998, at 1. And even though she was not a plaintiff but merely a vocal opponent of the school-prayer policy challenged in *Sante Fe Independent School District v. Doe,* 530 U.S. 290 (2000), Debbie Mason received threatening phone calls and was followed home by persons trying to scare her. Kenny Byrd, *Baptist Family Opposed to Football Prayer Feels Pressure*, BAPTIST STANDARD, June 12, 2000. Eventually, her husband and children became unable to find work in the town where they lived. *Id.*

Tammy Kitzmiller, the lead plaintiff in a high-profile case challenging a Pennsylvania school district's promotion of intelligent design, received death threats, among other hate mail. *Judgment Day: Intelligent Design on Trial* (PBS *NOVA* television broadcast Nov. 13, 2007); *see generally Kitzmiller v. Dover Area School District,* 400 F. Supp. 2d 707, 721-22 (M.D. Pa. 2005). New Jersey high-school student Matthew LaClair also received a death threat after he tape-recorded and publically objected to his history teacher's frequent proselytizing of students. Tina Kelley, *Talk in Class Turns to God, Setting Off Public Debate on Rights,* N.Y. TIMES, Dec.

18, 2006, at B1.  After speaking out, LaClair was quickly ostracized by his classmates.  Matthew LaClair, *Scholarship Essay,* http://www.aclu.org/students/34399res20080314.html.

In the case of *Wynne v. Town of Great Falls*, 376 F.3d 929 (4th Cir. 2004), the plaintiff suffered extreme harassment at the hands of her neighbors after she sued to enjoin a town council from opening its meetings with sectarian prayers.  Individuals unhappy with the suit broke into the plaintiff's home and beheaded her pet parrot, leaving behind a note reading, "You're next!"  *See* Christina Lee Knauss, *A Quiet Life No More,* THE STATE, Sept. 19, 2004, at D1.  In addition, several of the plaintiff's pet cats were killed and her pet dog was beaten.  *Id.*

Tyler Deveny, the eighteen year-old plaintiff in *Deveney[1] v. Board of Education*, 231 F. Supp. 2d 483 (S.D.W. VA. 2002), endured a beating of his own after successfully challenging the invocation planned for his high-school graduation ceremony.  *See* Charles Shumaker, *Student Beaten for Prayer Suit, He Says,* CHARLESTON GAZETTE & DAILY MAIL, June 19, 2002, at 6D.  A group of eight teens evidently displeased with the outcome attacked Deveny in a public place, with one saying, "Oh, you hate God," before striking Deveny in the face.  *Id.*

Unlike Deveny, the Dobrich family—plaintiffs in *Dobrich v. Walls*, 380 F. Supp. 2d 366 (D. Del. 2005)—did not suffer physical violence after challenging their public school district's practices of permitting teaches to proselytize and distribute Bibles to non-Christian students and of rewarding students who attended school-sponsored Bible clubs.  *See* David Bario, *A Lesson in Tolerance*, AM. LAWYER, July 2008, at 122.  But the harassment, anti-Semitic taunts, and veiled threats the family endured from fellow community members ultimately drove them to move to another county.  *Id.*

Plaintiffs challenging religious displays on public property have also experienced retaliation in recent years.  Anonka Jocham, the plaintiff in *Jocham v. Tuscola County*, 239 F.

---

[1] Mr. Deveny's last name was erroneously spelled "Deveney" in the case caption.

-6-

Supp. 2d 714 (E.D. Mich. 2003), received threatening phone calls and letters, and was the target of vandalism, after she challenged a private group's erection of a nativity scene on the lawn of her county courthouse. *See* Margaret Downey, *Discrimination Against Atheists: The Facts,* FREE INQUIRY, June 2004, at 41, 43. Margaret Downey wrote about Jocham's experiences after having endured similar harassment herself. *See* Joseph A. Slobodzian & Jonathan Gelb, *Commandments Ruling Spurs Threats,* PHILA. INQUIRER, Mar. 8, 2002, at B1. As founder and president of Freethought Society of Great Philadelphia—the organizational plaintiff in *Freethought Society v. Chester County*, 334 F.3d 247 (3d Cir. 2003), a challenge to a Ten Commandments plaque displayed on a county courthouse's exterior wall—Downey received threatening emails and telephone calls, including one ending in the warning: "You're going to get it." *Id.*

And in a case from the Seventh Circuit challenging the display of Christian paintings by the City in a public park, Judge Cudahy gave this description of events surrounding the substitution of a new, anonymous plaintiff for the original, named one:

> The record indicates that the original plaintiff in this case, Richard Rohrer, was, in effect, ridden out of town on a rail for daring to complain about the City's conduct. The present plaintiff has concealed her identity to avoid suffering the same treatment. However much some citizens of Ottawa may disagree with the position that the plaintiffs have taken, however much they may think the plaintiffs annoying and overlitigious, the conduct of some of them has been deplorable.

*Doe v. Small*, 964 F.2d 611, 626 (7th Cir. 1992) (Cudahy, J., concurring in the judgment) (citations omitted).

### B. Publicity of Opposition to the School Board's Actions has Generated Hostile Comments in the Community

Plaintiffs face a particular threat of retaliation in this case, due to the publicity of the School Board's action. In email correspondence to the American Civil Liberties Union of

Virginia and the Freedom From Religion Foundation (which represent the plaintiffs and have been publicly associated with the issue), and in online commentary to media accounts, individuals have expressed the desire to suppress minority view points, and have alluded to a desire for those in disagreement with the School Board's decision to leave Giles County, to descend to Hell, or to hastily confront judgment day.  One email correspondent wrote, "Perhaps one day there may be a plane that travels to 'you know where' and I would gladly buy each of you a one way ticket! … They are not bothering you so take a ride to where somebody wants you, perhaps....'you know where!'" Ex. ) 6 (e-mail from aftonjulianne@aol.com to ACLU of Virginia, sent January 29, 2011).  In another, an individual wrote "One day when you are near your end days, I can only hope that you pray and ask GOD for his forgiveness.  For now, I will pray that the one day comes sooner for you all rather than later." Ex. 5 (e-mail from "Mark Brittain," MBrittain@cox.net to ACLU of Virginia, sent January 21, 2011).  A third individual wrote, "Keep up the good work, you'll have a special place in Hell."  Ex. 7) (e-mail from "Bran Midkiff," branmidkiff@yahoo.com to ACLU of Virginia, sent January 21, 2011).   On a comment section of the Roanoke Times Newspaper website, one commentator wrote, "Sure sounds to me like non-Christians ought to move out of Giles County before things get ugly over there."  Ex. 8 p. 23 (comment 93).  Another wrote, "The more the liberal pushes, the bigger the backlash when it comes, and it is coming.  People will only be screwed with for so long."  Ex. 8 p. 18 (comment 77).   A third wrote, "As for the atheistic moral relativism which seem to be dominating our culture, attempting to steal the sacredness and holiness of Life, let IT be silenced and put to shame."  Ex. 8 p. 21-22 (comment 89).  On the discussion page of an article posted on wdbj7.com, someone suggested, "Maybe we should ship these 'families' overseas to play in the sand with al-Quaida for a little while...maybe then, they would seek God's word!"  Ex. 9.  While

each of these comments does not directly threaten physical harm, the comments illustrate a risk of retaliatory harm, especially considering that the plaintiffs include a school aged child. Urging a quick sojourn to "you know where" may be a benign comment to an adult, but if directed to a minor, can be harmful. Even when the threats are not explicitly made, the perception of a threat is equally palpable. One mother wrote of bullying at the school over the controversy surrounding the School Board's actions. She wrote, *"*My high school aged daughter was told by a group of students that if she didn't believe the commandments belonged in the school, she must worship satan!" Ex. 8 p. 32 (comment 120). Doe 1 confirms the existence of religious harassment in Doe 1's school, noting, "I have often heard Christian students tell non-Christian students that they are going to hell." Ex. 1 ¶ 7 (Doe Decl.).

The opprobrium directed towards opponents of the Ten Commandments display has even been vocalized by elected leaders of the County. Eric Gentry, chairman of the Board of Supervisors, said at the School Board hearing, "we won't let an anonymous coward tell us how to run our business." Ex. 10 (*Giles School Board Makes a Decision*, VIRGINIAN LEADERS, Jan. 26, 2011.) It appears that the vitriol against opponents of the Ten Commandments is even expressed by teachers in the public schools. *See* Ex, 11 (e-mail from "Toma Eaton," teaton@pemtel.net to Freedom From Religion Foundation, Jan. 20, 2011) ("You folks are allowing Satin [sic] to rule you!!!... Again I am praying that you will be strong enough to run Satin [sic] out of your life, because we will fight for Jesus in Giles County"); Ex. 4 ¶ 2 (Elliott Decl.) (noting that a "Toma Eaton" appears on a list of Giles County Public Schools elementary faculty).

Under these circumstances, it is unsurprising that plaintiffs Doe 1 and Doe 2 fear retaliation should their association with this lawsuit become known. Ex. 1 ¶ 6 (Doe 1 Decl.); Ex..2 ¶ 5 (Doe 2 Decl.).

### III. The Plaintiffs' Age Weighs in Favor of Anonymity.

As a minor, Doe 1 is particularly vulnerable to the "risk of retaliatory physical or mental harm." Recognizing the particular vulnerabilities of minors in litigation, the Federal Rules of Civil Procedure require that minors be identified by their initials. Fed. R. Civ. P. 5.2. This measure of protection is not sufficient in this case, however, due to the highly publicized nature of the controversy and the size of the public school population in Giles County. As of June August 31, 2011, the number of high school students was 932; the number of students at Narrows High School was 292. Giles County Public Schools, http://sbo.gilesk12.org/curenr.pdf (last visited Sep. 13, 2011). Furthermore, with an estimated population of 17,286 in Giles County, identification of the parent would easily expose the identity of the minor plaintiff. U.S. Census Bureau, http://quickfacts.census.gov (last visited Aug. 31, 2011). Because the plaintiffs are drawn from such a small pool of individuals, even the use of initials for the minor plaintiff would make the plaintiffs easily identifiable.

Because of the potential harm to children in Establishment Clause cases, courts have frequently allowed minor plaintiffs to proceed using pseudonyms. *See, e.g., Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290 (2000); *Doe v. Porter*, 370 F.3d 558, 560-561 (6th Cir. 2004) (upholding lower court's grant of protective order); *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981) (reversing lower court's denial of protective order).

## IV. Action is Against Government Party

"When a plaintiff challenges the government or government activity, courts are more like[ly] to permit plaintiffs to proceed under a pseudonym than if an individual has been accused publicly of wrongdoing." *Yacovelli v. Moeser*, 2004 U.S. Dist. LEXIS 9152 (M.D.N.C. May 20, 2004); S*ee, e.g. Doe v. Harlan County Indep. Sch. Dist.*, 96 F. Supp. 2d 667, 671 (E.D. Ky. 2000); *Doe v. N.C. Central Univ.*, 1999 U.S. Dist. LEXIS 9804, 1999 WL 1939248 at *4 (M.D.N.C. April 15, 1999). Furthermore, "the filing of an action challenging the constitutional validity of government activity generally involves no injury to the Government's reputation, while an action against a private party can result in damage to the defendant's reputation as well as economic harm." *Doe v. Mertin*, 219 F.R.D. 387, 394 (E.D. Va. 2004) (internal quotation marks and citations omitted). In this case, the defendant is the School Board for the County and, therefore, this factor favors the plaintiffs.

## V. There is Little Risk of Unfairness to the Opposing Party.

Finally, the School Board will not be prejudiced by anonymity of the plaintiffs. The plaintiffs are challenging the constitutionality of the School Board's actions, and not the personal conduct of any individual school board member. As a government body, the School Board's decisions affect thousands of students, parents, and community members. Protestation, anonymous or public, through litigation or through dialogue, is due course for government bodies. Granting anonymity to the plaintiffs who challenge the School Board's decision has little risk of unfairness and prejudice to the defendant.

-11-

## VI. Protective Order

In order to ensure that plaintiffs' identities are fully protected, plaintiffs' request the entry of a protective order prohibiting defense counsel, Court personnel and any other person from disclosing plaintiff's identities, and providing that any documents containing plaintiffs' identities be filed with the Court be filed under seal. A draft protective order is attached hereto as Exhibit 12.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that their Motion for Leave to Use Pseudonyms and For Protective Order be granted.

Respectfully submitted,

DOE 1
DOE 2

By:

_____
Rebecca K. Glenberg (VSB #44099)
Thomas O. Fitzpatrick (VSB #80364)
American Civil Liberties Union of Virginia
      Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
(804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org

Frank M. Feibelman (VSB #13877)
Cooperating Attorney for the ACLU of Virginia
5206 Markel Rd., Suite 102
Richmond, Virginia 23230
(804) 355-1300
FAX: (804) 355-4684
frank@feibelman.com

-12-

Patrick C. Elliott
WI Bar #1074300 (*pro hac vice* motion pending)
Freedom From Religion Foundation
304 W. Washington Ave
Madison, Wisconsin 53703
(608) 256-8900
Fax: (608) 204-0422
patrick@ffrf.org

Dated: September 13, 2011