IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

|  |  |  |
|---|---|---|
| DOE 1, by Doe 1's next friend and parent, | ) | |
| DOE 2, who also sues on DOE 2's own behalf, | ) | |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | CASE No. 7:11-cv-00435-MFU |
| v. | ) | |
| | ) | |
| SCHOOL BOARD OF GILES COUNTY, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| _____ | ) | |

**DEFENDANT SCHOOL BOARD OF GILES COUNTY'S
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, School Board of Giles County, ("School Board") by and through its attorneys of record, submits the following Brief in Support of its Motion for Summary Judgment:

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The School Board incorporates by reference the Statement of Undisputed Material Facts presented in the Motion for Summary Judgment as if set forth in full herein. The School Board will reference the Statement of Undisputed Material Facts by using the abbreviation "UMF" followed by the corresponding factual statement that supports the assertion.

## SUMMARY OF ARGUMENT

The School Board has opened a limited forum for the display of educational, historical and community interest documents. Private parties have placed historical document displays in the forum throughout the history of the district. Two of the recent displays have included a copy of the Ten Commandments, one including the Ten Commandments with the Constitution in a single frame, and the other including the Ten Commandments amid numerous historical and foundational documents that are part of the Virginia Standards of Learning incorporated into the Giles County curriculum.

Prevailing precedent provides that such displays evince a secular, not religious purpose, even if displayed in a public school. In addition, objective observers, aware of the history and context of the displays, would not perceive an unconstitutional endorsement of religion. Therefore, the School Board has not violated the Establishment Clause.*McCreary County v. ACLU*, 545 U.S. 844, 857-863 (2005), *Good News Club v. Milford Central School*, 533 U.S. 98

(2001). In addition, since the School Board has opened a limited public forum available to a variety of speakers on a neutral basis, the Establishment Clause is not implicated. *Good News Club*, 533 U.S. at 121.

Because there is no evidence of an impermissible religious purpose or endorsement, and in light of the limited public forum created by the School Board, Defendant is entitled to summary judgment in its favor on Plaintiffs' Establishment Clause claim.

## LEGAL ARGUMENT

## I.     THE SCHOOL BOARD HAS ESTABLISHED THAT THERE IS NO GENUINE ISSUE OF MATERIAL FACT AND IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

As this Court explained, an award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c), *Desper v. Lee*, 2011 WL 5024587 (W.D. Va. 2011) *aff'd*, 2012 WL 580693 (4th Cir. Feb. 23, 2012). The School Board bears the initial burden of showing that there is no genuine issue of material fact, and then the burden shifts to Plaintiffs to show that there is such an issue. *Id.* (citing *Celotex Co. v. Catrett*, 477 U.S. 317, 323 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Co*., 475 U.S. 574, 586–87 (1986)). Plaintiffs cannot avoid summary judgment unless they can present a genuine issue of material fact "such that a reasonable jury could return a verdict for the non-moving party." *Id.* (citing *Anderson v. Liberty Lobby*, *Inc.,* 477 U.S. 242, 248 (1986)). To forestall summary judgment, Plaintiffs must set forth more than a "mere ... scintilla of evidence," and cannot create a justiciable issue through

speculation or building inference upon inference. *Id.* (citing *Anderson*, 477 U.S. at 252; *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985)).

The School Board has met its burden under Rule 56(c), as discussed more fully below. The undisputed material facts show that the historical document displays, one of which remained in place for more than a decade without legal challenge despite Plaintiffs knowing of its existence the entire time, have wholly secular purposes. In addition, the history, context and implementation of the displays send an unmistakable message of education about the foundation of the Commonwealth and nation, in accordance with the Commonwealth's Standards of Learning, **not** an endorsement of religion. Plaintiffs cannot meet their burden of setting forth more than a mere scintilla of evidence that the displays have a religious purpose or send a message of endorsement of religious belief. In fact, Plaintiffs cannot present even a scintilla of evidence of religious purpose or endorsement because there is no evidence of such a message.

Consequently, Plaintiffs cannot overcome summary judgment in the School Board's favor under Rule 56 and this Court's precedent in *Desper v. Lee.* The displays do not violate the Establishment Clause as a matter of law. *McCreary County v. ACLU*, 545 U.S. 844, 857-863 (2005). Consequently, the School Board is entitled to judgment in its favor.

## II.     THE HISTORICAL DOCUMENTS DISPLAYS ARE CONSTITUTIONAL BECAUSE THEY EVINCE A PREDOMINANTLY SECULAR PURPOSE.

Examining the historical documents displays under the Supreme Court's most recent iteration of the much-maligned but still cited *Lemon* test reveals that the School Board acted with a secular purpose within the confines of the Establishment Clause. *See McCreary County v. ACLU*, 545 U.S. 844, 857-863 (2005)[1] (reinterpreting and then applying the purpose prong of the

---

[1] As well as addressing displays in McCreary County Kentucky, *McCreary County* also addressed similar displays in Pulaski County Kentucky. At the district court, there were three

standard announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). In finding an impermissible religious purpose for only the fifth time since 1971, the *McCreary County* court refined the purpose inquiry, but also reiterated that such findings should be "rare." *McCreary County*, 554 U.S. at 859-863. Illustrating the rarity of such a finding, on the same day, the Court found that a six-foot tall granite Ten Commandments monument with " I AM THE LORD THY GOD" prominently displayed, which had stood for more than 40 years in a large park with other sporadic and widely separated displays, without complaint, did not evince a predominant religious purpose, but a dual religious/secular purpose with the secular purpose predominating. *Van Orden v. Perry,* 545 U.S. 677, 701 (2005) (Breyer, J., concurring).

The Supreme Court has not analyzed a public display of the Ten Commandments since *McCreary County* and *Van Orden.* However, circuit courts applying the *McCreary County* and *Van Orden* cases to public displays of the Ten Commandments, including displays virtually identical to the School Board's display, have found that the displays have a permissible, predominantly secular purpose. *See, e.g., ACLU of Ky. v. Grayson County,* 591 F.3d 837 (6th Cir. 2010) (finding a virtually identical Foundations of American Law and Government Display constitutional); *ACLU of Ky v. Mercer County,* 432 F.3d 624 (6th Cir. 2005) (same); *Books v. County of Elkhart*, 401 F.3d 857, 866 (7th Cir. 2005) (same)*; ACLU Nebraska Foundation v.*

cases addressing the same displays, *ACLU v. McCreary County*, 96 F.Supp. 2d 679 (E.D. Ky. 2000); *ACLU v. Pulaski County*, 96 F.Supp.2d 691 (E.D. Ky. 2000) and *Doe v. Harlan County*, 96 F.Supp. 2d 667 (E.D. Ky 2000). The *Harlan County* case dealt with the same displays in Harlan County schools. The district court consolidated the three cases, which remained consolidated at the Sixth Circuit, which affirmed the district court's grant of a preliminary injunction. *ACLU of Ky v. McCreary County*, 354 F.3d 438 (6th Cir. 2003). The Supreme Court granted certiorari in the *McCreary County* and *Pulaski County* cases, and affirmed the Sixth Circuit's ruling in *McCreary County v. ACLU*, 545 U.S. 844 (2005). A separate petition for certiorari in the *Harlan County* case was denied, *Harlan County v. ACLU*, 545 U.S. 1152 (2005). In subsequent proceedings at the district court, however, the *Harlan County* case was dismissed as moot when the Doe plaintiff graduated. *ACLU v. McCreary County,* 2007 WL 290320 (E.D. Ky. 2007).

*City of Plattsmouth,* 419 F.3d 772 (8th Cir. 2005) (en banc) (finding a granite stand-alone monument constitutional under *Van Orden*); *Card v. City of Everett*, 520 F.3d 1009 (9th Cir. 2008) (same); *ACLU v. Bd. Of Comm'rs of Lucas County,* 444 F.Supp.2d 805, 811-812 (N.D. Ohio 2006) (same).

Under the *Lemon* "purpose" test as refined by *McCreary County*, a governmental agency violates the Establishment Clause only when it "acts with the ostensible and predominant purpose of advancing religion," judged by an objective observer aware of the text, legislative history and implementation of the state action. *McCreary County,* 545 U.S. at 861-863. The undisputed material facts show that the text, legislative history and implementation of the historical documents displays here reveal a secular educational purpose that does not violate the Establishment Clause.

**A.     The History And Context Of The Displays Evince A Secular Purpose Under Prevailing Precedent.**

***1.  The Historical Document Displays Have A Secular Purpose Under McCreary County and Van Orden.***

While the *McCreary County* Court found an impermissible religious purpose underlying Ten Commandments displays in two Kentucky counties, it also emphasized the narrowness of its holding (limiting the finding only to the Preliminary Injunction phase) and stated that finding such impermissible purposes was an unusual departure from the usual deference accorded to legislative statements of purpose. *McCreary County*, 545 U.S. at 859-863, 873-874. "[T]he Court often does accept governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims. But in those unusual cases where the claim was an apparent sham, or the secular purpose secondary, the unsurprising results have been findings of no adequate secular object, as against a predominantly religious one." *Id.* at 865.  The Court concluded that the history of the displays of the Ten Commandments in *McCreary County*, *i.e.,*

stand-alone copies of the Decalogue erected by government officials with public statements regarding the religious content of the document, followed by a display prominently featuring the same copy of the Decalogue surrounded by other documents emphasizing religious heritage, created a sectarian pedigree that the Court determined superseded the county's stated secular purposes. *Id.* at 868, 883-884 (O'Connor, J. concurring). The Court also cautioned: "we do not decide that the Counties' past actions forever taint any effort on their part to deal with the subject matter." *Id.* at 873-874. "Nor do we have occasion here to hold that a sacred text can never be integrated constitutionally into a governmental display on the subject of law, or American history." *Id.* at 874.

> We do not forget, and in this litigation have frequently been reminded, that our own courtroom frieze was deliberately designed in the exercise of governmental authority so as to include the figure of Moses holding tablets exhibiting a portion of the Hebrew text of the later, secularly phrased Commandments; in the company of 17 other lawgivers, most of them secular figures, there is no risk that Moses would strike an observer as evidence that the National Government was violating neutrality in religion.

*Id.* By contrast, according to the Court, the initial displays in *McCreary County* would strike an observer as evidence that the government was violating the concept of neutrality in religion, and the erection of a Foundations of American Law and Government Display within a short period of time did not sufficiently erase that memory from the mind of the objective observer so as to overcome the finding of an impermissible religious purpose. *Id.*

However, when the Ten Commandments are, from the outset, placed with other depictions of historical documents and events, as in the case of the granite display on the grounds of the Texas Capitol, the display "has a dual significance, partaking of both religion and government." *Van Orden v. Perry*, 545 U.S. 677, 692 (2005). Justice Breyer, whose concurrence was the decisive opinion in the case, explained: "Here the tablets have been used as part of a

display that communicates not simply a religious message, but a secular message as well." *Id.* at 701 (Breyer, J. concurring). "The circumstances surrounding the display's placement on the capitol grounds and its physical setting suggest that the State itself intended the latter, nonreligious aspects of the tablets' message to predominate." *Id.* Of particular importance to the Court's finding of a secular, as opposed to a religious, purpose, was the fact that the Ten Commandments monument had been in place for more than 40 years without complaint. *Id.* "Those 40 years suggest that the public visiting the capitol grounds has considered the religious aspect of the tablets' message as part of what is a broader moral and historical message reflective of a cultural heritage*." Id.* at 702-703.

Similarly, the genesis and unchallenged 11-year history of the Original Display suggests that the objective observer visiting Giles County Public Schools has considered any religious aspect in the smaller Ten Commandments portion of the Original Display part of a broader moral and historical message reflective of cultural heritage. Doe 2 affirmed what former Superintendent Dr. Robert McCracken described as the "terrible fear" about school safety that the entire Giles County community experienced following the Columbine school shootings in 1999. (Undisputed Material Fact, "UMF," 1). As part of addressing that fear, Darrell Scott, the father of a student killed in the Columbine school shootings, addressed the Giles County community in an effort to "focus our community on what we believe our country and our schools were founded on, and to keep us in a position of looking forward, not continuing to look back at Columbine." (UMF 4).

As a further effort to address the fear prompted by the Columbine shootings, community leaders proposed posting historical documents in the schools to help everyone focus on the foundation of the country, a foundation that they believed had been eroded by Columbine and

similar events. (UMFs 5-8). The result of that effort was a display that, unlike the original display found unconstitutional in *McCreary County,* featured the United States Constitution on top of a smaller copy of the Ten Commandments contained in a single frame (the "Original Display"). (UMFs 25-26). The Constitution and the Ten Commandments are part of the Virginia Standards of Learning "("SOLs") that are taught to Giles County students, and are specifically referenced in the textbooks used by Doe 1 and other Giles County students. (UMFs 65-73). Dr. McCracken approved the posting of the Original Display after receiving informal approval from the School Board. (UMFs 16, 23). Community members posted the Original Display in Giles County elementary and secondary schools without fanfare or ceremony. (UMF 24).

The Original Display remained posted in the schools without legal challenge or complaint until the Freedom From Religion Foundation (FFRF) sent a letter to the School Board on December 8, 2010. (UMF 30). Even Doe 1 and Doe 2, who were aware of the presence of the Ten Commandments in the Original Display since it was posted in 1999, did not complain about or legally challenge the display until 2011, and then only after hearing news reports about the letter from the FFRF and the school board's vote to rehang the display. (UMFs, 74-81). In fact Doe 2 did not even see the Original Display until after the FFRF letter had generated news coverage, and even then was not contemplating legal action. (UMFs 74-81). Doe 1 did not complain about the display and was not aware of anyone else complaining about it. (UMFs 74-81). In fact, to him the Original Display was "just like a dusty old trophy in the case." (UMF 77).

The Original Display was modified to include the Constitution and Declaration of Independence in response to the FFRF letter in December 2010, and then the Ten Commandments were placed back into the Original Display after the Board's action in late January 2011. (UMFs 32-36). The Original Display was subsequently removed in February 2011

following a vote by the School Board, acting upon advice of counsel. (UMF 36). Before that vote occurred, community leaders proposed a new broader foundational documents display. (UMFs 34-53). Months later, in June 2011, the School Board approved a resolution that memorialized its limited public forum and permitted private parties to display historical documents in accordance with a procedure spelled out in the resolution. (UMF56). In accordance with that procedure, private parties obtained approval for and posted a Foundations of American Law and Government display ("Foundations Display") in 2011, shortly before the Does filed the present lawsuit. (UMFs 56-59).

The Foundations Display consists of a picture of Lady Justice, the Bill of Rights to the United States Constitution, the Virginia Statute for Religious Freedom, the Declaration of Independence, the Virginia Declaration of Rights, the Mayflower Compact, the Magna Carta (which takes up two frames), the Ten Commandments, a brief explanatory document, and a copy of the resolution, placed in equal-sized frames. (UMFs 56-59). Earlier this year, Pastor Wilburn also obtained approval under the procedure set forth in the resolution, and posted additional historical documents consisting of the First Charter of Virginia, the Fundamental Orders of Connecticut, a depiction and quote of Patrick Henry, a depiction of Minutemen, a depiction of George Washington, Washington's Farewell Address, a depiction of Thomas Jefferson, a copy of Jefferson's letter to the Danbury Baptists, a copy of Jefferson's letter to Reverend Samuel Miller, a copy of Jefferson's 1779 Thanksgiving Proclamation, a copy of the Northwest Ordinance, and a document explaining the significance of those documents. (UMFs 60-64).

Consequently, the historical document displays in this case, like the display in *Van Orden* and unlike the original displays in *McCreary County,* bespeak an acknowledgment of the moral and historical underpinnings of the Commonwealth's and the country's cultural heritage, a

secular purpose that satisfies *Lemon*. *See Van Orden*, 545 U.S. at 702-703 (Breyer, J., concurring). Since the Giles County displays do not have the sectarian history that the Supreme Court found permeated the original displays in *McCreary County,* they do not fall within the unusual circumstances that prompted the Court to depart from the usual deference accorded to legislative statements of purpose. *See McCreary County*, 545 U.S. at 868. The fact that the third display in *McCreary County,* which the Supreme Court included in its finding of impermissible religious purpose, was virtually identical to the Foundations Display here does not change the conclusion that *McCreary County* is distinguishable from this case. The *McCreary County* Court specifically held that its finding was based upon the religious purpose arising from the original stand-alone Ten Commandments display, and that if the Foundations Display could be separated from such a history then the outcome could be different. *Id.* at 872-874.

### 2. The Displays Have A Valid Secular Purpose Under Post-McCreary County Cases Examining Virtually Identical Displays.

That is the situation in this case, as it was in cases analyzing displays virtually identical to the Giles County Foundations Display that did not have the same history present in *McCreary County*. *Grayson County*, 591 F.3d 837; *Mercer County*, 432 F.3d 624; *Books* 401 F.3d 857; *Rowan County*, 513 F. Supp. 2d 889. In *Grayson County* and *Mercer County*, panels of the same Sixth Circuit court that had overturned the displays in *McCreary County* applied the modified *Lemon* purpose prong described in *McCreary County* and found that Foundations Displays did not evince an impermissible religious purpose. *Mercer County*, 432 F.3d at 634; *Grayson County*, 591 F. 3d at 854. In both cases, the panels recognized the differential history between their displays and the Foundations Displays in *McCreary County*, and followed the *McCreary County* Court's admonition that the history of the *McCreary County* displays did not impose an

indelible taint upon all future attempts to post Foundations Displays. *Mercer County*, 432 F.3d at 634; *Grayson County*, 591 F. 3d at 853.

In *Mercer County*, the panel examined the context of the display in light of the county's stated purpose under *McCreary County*'s modified predominant purpose test and found that the predominant purpose of the Foundations Display was secular. *Mercer County*, 432 F.3d at 632. Critical to the finding of sectarian purpose in *McCreary County* was the extended history: an original standalone copy of the Ten Commandments; a pastor's speaking to the existence of God at the hanging ceremony; a second, more distinctly religious display; and the "extraordinary" resolutions authorizing the displays that were not repealed even after the Foundations Display was posted. *Id.* at 631. The objective observer in McCreary and Pulaski Counties was deemed aware of this background, and thus saw an impermissible purpose. *Id.* The Mercer County display, on the other hand, lacked a similar sectarian pedigree. *Id.* "Here, there was only one display, one authorizing measure, and one implementation, all of which demonstrate a secular purpose." *Id.*

> The "Foundations" display is the lone exhibit the County has posted in its courthouse. There being but one display, the County has needed but one resolution. Mr. Rousey hung the display himself; there is no evidence of a ceremony solemnized by a clergyman. In fact, the only history the objective observer would incorporate into this display is the statement of Judge McGinnis that the purpose of the display is to recognize American legal traditions.

> We defer to the government's stated purpose, except "in those unusual cases where the claim was an apparent sham" and the primary objective is religious, [*McCreary County,* 125 S.Ct.] at 2736 (emphasis added). Although we presume the sincerity of the legislature's express purpose, *see id.* at 2735; *ACLU v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 307 (6th Cir.2001) (en banc), objective evidence may be helpful in " 'distinguis[h][ing] a sham secular purpose from a sincere one,' " *Santa Fe*, 530 U.S. at 308, 120 S.Ct. 2266 (quoting *Wallace*, 472 U.S. at 75, 105 S.Ct. 2479 (O'Connor, J., concurring)) (first alteration in original). Here, unlike McCreary County, Mercer County's stated purpose was more than a mere "litigating position." Instead, it is supported by context, including the explanatory document and the eight other objectively

historical and secular documents. A reasonable observer would not view this display as an attempt by Mercer County to establish religion. Instead, he would view it for what it is: an acknowledgment of history.

*Id.* at 631-632. "A finding of impermissible purpose should be rare" and restricted to circumstances where the impermissible purpose "emerges from readily discoverable facts." *Id.* at 630. Consequently, "[w]e agree with the district court that there is no evidence in this case that the County's stated purpose is a sham." *Id.* at 632.

Similarly, the *Grayson County* panel refused to impute any religious "taint" to a Foundations Display identical to the one in *Mercer County* and virtually identical to the Foundations Display in this case. *Grayson County*, 591 F.3d at 849. "Even if the text and official history of a statute express no secular purpose, the statute should be held to have an improper purpose only if it is beyond purview that endorsement of religion or a religious belief 'was and is the law's reason for existence.'" *Id.* at 848 (citing *Wallace v. Jaffree*, 472 U.S. 38, 75 (1985) (O'Connor, J., concurring in the judgment)). "Thus, a plaintiff must show that the predominate purpose for a challenged display is religious, although a totally secular purpose is not required." *Id.* "Indeed, if there is no manifest religious purpose for a display, an Establishment Clause complaint should fail, even if 'savvy officials had disguised their religious intent so cleverly that the objective observer just missed it.'" *Id.* (citing *McCreary County,* 545 U.S. at 863).

The *Grayson County* court said that *McCreary County* did not change the presumption that a government's statement of purpose is to be accorded deference. *Id.* at 853. Nor was it constitutionally significant that in Grayson County it was a minister who asked to post the same display that was upheld in Mercer County. *Id.* "[C]ourts must proceed with caution in attributing an unconstitutional purpose to a government entity," and a finding of impermissible purpose

should be rare. *Id.* The Sixth Circuit panel found that the Foundations Display sent an "unmistakable message of the County's acknowledgment of legal history." *Id.*

Similarly, the Seventh Circuit found that a Foundations Display virtually identical to the Foundations Display in Giles County satisfied *Lemon*'s purpose prong. *Books* 401 F.3d at 866. As the Supreme Court did in *McCreary County*, and the Sixth Circuit did in *Mercer County* and *Grayson County*¸ the Seventh Circuit emphasized the importance of reviewing both the content and context of a display and the government's stated purposes. *Id*. at 865. As the Sixth Circuit found in *Mercer County* and *Grayson County*, the Seventh Circuit concluded that the Foundations Display, "taken as a whole, does not belie the County's asserted secular purpose of exhibiting important historical documents to contribute to the education and moral character of its citizens by instilling a sense of history, civic duty, and responsibility." *Id.* at 866. When the government has adopted a resolution setting forth historical, educational or cultural reasons for a display and the display as a whole reflects those values, then it is reasonable to find that there is a secular purpose. *Id.*

In *ACLU v. Rowan County*, the district court reviewed the Rowan County Foundations Display under *McCreary County* and the Sixth Circuit's decision in *Mercer County*. 513 F. Supp. 2d at 905. The *Rowan County* court found that the Foundations Display did not violate the predominant purpose prong of *Lemon* as articulated in *McCreary County* even though the original display in *Rowan County* consisted of a stand-alone copy of the Ten Commandments. *Id.* The court found that while Rowan County's history of having the Ten Commandments displayed in isolation suggested that religion might have been a purpose for the display, it was not the predominant purpose. *Id.*

Courts analyzing Ten Commandments monuments since *McCreary County* and *Van Orden* have similarly adhered to the principle that "a finding of impermissible purpose should be rare" and restricted to circumstances where the impermissible purpose "emerges from readily discoverable facts." *ACLU v. Lucas County,* 444 F.Supp.2d at 811 (citing *ACLU v. Mercer County,* 432 F.3d at 630). "Generally, a court must defer to the government's stated purpose, *McCreary County*, 125 S.Ct. at 2735, but deference is not warranted "in those unusual cases where the claim was an apparent sham. *Id*. at 2736." *Id.* "In light of the Court's application of the purpose prong in *McCreary,* displays of the Decalogue, even in a courthouse, if undertaken without a religious purpose, may be constitutionally acceptable." *Id.* at 811-812. In keeping with the Eighth and Ninth Circuits, the Ohio district court found that the Lucas County granite Ten Commandments monument, "part of an assemblage of several markers, memorials, and monuments on the courthouse lawn," was constitutionally permissible. *Id.* at 815.

In *ACLU v. City of Plattsmouth,* the Eighth Circuit, sitting en banc, reversed the panel's decision that a granite stand-alone monument had an impermissible religious purpose under *Lemon*. 419 F.3d at 775. The en banc court relied upon *Van Orden* to reverse the panel's decision, but found that the conclusion would be same under *Lemon*, based upon the reasons set forth by the dissent in the panel opinion. *Id*. at 778 n.8 (citing *ACLU Nebraska Foundation v. City of Plattsmouth,* 358 F.3d 1020, 1043-50 (8th Cir. 2004) (Bowman, J. dissenting)). In that dissenting opinion adopted by the en banc court, Judge Bowman rejected the panel's finding that an impermissible religious purpose was imputed to the city because of the perceived religious purpose of the monument's donors decades before and the fact that the display consisted of the Ten Commandments. *Plattsmouth* 358 F. 3d at 1044 (Bowman, J., dissenting). As the en banc

court implicitly recognized, such an imputed religious purpose based merely upon perception is not acceptable even after *McCreary County*. *See Plattsmouth* (en banc), 419 F.3d at 778 n.8.

Similarly, the Ninth Circuit refused to impute a religious purpose from the past unto a present display when it upheld a granite stand-alone Ten Commandments monument that was substantially similar to the monument found constitutional in *Van Orden*. *Card*, 520 F.3d at 1020. "The City's intent is the key here, and nothing apart from the monument's text suggests a religious motive on the City's part." *Id.* The Ninth Circuit specifically rejected the plaintiff's assertion that a religious purpose should be imputed because of the presence of clergy at the dedication ceremony more than 40 years prior to the case. *Id.* "All indications in the record are that the Eagles arranged and funded the dedication. While the Mayor was present to accept the monument, as noted above, the City had many plausible secular reasons for accepting the gift, and we will not infer a non-secular purpose." *Id.* As was trued with the monument in *Van Orden*, the monument in *Card* was placed amid other historical monuments and had been in place for more than 30 years before any complaints were raised, factors which further pointed to a secular purpose. *Id.* at 1020-1021.

Although it found that the actions and statements of legislators constituted an impermissible endorsement of religion, the Tenth Circuit rejected a claim that a granite Ten Commandments monument had an impermissible religious purpose. *Green v. Haskell Co. Bd. of Comm'rs,* 568 F.3d 784, 798 (10th Cir. 2009). The court rejected the plaintiff's claim that public displays of the text of the Ten Commandments were presumptively unconstitutional. *Id.* "The Ten Commandments have a secular significance that government may acknowledge." *Id.* at 798-799 (citing *Van Orden*, 545 U.S. at 688-89 (plurality opinion) and observing that "acknowledgments of the role played by the Ten Commandments in our Nation's heritage are

common throughout America," and *id.* at 701 (Breyer, J., concurring) noting that in certain contexts the Commandments can convey "a secular moral message ... about proper standards of social conduct" or a message "about a historic relation between those standards and the law"). "Like the *McCreary* Court, we are unwilling to presume that the text of the Ten Commandments here could not be constitutionally integrated into a governmental display that highlights its secular significance." *Id.* at 799 (citing *McCreary County*, 545 U.S. at 874).

The undisputed material facts in this case, viewed in light of this prevailing precedent, prove as a matter of law that the School Board's historical document displays have a permissible educational purpose. As was true in *Mercer County, Grayson County, Books* and *Rowan* County, and unlike the original display found unconstitutional in *McCreary County*, the Original Display in this case was not a stand-alone copy of the Ten Commandments, but a copy of the United States Constitution on top of a smaller copy of the Ten Commandments contained in a single frame. (UMFs 5-9, 25-26). The Original Display, which was posted in response to the fear generated by the Columbine shootings in 1999, featured the Constitution and the Ten Commandments. (UMF 25-26). Furthermore, the Constitution and Ten Commandments are also part of the Virginia Standards of Learning "("SOLs") that are taught to Giles County students. (UMFs 65-73).

The United States History textbook used in Giles County Public Schools, and used by Doe 1, includes the following statement: "The values found in the Bible, including the Ten Commandments and the teachings of Jesus, inspired American ideas about government and morality." (UMF 7). The World History textbook used by Doe 1, discusses the Biblical laws of Israel, "the most important of which would be called the Ten Commandments,." which lists the Ten Commandments as follows:

I the Lord am your God who brought you out of the land of Egypt, the house of bondage: you shall have no other gods beside Me.
You shall not make for yourself a sculptured image….
You shall not swear falsely by the name of the Lord your God
Remember the sabbath day and keep it holy….
Honor your father and your mother, that you may long endure on the land that the Lord your God is giving you.
You shall not murder.
You shall not commit adultery.
You shall not steal.
You shall not bear false witness against your neighbor.
You shall not covet…anything that is your neighbor's.

(UMF 66) The World History textbook used in the Giles County Schools further states that "Jewish religious beliefs and ethical principals became an important part of the heritage of the West." (UMFs 65-68). The History SOLs include the following standard for World History and Geography to 1500 A.D.:

WHI.3 The student will demonstrate knowledge of ancient river valley civilizations, including those of Mesopotamia, Egypt, the Indus River Valley, and China and the civilizations of the Hebrews, Phoenicians, and Nubians, by

a)      locating these civilizations in time and place;
b)      describing the development of social, political, and economic patterns, including slavery;
c)      explaining the development of religious traditions;
d)      describing the origins, beliefs, traditions, customs, and spread of Judaism;
e)      explaining the development of language and writing.

(UMF 71). The History SOLs also include the following standard under Virginia and United States Government:

GOVT. 2: The student will demonstrate knowledge of the political philosophies that shaped the development of Virginia and United States constitutional government by

a)      describing the development of Athenian democracy and the Roman republic;
b)      explaining the influence of the Magna Carta, the English Petition of Rights, and the English Bill of Rights;
c)      examining the writings of Hobbes, Locke, and Montesquieu;
d)      explaining the guarantee of the "rights of Englishmen" set forth in the charters of the Virginia Company of London;

e)      analyzing the natural rights philosophies expressed in the Declaration of Independence;

f)      examining George Mason's Virginia Declaration of Rights, Thomas Jefferson's Virginia Statute for Religious Freedom, and James Madison's leadership role in securing adoption of the Bill of Rights by the First Congress.

(UMF 72). The History SOLs include the following standard under Civics and Economics:

CE.2    The student will demonstrate knowledge of the foundations of American constitutional government by

a)      explaining the fundamental principles of consent of the governed, limited government, rule of law, democracy, and representative government;

b)      explaining the significance of the charters of the Virginia Company of London, the Virginia Declaration of Rights, the Declaration of Independence, the Articles of Confederation, the Virginia Statute for Religious Freedom, and the Constitution of the United States, including the Bill of Rights;

c)      identifying the purposes for the Constitution of the United States as stated in its Preamble;

d)      identifying the procedures for amending the Constitution of Virginia and the Constitution of the United States.

(UMF 73).

The Foundations Display complements these standards by including a picture of Lady Justice, the Bill of Rights to the United States Constitution, the Virginia Statute for Religious Freedom, the Declaration of Independence, the Virginia Declaration of Rights, the Mayflower Compact, the Magna Carta, and  the Ten Commandments. (UMFs 56-60). Recent additions to the Foundations Display, *e.g..,* the First Charter of Virginia, the Fundamental Orders of Connecticut, a depiction and quote of Patrick Henry, a depiction of Minutemen, a depiction of George Washington, Washington's Farewell Address, a depiction of Thomas Jefferson, a copy of Jefferson's letter to the Danbury Baptists, a copy of Jefferson's letter to Reverend Samuel Miller, a copy of Jefferson's 1779 Thanksgiving Proclamation and  a copy of the Northwest Ordinance further complement the curriculum based upon the Virginia SOLs. (UMFs 61-65).

Consequently, the historical document displays in this case have none of the religious concerns raised by the original displays in *McCreary County* nor by the stand-alone Ten

Commandments display struck down in *Stone v. Graham,* 449 U.S. 39 (1980) (per curiam), discussed immediately below. Absent such a history, and in light of the significant connection between the documents contained in the displays and the school's curriculum, this Court should find, as a matter of law, that the displays have a secular, educational purpose that does not violate the Establishment Clause.

### B. The Fact That The Displays Appear In A School Setting Does Not Negate The Finding Of A Secular Educational Purpose.

Prior to *McCreary County*, the Supreme Court had only found an impermissible religious purpose four times since *Lemon. McCreary County*, 545 U.S. at 865 (citing *Stone*, 449 U.S. 39; *Wallace v, Jaffree*, 472 U.S. 38 (1985); *Edwards v. Aguillard*, 482 U.S. 578 (1987) and *Santa Fe Indep. School Dist. v. Doe*, 530 U.S. 290 (2000)). Although each of those cases involved religious expression in the public school setting, they did not change the principle that courts will presume that the government's stated secular purpose is sincere. Instead, the decisions reflect that the Supreme Court has "been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Van Orden,* 545 U.S. at 691. Furthermore, the cases finding Establishment Clause violations in school settings, including *Stone,* which addressed state-mandated posting of the Ten Commandments on classroom walls, involved compulsory laws or policies in which the school district or the state directed that certain religious texts or prayers be displayed or read during instructional time or at school events. It was the specific sanctioning by the school district or state, which is not present in this case, which violated the Establishment Clause and which makes those cases inapposite to this case.

By contrast, when, as occurred here, school districts have permitted private parties to display documents or conduct religiously-themed events at public schools, the Supreme Court and the Fourth Circuit have found no Establishment Clause violation. *See e.g., Board of*

*Education of Westside Community Schools v. Mergens,* 496 U.S. 226, 248 (1990) (rejecting an Establishment Clause challenge to Equal Access Act requirement that Christian club be granted equal access to public school facilities); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 401 (1993) (rejecting an Establishment Clause claim against an organization's showing of a Christian-based film on family values); *Good News Club v. Milford Central School*, 533 U.S. 98 (2001) (rejecting an Establishment Clause claim against a Christian-based after school enrichment club's use of school facilities); *Peck v. Upshur County Bd. of Educ.*, 155 F.3d 274 (4th Cir. 1998) (rejecting an Establishment Clause claim against privately funded Bible displays in public school); *Child Evangelism Fellowship of Maryland v. Montgomery County,* 373 F.3d 589 (4th Cir. 2004) (rejecting Establishment Clause claim against Christian-based after school club's distribution of literature in public school flyer forum).

> ### 1. The History and Context of the Displays are Unlike the School District Policies Found to Evince an Impermissible Religious Purpose.

In *Stone,* the Supreme Court found that a Kentucky statute which mandated that the Ten Commandments be posted in classrooms had a predominant religious purpose and therefore violated the Establishment Clause. *Stone v. Graham,* 449 U.S. at 41. The state legislature said that the statute served a secular legislative purpose, pointing to the following notation in small print at the bottom of each display of the Ten Commandments: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* The Supreme Court rejected the avowed secular purpose, holding that "the pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature." *Id.* at 41. "The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." *Id.* Of critical

importance to this case, the Court based its conclusion on the fact that "[t]his is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Id.* at 42. "Posting of religious texts on the wall serves no such educational function." *Id.* "If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause." *Id.*

At least three critical distinctions set this case apart from *Stone*. First, this case does not involve a Commonwealth or School Board mandate that the Ten Commandments be posted. The Original Display was placed by a private party at his request. (UMF 5-9). The Foundations Display, including the recent additions, was placed by private parties pursuant to a resolution that permits but does not mandate that historical documents be displayed in Giles County Schools in accordance with a procedure spelled out in the resolution. (UMFs 56-60). Second, neither the Original Display nor the Foundations Display consists of merely a copy of the Ten Commandments with a notation about their secular nature. (UMFs 25-26, 56-60). The Original Display consisted of a copy of the Constitution placed on top of a smaller copy of the Ten Commandments in a single frame. (UMF 25-26). The Foundations Display consists of the following: a picture of Lady Justice, copies of the Bill of Rights to the United States Constitution, the Virginia Statute for Religious Freedom, the Declaration of Independence, the Virginia Declaration of Rights, the Mayflower Compact, the Magna Carta, the Ten Commandments, a document discussing the Star Spangled Banner, the First Charter of Virginia, the Fundamental Orders of Connecticut, a depiction and quote of Patrick Henry, a depiction of

Minutemen, a depiction of George Washington, Washington's Farewell Address, a depiction of Thomas Jefferson, a copy of Jefferson's letter to the Danbury Baptists, a copy of Jefferson's letter to Reverend Samuel Miller, a copy of Jefferson's 1779 Thanksgiving Proclamation and a copy of the Northwest Ordinance, all of which complement the curriculum based upon the Virginia SOLs. (UMFs 56-65).

Finally, and most importantly, this case, unlike *Stone*, **is** a case in which the Ten Commandments, as well as the other documents in the displays, are integrated into the school curriculum. (UMFs 25-26, 56-73). The United States History textbook used in Giles County Public Schools includes the following statement: "The values found in the Bible, including the Ten Commandments and the teachings of Jesus, inspired American ideas about government and morality." (UMF 63-73). The History SOLs include a standard in which the students must demonstrate knowledge of the civilization of the Hebrews, including explaining the development of their religious traditions and describing the origins, beliefs, traditions, customs, and spread of Judaism, which would include the Ten Commandments, which as the Supreme Court said, "are undeniably a sacred text in the Jewish and Christian faiths." (UMF 63-73; *Stone,* 449 U.S. at 41. Consequently, unlike the mandated stand-alone Ten Commandments display that evinced a "predominantly religious" purpose, the private party Original and Foundation displays in this case are curriculum-based presentations of foundational documents that advance the School Board's secular educational purposes, as set forth in the Commonwealth's SOLs.[2]

---

[2] The testimony of Doe 1 underscores the need for additional efforts to educate students in the historical underpinnings of the Commonwealth and the nation. Doe 1, a self-styled history buff, does not know where the drafters of the Virginia Declaration of Rights got the idea that all men have a natural right to be free and independent (UMFs 110-117), nor to what religion the Puritans ascribed (UMFs 110-117), nor where the founders got their rights before the adoption of the Constitution, from which he believes we derive our rights. (UMFs 110-117).

Consequently, this case is also unlike *Edwards*, in which the Supreme Court found that a statute requiring that Creationism be taught did not advance the school district's stated secular purpose of protecting academic freedom. *Edwards*, 482 U.S. at 586-587. The state claimed that it was seeking to "maximize the comprehensiveness and effectiveness of science instruction." *Id.* at 588. If that secular purpose were genuine, then the state would have encouraged the teaching of all scientific theories about the origins of humankind. *Id.* Instead, the state forbade the teaching of evolution unless accompanied by teaching about creationism. *Id.* "The Act does not serve to protect academic freedom, but has the distinctly different purpose of discrediting evolution by counterbalancing its teaching at every turn with the teaching of creationism...." *Id.* at 589.

Noting an historic antagonism between evolution and religious teachings, the Court found that the state's purpose of discrediting evolution had "the preeminent purpose to advance the religious viewpoint that a supernatural being created humankind." *Id.* at 591. "The purpose of the Creationism Act was to restructure the science curriculum to conform with a particular religious viewpoint." *Id.* at 593. By contrast, in this case, the School Board adopted a resolution designed to acknowledge the historical foundations of the Commonwealth and the nation, and integrate the SOLs, which acknowledge, as Doe 2 confirms, the cultural and religious traditions that undergirded various civilizations. (UMFs 65-73, 99). The School Board is not mandating that certain viewpoints be taught or abandoned, or even that the displays be viewed, but is simply permitting historical displays that complement the curriculum put in place by the Virginia Department of Education. (UMFs 25-26, 53-74). The purpose of both the Original and Foundations displays is genuinely secular.

By contrast, in *Santa Fe*, the Supreme Court found that the district's stated secular purpose of a pre-game prayer policy to "foste[r] free expression of private persons...as well [as

to] solemniz[e] sporting events, promot[e] good sportsmanship and student safety, and establis [h] an appropriate environment for competition" was not genuine and not supported by the implementation of the policy. *Santa Fe,* 530 U.S. at 309. The school district's approval of only one specific kind of message, an "invocation,"  and the fact that only one student was permitted to give a content-limited message, suggested that the policy did little to "foster free expression." *Id.* "Furthermore, regardless of whether one considers a sporting event an appropriate occasion for solemnity, the use of an invocation to foster such solemnity is impermissible when, in actuality, it constitutes prayer sponsored by the school. And it is unclear what type of message would be both appropriately 'solemnizing' under the District's policy and yet nonreligious." *Id.* Given these observations, and in light of the school's history of regular delivery of a student-led prayer at athletic events, it is reasonable to infer that the specific purpose of the policy was to preserve a popular "state-sponsored religious practice." *Id.*

There is no such history in this case, but merely the acceptance of two privately sponsored historical document displays, one containing the Constitution and Ten Commandments, and one containing the Ten Commandments and eight other documents, with the recent addition of ten additional documents, that complement the state standards for history curriculum. (UMFs 25-26, 53-74). The only message sent by the School Board is one of acknowledging the historical documents upon which the Commonwealth and country were founded and which are an integral part of the students' history curriculum.

Similarly in *Wallace*, the Supreme Court found that the state's revision of a moment of silence statute to add the words "or voluntary prayer" did not further the stated purpose of protecting students' rights to voluntarily pray during the school day because the existing law already provided a one-minute moment of silence that did not hinder student prayer. *Wallace,*

472 U.S. at 59-60. Not only was there no evidence of a secular purpose, but the legislative history actually showed the opposite. *Id.* at 58. "Senator Donald Holmes, inserted into the legislative record—apparently without dissent—a statement indicating that the legislation was an 'effort to return voluntary prayer' to the public schools. Later Senator Holmes confirmed this purpose before the District Court." *Id.* at 57-58. "In response to the question whether he had any purpose for the legislation other than returning voluntary prayer to public schools, he stated: "No, I did not have no other purpose in mind." *Id.* "The State intended to characterize prayer as a favored practice. Such an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." *Id.* at 60.

In this case, the legislative history reveals only that the School Board informally approved the posting of the Original Display by private parties as part of a community-wide effort to allay fears prompted by the 1999 Columbine shootings and reminds the community of foundational principles as taught in Giles County Schools. (UMFs 5-9, 25-26). The legislative history further shows the School Board adopting a resolution that simply permits private parties to post historical documents which complement the Commonwealth's SOLs in Giles County schools. (UMFs 25-26, 55-74).

None of these cases finding impermissible religious purpose in the public school setting place the secular purpose of the School Board's actions in question. The School Board has not directed that certain religious documents be displayed or read, has not required the teaching of certain doctrines, nor sought to surreptitiously approve religious activities. The historical documents displays are just that—displays of historical documents that complement the SOLs drafted by the Department of Education. (UMFs 25-26, 55-74). The School Board's

acknowledgement of those documents is a genuinely secular purpose that does not violate the Establishment Clause.

## 2. The History and Context of the Displays Resemble the Conduct Found to Advance a Secular Purpose.

Cases such as this, involving private parties sponsoring displays or activities in public schools, have consistently been found permissible under the Establishment Clause. The Court has rejected claims that permitting third parties to display even religiously-themed documents (which the Giles County displays are not), conduct religiously-themed clubs or engage in similar activities on public school campuses would reflect an impermissible religious purpose that could subject school districts to Establishment Clause violations.

In *Mergens*, the Supreme Court rejected the school district's argument that granting a Christian club equal access to school facilities under the Equal Access Act, 20 U.S.C. § 4071, would violate the Establishment Clause. 496 U.S. at 249. The Court found that the Act's prohibition of discrimination on the basis of "political, philosophical, or other" speech as well as religious speech is a sufficient basis for meeting the secular purpose prong of the Lemon test. *Id.* at 248. The Court emphasized that what is relevant is the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law. *Id*. at 249. Since the Act granted equal access to both secular and religious groups, its purpose was not to "'endorse or disapprove of religion.'" *Id.* (contrasting *Wallace*, 472 U.S. at 56). Similarly, here, the School Board's resolution provides access for historical documents, not merely religious documents, and therefore satisfies the secular purpose prong of *Lemon*.

The Supreme Court upheld equal access policies against similar Establishment Clause claims in *Lamb's Chapel,* 508 U.S. at 401 and *Good News Club,* 533 U.S. at 113-116. Although upheld primarily under the endorsement prong of *Lemon* (as discussed below), the holdings in

*Lamb's Chapel* and *Good News Club* reinforce the fact that granting access to private parties to display documents or conduct activities on school property does not run afoul of *Lemon*'s purpose prong just because some of the document or activities might have a religious theme, so long as the religious theme does not predominate.

In *Peck,* the Fourth Circuit upheld a school board's access policy against a claim that it violated the Establishment Clause. 155 F.3d at 282. "The Board's policy is neutral because it was plainly adopted, not to advance religion, but for the secular purpose of opening a forum for speech, in order to further the schools' educational mission." *Id.* at 279. The court found that the board's "express purpose" for its practice of allowing private speakers to access the public schools was to "enhance the students' education by exposing them to a broad spectrum of knowledge." *Id.* Notably, the Fourth Circuit refused to impute an impermissible religious purpose to the school board merely because the request at issue was a request to display Bibles. *Id.* at 281. "In sum, by accommodating its constituents' request that religious speech be allowed at least limited access to the Upshur County open school forums, the Board did nothing more than affirm the right of religious speakers to use the Upshur County school forums on equal terms with others, …and the Supreme Court has explicitly held that 'prevent[ing] discrimination against religious and other types of speech' in a school forum is an 'undeniably secular' purpose." *Id.* (citing *Mergens*, 496 U.S. at 249).

When viewed in the context of these cases, the School Board's actions in approving the private party historical displays in Giles County have an unmistakable secular purpose, as stated in the preamble to the resolution adopted in 2011:

> It is recognized by the Board that many documents and symbols, taken as a whole, have special historical significance to our community, our county, and our country's history. Some of these documents and symbols include, but are not limited to, the idea of equal justice under law as symbolized by Lady Justice; the

27

Bill of Rights to the United States Constitution, the Virginia Statute for Religious Freedom, the Declaration of Independence, the Virginia Declaration of Rights, the Mayflower Compact, the Magna Carta and the Ten Commandments. A sense of historical context, civic duty and responsibility, and a general appreciation and understanding of the law of this land are all desirable components of the education of the youth of the county. We believe these above named documents positively contribute to the educational foundations and moral character of students in our schools. There may be other documents, speeches, letter, and writings which are equally important as those mentioned above, but, it is our opinion, that these above mentioned documents that may instill qualities desirable of the students in our schools, have had particular historical significance in the development of this country.

(UMF 56). In addition, the School Board made clear that it was opening a limited public forum in which additional displays could be offered (and were):

3. Any individual, private group, or organization who wishes to finance the posting of the above listed historical documents may be allowed to do so by making a written request to the Superintendent of the Giles County Schools. The written request shall include the name of the person, individual, or group that wishes to sponsor the historical display at the particular school or schools, and shall contain the name of the school where the documents are requested to be displayed, and shall contain a statement that the person or group agrees to the terms and conditions of this resolution and shall be signed by the person or representative of the sponsor.

4. Any person, group, or organization that wishes to post any other historical documents at any schools, shall notify the Superintendent of the Giles County Schools in the same manner as is outlined herein above. Each request must be made in writing and signed by the person, individual, or group that wishes to place any historical document in the school. They shall attach a copy of the document or documents the person wishes to place in each school and shall cite the particular historical significance and importance of said documents. The Superintendent shall present the petition to the Giles County School Board. If the Giles County Board approves the same, a copy of each such historical document shall be added to the historical document display at the schools, at the expense of the person or organization requesting the additional historical document display. The additional historical documents shall be displayed in the same uniform size and content as other historical documents on display, and shall not be given greater or less prominence that any other historical document on display.

If the Giles County Board refuses the request of any person or group to post additional historical documents, the Board shall state in writing the reasons for refusing the request.

(UMF 56). The secular purpose is further evident when the contents of the displays are viewed in context with the Virginia SOLs, which provide, in part:

> WHI.3 The student will demonstrate knowledge of ancient river valley civilizations, including those of Mesopotamia, Egypt, the Indus River Valley, and China and the civilizations of the Hebrews, Phoenicians, and Nubians, by
>
> a) locating these civilizations in time and place;
> b) describing the development of social, political, and economic patterns, including slavery;
> c) explaining the development of religious traditions;
> d) describing the origins, beliefs, traditions, customs, and spread of Judaism;
> e) explaining the development of language and writing.
>
>
> GOVT. 2: The student will demonstrate knowledge of the political philosophies that shaped the development of Virginia and United States constitutional government by
>
> a) describing the development of Athenian democracy and the Roman republic;
> b) explaining the influence of the Magna Carta, the English Petition of Rights, and the English Bill of Rights;
> c) examining the writings of Hobbes, Locke, and Montesquieu;
> d) explaining the guarantee of the "rights of Englishmen" set forth in the charters of the Virginia Company of London;
> e) analyzing the natural rights philosophies expressed in the Declaration of Independence;
> f) examining George Mason's Virginia Declaration of Rights, Thomas Jefferson's Virginia Statute for Religious Freedom, and James Madison's leadership role in securing adoption of the Bill of Rights by the First Congress.
>
> CE.2 The student will demonstrate knowledge of the foundations of American constitutional government by
>
> a) explaining the fundamental principles of consent of the governed, limited government, rule of law, democracy, and representative government;
> b) explaining the significance of the charters of the Virginia Company of London, the Virginia Declaration of Rights, the Declaration of Independence, the Articles of Confederation, the Virginia Statute for Religious Freedom, and the Constitution of the United States, including the Bill of Rights;
> c) identifying the purposes for the Constitution of the United States as stated in its Preamble;
> d) identifying the procedures for amending the Constitution of Virginia and the Constitution of the United States.

(UMFs 66-74).

Doe 2 acknowledges that the Ten Commandments are "important" and were "important to some of our founding fathers," and are appropriate in an educational setting. (UMFs 98-102). Doe 2 also agrees with the statement in Giles County's United States History textbook that "Judeo-Christian roots, the values found in the Bible, including the Ten Commandments and the teachings of Jesus, inspired American ideas about government and morality." (UMFs 98-102).[3] Doe 2 also agrees that "a sense of historical context, civic duty and responsibility, and a general appreciation and understanding of the law of this land are desirable components of an education," as stated by the School Board in its resolution from which the Foundations Display was approved. (UMF 101).

Accordingly, the School Board's actions constitute a valid secular purpose, not an impermissible religious purpose, and therefore do not violate the Establishment Clause. The School Board is entitled to judgment as a matter of law.

### C. The Historical Integration Of The Ten Commandments Into Early Statutory and Common Law Further Demonstrates The Historical/Educational Purpose of the Displays.

Finding a secular purpose in the School Board's approval of privately donated historical document displays is further buoyed by the close relationship between religion and the Commonwealth's and country's history and government, and in particular, by the integration of the Ten Commandments into the Constitution and early statutory and common law. As the Supreme Court said in *Van Orden,*

> It is true that religion has been closely identified with our history and government .... The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in

---

[3]     Doe 1's disagreement with this proposition is based on no scientific evidence or persuasive authority, and merely demonstrates once again the need for more education and exposure on the subject, not less. (UMF 97).

> their writings, from the Mayflower Compact to the Constitution itself .... It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people who, in the words of Madison, are 'earnestly praying, as ... in duty bound, that the Supreme Lawgiver of the Universe ... guide them into every measure which may be worthy of his [blessing ... .]'"

545 U.S. at 683 (citing *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 212-213(1963)). In particular, the *Van Orden* Court acknowledged that the Ten Commandments have affected the country's heritage. "Our opinions, like our building, have recognized the role the Decalogue plays in America's heritage." *Id.* at 689-690 (citing *McGowan v. Maryland*, 366 U.S.420, 442 (1961), *id.* at 462, (separate opinion of Frankfurter, J.)). The Executive and Legislative Branches have also acknowledged the historical role of the Ten Commandments. *See, e.g.*, Public Papers of the Presidents, Harry S. Truman, 1950, p. 157 (1965); S. Con. Res. 13, 105th Cong., 1st Sess. (1997); H. Con. Res. 31, 105th Cong., 1st Sess. (1997)." *Id.* at 690. "These displays and recognitions of the Ten Commandments bespeak the rich American tradition of religious acknowledgments." *Id.*

That acknowledgment includes not only laws based upon the second tablet, *i.e.*, Commandments about honoring parents and prohibiting adultery, murder, theft and perjury, but also the tenets in the first table, *i.e.,* the First through Fourth Commandments. These tenets were integrated into Virginian and American law at the time of the founding, and therefore are part of the cultural heritage that Giles County students study as part of the SOLs. The First Commandment, "I am the LORD thy God," was the basis for a 1610 Virginia statute that required that leaders give "allegiance" to God, "from whom all power and authority is derived," and who is the "King of kings, the Commander of commanders, and Lord of hosts."[4]  Similarly, in1641,

---

[4]     *Articles, Laws, and Orders, Divine, Politic and Martial for the Colony of Virginia*, reprinted in Donald S. Lutz, ed., COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION: A DOCUMENTARY HISTORY, at 315-16.

Massachusetts adopted a law that stated, "If any man after legal conviction shall have or worship any other god but the Lord God, he shall be put to death. Deut. 13.6, 10, Deut. 17.2, 6, Ex. 22.20."[5]

The Second Commandment, which forbids the making of idols, was made part of the law in New Hampshire in 1680, when the colony enacted an idolatry law that stated, "Idolatry.  It is enacted by ye Assembly and ye authority thereof, yet if any person having had the knowledge of the true God openly and manifestly have or worship any other god but the Lord God, he shall be put to death. Ex. 22.20, Deut. 13.6 and 10."[6] Also the 1780 Constitution of Massachusetts stated in Part I, Article II: "It is the right as well as the duty of all men in society, publicly, and at stated seasons, to worship the SUPREME BEING, the great creator and preserver of the universe."

The Third Commandment's prohibition against using God's name in vain was adopted by Virginia in 1610 ("That no man blaspheme God's holy name upon the pain of death") and by Connecticut in 1639 ("If any person shall blaspheme the name of God the Father, Son, or Holy Ghost . . . he shall be put to death").[7]  In a case cited by the United States Supreme Court in *Church of the Holy Trinity v. U. S.*, 143 U. S. 457, 470-471 (1892), the Pennsylvania Supreme Court reaffirmed that the civil laws against blasphemy were derived from divine law: "The true principles of natural religion are part of the common law; the essential principles of revealed religion are part of the common law; so that a person vilifying, subverting or ridiculing them may be prosecuted at common law." *Updegraph v. Commonwealth*, 11 Serg. & Rawle 393, 401

---

[5]     *Massachusetts Body of Liberties* (1641), reprinted in THE COLONIAL LAWS OF MASSACHUSETTS at 33 (W. H. Whitmore, 1890).

[6]     *General Laws and Liberties of New Hampshire 1680*, reprinted in COLONIAL ORIGINS at 6.

[7]     *See* COLONIAL ORIGINS at 316.

(Pa. 1824). The court then noted that the Commonwealth's laws against blasphemy had been drawn up by James Wilson, a signer of the Constitution and original Justice on the U. S. Supreme Court:

> The late Judge Wilson, of the Supreme Court of the United States, Professor of Law in the College in Philadelphia, was appointed in 1791, unanimously by the House of Representatives of this State to "revise and digest the laws of this commonwealth. . . . " He had just risen from his seat in the Convention which formed the Constitution of the United States, and of this State; and it is well known that for our present form of government we are greatly indebted to his exertions and influence. With his fresh recollection of both constitutions, in his course of Lectures (3d vol. of his works, 112), he states that profaneness and blasphemy are offences punishable by fine and imprisonment, and that Christianity is part of the common law. It is vain to object that the law is obsolete; this is not so; it has seldom been called into operation because this, like some other offences, has been rare. It has been retained in our recollection of laws now in force, made by the direction of the legislature, and it has not been a dead letter.

*Id.* at 403.

> In the same manner, the Maine Supreme Court held that:

> To curse God means to scoff at God; to use profanely insolent and reproachful language against him. This is one form of blasphemy under the authority of standard lexicographers. To contumeliously reproach God, His Creation, government, final judgment of the world, Jesus Christ, the Holy Ghost, or the Holy Scriptures as contained in the canonical books of the Old and New Testament, under the same authorities, is to charge Him or Them with fault, to rebuke, to censure, to upbraid, doing the same with scornful insolence, with disdain, with contemptuousness in act or speech. This is another form of blasphemy. But as particularly applicable, perhaps, to the present case, it is blasphemy to expose any of these enumerated Beings or Scriptures to contempt and ridicule. To have done any one of these things is blasphemy under the statute as well as at common law. It was not necessary for the state to prove that the respondent did them all.

*State v. Mockus,* 113 A. 39, 42 (Me. 1921). The Florida Supreme Court defined profanity by reference to the precepts of the Third Commandment: "This court has never defined the legal meaning of the word 'profanity' so far as this writer has been able to discover, but a number of other courts of last resort have done so, and practically all of them, following pretty closely the

dictionary meaning, define it as the use of words importing 'an imprecation of Divine vengeance,' of 'implying Divine condemnation,' or words denoting 'irreverence of God and holy things,' -- blasphemous." *Cason v. Baskin*, 20 So.2d 243, 247 (Fla. 1944) (en banc).

The Fourth Commandment's directive to keep the Sabbath holy was recognized in Article 1, Section 7, Paragraph 2 of the Constitution, which states, in part, "If any Bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law...." The Supreme Court upheld Sunday closing laws, recognizing that Sunday has come to have "special significance as a rest day in this country." *McGowan v. Maryland*, 366 U.S. 420, 451 (1961). "People of all religions and people with no religion regard Sunday as a time for family activity, for visiting friends and relatives, for late sleeping, for passive and active entertainments, for dining out, and the like." *Id.* at 451-452. "The cause is irrelevant; the fact exists. It would seem unrealistic for enforcement purposes and perhaps detrimental to the general welfare to require a State to choose a common day of rest other than that which most persons would select of their own accord." *Id.*

The Fourth Commandment was also integrated into state statutes. In 1787, Vermont enacted a ten-part law to preserve the Sabbath.[8] In 1791, Massachusetts enacted an eleven-part law.[9] In 1792, Virginia enacted an extensive eight-part law, which was written by Thomas Jefferson and sponsored by James Madison.[10] In 1798, New Jersey enacted a twenty-one-part

---

[8] *See* An Act for the Due Observation of the Sabbath (passed March 9, 1787), STATUTES OF THE STATE OF VERMONT (1791) at 155-15.

[9] *See* Of the Observance of the Lord's Day and the Prevention and Punishment of Immorality (passed November 4, 1835), THE REVISED STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS (1836) at 385-386.

[10] *See* An Act for the Effectual Suppression of Vice, and Punishing the Disturbers of Religious Worship, and Sabbath Breakers (passed December 26, 1792), 1 THE REVISED CODE OF THE LAWS OF VIRGINIA (1819) at 554-556; *see also* A DIGEST OF THE LAWS OF VIRGINIA (1823) 453-454; Robert A. Rutland, ed., Bills for a Revised State Code of Laws,

law.[11] In 1799, New Hampshire enacted a fourteen-part law.[12] In 1821, Maine enacted a thirteen-part law.[13]

Finally, the Missouri Supreme Court observed that the state's law that Sundays were excepted from the 10-day period under which the Governor could return a bill contained a recognition "of the Lord's Day as a day exempted by law from all worldly pursuits." *Missouri v. Chicago B. & Q. R. Co.*, 143 S.W. 785, 803 (Mo. 1912). "The framers of the Constitution, then, recognized Sunday as a day to be observed, acting themselves under a law which exacted a compulsory observance of it." *Id.* "If a compulsory observance of the Lord's Day as a day of rest had been deemed inconsistent with the principles contained in the Constitution, can anything be clearer than, as the matter was so plainly and palpably before the Convention, a specific condemnation of the Sunday law would have been engrafted upon it? So far from it, Sunday was recognized as a day of rest." *Id.*

As the Supreme Court acknowledged, America's foundations included an integration of religion into the fabric of the nation. Recognizing that integration, as exemplified by the Original and Foundations displays, does not create an impermissible religious purpose on the part of the School Board.

---

8 THE PAPERS OF JAMES MADISON (Chicago: University of Chicago Press, 1973) at 391-396; Julian P. Boyd, ed., *The Revisal of the Laws*, 1776-1786, 2 THE PAPERS OF THOMAS JEFFERSON (Princeton: Princeton University Press, 1950) at 322.

[11] *See* An Act for Suppressing Vice and Immorality (passed March 16, 1798), LAWS OF THE STATE OF NEW JERSEY (1800) at 329-333.

[12] See An Act for the Better Observation of the Lord's Day, and for Repealing All the Laws Heretofore Made for that Purpose (passed December 24, 1799), reprinted in CONSTITUTION AND LAWS OF THE STATE OF NEW HAMPSHIRE (1805) at 290-293

[13] See An Act Providing for the Due Observation of the Lord's Day, Laws of the State of Maine at 67-71 (1822).

## II. THE HISTORICAL DOCUMENTS DISPLAYS DO NOT VIOLATE THE ESTABLISHMENT CLAUSE BECAUSE THE PURPOSE, HISTORY AND CONTEXT OF THE DISPLAYS DO NOT REFLECT AN ENDORSEMENT OF RELIGION.

The School Board's actions of permitting private parties to display historical documents in Giles County schools cannot, as a matter of law, be viewed as an endorsement of religion. *See*, *County of Allegheny v. ACLU*, 492 U.S. 573, 593-594 (1989). "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Id.* at 594 (citing *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J. concurring)). "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message." *Lynch*, 465 U.S. at 688.[14]

The question is not whether the government has taken an action that advances or inhibits religion. *Id.* at 691-692. Instead, "[w]hat is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." *Id.* at 692. "It is only practices having that effect, whether intentionally or unintentionally, that make religion relevant, in reality or public perception, to status in the political community." *Id.* Utilizing that definition, the Supreme Court found that a tax exemption for religious, educational and charitable organizations, mandatory Sunday closing laws and released time from school for off-campus religious instruction did not constitute impermissible endorsement. *Walz v. Tax*

---

[14] Significantly, while Doe 1 here asserts that he has been made to feel like an outsider, *see* Complaint, ¶23, when Plaintiffs were questioned at deposition it was discovered that it was not the displays that made Doe 1 feel like an outsider, but a release time program of which Doe 2 chose to opt him out that makes him feel alienated. (UMF 86). The Does have not challenged the constitutionality of the release time program. (UMF 87).

*Commission,* 397 U.S. 664 (1970) (tax exemption); *McGowan v. Maryland*, 366 U.S. 420 (1960) (Sunday closing law); *Zorach v. Clauson*, 343 U.S. 306 (1952) (release time).

The endorsement inquiry is based upon the viewpoint of an "objective observer," similar to the reasonable observer in tort law, instead of the perceptions of an individual. *Capitol Square Review and Advisory Bd., v. Pinnette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in judgment). As Justice O'Connor explained: "our Establishment Clause jurisprudence must seek to identify the point at which the government becomes responsible, whether due to favoritism toward or disregard for the evident effect of religious speech, for the injection of religion into the political life of the citizenry." *Id.* That point cannot be merely when an individual perceives favoritism or disregard of religion, because under that standard, a religious display would necessarily be precluded so long as some passersby might perceive a governmental endorsement. *Id.* Instead, "the endorsement test creates a more collective standard to gauge 'the 'objective' meaning of the [government's] statement in the community.'" *Id.* (citing *Lynch*, 465 U.S. 690 (O'CONNOR, J., concurring)). The Court does not ask whether there is anyone or someone who perceives an endorsement of religion. *Id.* Rather, the reasonable observer in the endorsement inquiry represents collective wisdom, and "must be deemed aware of the history and context of the community and forum in which the religious display appears." *Id.* at 780-781.

Applying that standard in the school context, the Supreme Court has found an impermissible religious endorsement when a school district directs religious activity, such as prayer or Bible reading. For example, impermissible religious endorsement is present when the state requires that Bible verses be selected and read over the public address system or in class and that students recite the Lord's Prayer at the beginning of the school day. *School Dist. of*

*Abington Township v. Schempp*, 374 U.S.203, 223 (1963). "These exercises are prescribed as part of the curricular activities of students who are required by law to attend school. They are held in the school buildings under the supervision and with the participation of teachers employed in those schools." *Id.* Therefore, they are unlike the release time activities upheld in *Zorach*, 343 U.S. 306. *Id.*

Reading a prayer over the public address system at school football games also creates impermissible religious endorsement. *Santa Fe*, 530 U.S. at 310. "In this context the members of the listening audience must perceive the pregame message as a public expression of the views of the majority of the student body delivered with the approval of the school administration." *Id.* at 308. "Regardless of the listener's support for, or objection to, the message, an objective Santa Fe High School student will unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval." *Id.* A state law mandating the posting of the Ten Commandments on classroom walls is also impermissible religious endorsement, as it places the state's imprimatur on religious expression. *Stone*, 449 U.S. at 42. The same is true of state laws directing that evolution only be taught in conjunction with creationism, *Edwards,* 482 U.S at 585, or banning the teaching of evolution entirely. *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968).

By contrast, the Supreme Court has held that a school district does not impermissibly endorse religion when, in accordance with a neutral access policy, it permits third parties to use school facilities for displays or activities with a religious theme. *See, e.g., Widmar v. Vincent*, 454 U.S. 263, 272-273 (1981) (finding no impermissible endorsement in making university forum available to religious-based group); *Lamb's Chapel,* 508 U.S., at 394-395 (finding no

impermissible endorsement for a Christian-based film series on family values shown after hours and open to the public).

In *Good News Club*, the Supreme Court found that a school district would not violate the Establishment Clause by permitting a Christian-based after-school enrichment club to hold meetings on elementary school campuses after instructional time. 533 U.S.at 119. "Even if we were to inquire into the minds of schoolchildren in this case, we cannot say the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum." *Id*. at 118. "We decline to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive. *Id.*at 119.

Similarly in *Mergens*, the Supreme Court rejected the proposition that granting a Christian club permission to use school facilities would amount to impermissible religious endorsement. 496 U.S. at 250. "[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Id.* (emphasis in original). "We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Id.* "The proposition that schools do not endorse everything they fail to censor is not complicated." *Id.*

The Fourth Circuit found no impermissible endorsement in a school's neutral access policy that permitted a Bible display. *Peck,* 155 F.3d at 287. "The neutrality of the Board's action is evidenced, not only by its secular purpose of reducing the extent of discrimination

against religious speech, but also by the fact that the Board has affirmed and maintained the distinction between its own speech and the private religious speech that occurs in the school forum by acting affirmatively to discourage any mistaken impression that the private speakers are speaking for the Board or the schools." *Id.* "The Board has neither coerced any student to participate in a religious activity nor impermissibly 'endorsed' religion by allowing, under the circumstances described, the privately sponsored Bible displays for a single day during the year." *Id.*

Likewise, the Fourth Circuit held that granting a Christian after-school enrichment club access to the school's flyer distribution program on an equal basis with similar secular groups would not create an impermissible endorsement of religion. *Child Evangelism Fellowship of Maryland v. Montgomery County Public Schools*, 373 F.3d 589, 601 (4th Circuit 2004). "In sum, requiring students to carry home, among other items, a flyer containing an invitation to participate in a religious activity—an invitation that cannot be accepted absent parental consent—does not coerce religious activity in violation of the Establishment Clause." *Id.*

In this case, the School Board's approval of private parties' posting of historical document displays is the kind of religiously neutral policy that the Supreme Court has found does not create impermissible religious endorsement. The Original Display, consisting of a large copy of the Constitution placed on top of a small copy of the Ten Commandments, was proposed, funded and placed by private citizens seeking to allay community fears about eroding foundational principles following the Columbine shootings in 1999. (UMF 5-9, 25-26). The School Board did not take formal action to approve the Original Display, but informally approved Dr. McCracken's decision to permit the community members to post the display. (UMFs 16, 23). No one associated with the School Board required that students view the display,

including the Ten Commandments portion, nor that they agree with the contents of the display. (UMFs 104-108).

In fact, neither students nor school board members paid much attention to the display. (UMFs ). School Board members did not recall seeing the displays, despite making several trips to the schools. (UMFs 28-29). Despite being aware of the Original Display since 1999, Doe 2 never saw it until 2011, after learning about FFRF's letter in the news. (UMFs 75, 81, 86-94). Doe 1 did not complain nor did he know of anyone who complained about the display, which was like a dusty old trophy in the trophy case. (UMFs 76-78). In fact, Doe 1 was not aware of the contents of the Original Display, in that he believed that the display contained only the Ten Commandments, not the Ten Commandments and the Constitution. (UMFs 88-91). Neither Doe 1 nor Doe 2 was aware that the Ten Commandments were replaced by the Declaration of Independence for a period of time. (UMFs 88-91). Only when the FFRF's letter was featured in the news media did Doe 1 and Doe 2 consider challenging the contents of the display. (UMFs 78-96).

The School Board's 2011 action adopting a resolution that creating a limited public forum by establishing a procedure under which private parties may propose historical document displays, also does not create an endorsement of religion. The School Board did not mandate that certain documents be posted, but merely provided that private parties could post historical document displays in Giles County schools if they follow certain procedures, and if the documents comply with the purpose stated in the preamble of the resolution, *i.e.,* documents that have special historical significance to our community, our county, and our country's history, that have positively contributed to the educational foundations and moral character of students in our schools. (UMF 56). In a statement that Doe 2 agrees with, the School Board explained that: "A

sense of historical context, civic duty and responsibility, and a general appreciation and understanding of the law of this land are all desirable components of the education of the youth of the county." (UMFs 56, 101). One of the documents listed in the non-exhaustive listing of documents that could be included in a display was the Ten Commandments, listed in the Giles County history textbook as inspiring American ideas about government and morality, a statement that Doe 2 agrees with. (UMF 99). Documents described in the resolution were specifically listed in the Virginia SOLs as documents which students should be familiar with and able to explain. (UMFs 59-73). The School Board did not take any further action to dictate the actual contents of the Foundations Display, which was assembled, funded and placed by private parties. (UMFs 56-65).

The objective observer in Giles County, aware of the history of the historical document displays and of the community's social environment, could not perceive an endorsement of religion as was present in the mandates in *Stone* and *Schempp*. Instead, the actions of the School Board reflect a religiously neutral acknowledgment and accommodation of the historical and moral foundations of the county, such as the actions upheld in *Good News Club, Peck, Lamb's Chapel* and *Mergens*. The School Board's actions do not constitute an impermissible endorsement of religion in violation of the second prong of the *Lemon* test. Consequently, the School Board has not violated the Establishment Clause as a matter of law and is entitled to judgment in its favor.

## IV. SINCE THE SCHOOL BOARD CREATED A LIMITED PUBLIC FORUM, THE ESTABLISHMENT CLAUSE IS NOT IMPLICATED.

The School Board is entitled to summary judgment because its limited public forum into which the Original and Foundations displays were posted does not implicate the Establishment Clause merely because it might permit the display of a religiously themed document. Both the

Original Display and Foundations Display were paid for, designed and posted by private parties in a public forum created by the School Board for the presentation of historical, educational and civic displays. At the time that the Original Display was posted, the School Board had long maintained an "open school system going back as far as the use of the building" and as a result had "tons of community things posted in the schools on a regular basis." (UMF 10). In 2011, the School Board formalized the limited public forum when it adopted the resolution that established the parameters and procedure for private displays in the schools. (UMF 56). In its decisions upholding school policies that accommodate private displays or events that happen to include religious themes, the Supreme Court has held that when, as has occurred here, a school district establishes a limited public forum for private speech, there is no Establishment Clause violation when the policies permit religiously themed displays or presentations in public schools. *Mergens,* 496 U.S. at 247-251; *Lamb's Chapel,* 508 U.S. at 401; *Good News Club*, 533 U.S. at 121 (Scalia, J. concurring).

As Justice Scalia said in his concurring opinion in *Good News Club*, "[r]eligious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum, publicly announced and open to all on equal terms." 533 U.S. at 121 (Scalia, J. concurring) (citing *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 770 (1995)). "The same is true of private speech that occurs in a limited public forum, publicly announced, whose boundaries are not drawn to favor religious groups but instead permit a cross-section of uses. In that context, which is this case, 'erroneous conclusions [about endorsement] do not count.'" *Id.* (citing *id.*). Such a limited public forum provides the neutrality toward religion that prevents an Establishment Clause violation. *Id.* at 114. "For the 'guarantee of neutrality is respected, not offended, when the government, following neutral

criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse.'" *Id.* (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995)). Similarly, in *Lamb's Chapel,* Justice Scalia said, "I would hold, simply and clearly, that giving [a private religious group] nondiscriminatory access to school facilities cannot violate [the Establishment Clause] because it does not signify state or local embrace of a particular religious sect." *Lamb's Chapel* 508 U.S. at 401 (Scalia, J., concurring in judgment).

In *Mergens*, the Court rejected a claim that granting a religious club access to a public school forum under a neutral access policy would violate the Establishment Clause. 496 U.S. at 250. The Court pointed out, in a statement that has been widely quoted since, "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Id.* The Court noted that the broad spectrum of speech activities that were permitted and the fact that students were free to initiate and organize additional activities counteracted any possible message of official endorsement of or preference for religion or a particular religious belief. *Id.* at 252.

Similarly, in this case, the School Board has permitted a broad spectrum of speech activities in Giles County Public Schools, and the 2011 resolution specifically provides that:

> Any individual, private group, or organization who wishes to finance the posting of the above listed historical documents may be allowed to do so by making a written request to the Superintendent of the Giles County Schools. The written request shall include the name of the person, individual, or group that wishes to sponsor the historical display at the particular school or schools, and shall contain the name of the school where the documents are requested to be displayed, and shall contain a statement that the person or group agrees to the terms and conditions of this resolution and shall be signed by the person or representative of the sponsor.

Any person, group, or organization that wishes to post any other historical documents at any schools, shall notify the Superintendent of the Giles County Schools in the same manner as is outlined herein above.

(UMFs 10, 56). Consequently, as was true in *Mergens, Lamb's Chapel* and *Good News Club*, there is no danger of endorsement of religion and the Establishment Clause is not implicated in the School Board's actions in approving the Original and Foundations displays, as well as the supplemental documents posted in the last few months. The School Board is entitled to judgment in its favor as a matter of law.

## CONCLUSION

The School Board's approval of private party historical document displays had a secular educational purpose. An objective observer, fully aware of the history and context of the historical documents displays would not perceived endorsement of religion. Consequently, the School Board has not violated the Establishment Clause.

The School Board has created a limited public forum which precedent establishes does not implicate the Establishment Clause. Consequently, the School Board is entitled to judgment as a matter of law.

Dated:  April 11, 2012.

/s/ Richard L. Mast, Jr.
Mary E. McAlister VSB # 76057
Richard L. Mast, Jr. VSB # 80660
Mathew D. Staver*
Stephen M. Crampton*
Liberty Counsel
P.O. Box 11108
Lynchburg, VA 24506
(434) 592-7000 Telephone
(434) 592-7700 Fax
court@lc.org email.
Attorneys for Defendant
*Admitted Pro hac vice

**CERTIFICATE OF SERVICE**


On April 11, 2012, I electronically filed this document through the ECF system, which will send a notice of electronic filing to the following:


Rebecca K. Glenberg
Thomas O. Fitzpatrick
American Civil Liberties Union of Virginia Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
(804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org

Frank M. Feibelman
Cooperating Attorney for the ACLU of Virginia
5206 Markel Rd., Suite 102
Richmond, Virginia 23230
(804) 355-1300
FAX: (804) 355-4684
frank@feibelman.com


Patrick C. Elliott
Freedom From Religion Foundation
304 W. Washington Ave
Madison, Wisconsin 53703
(608) 256-8900
Fax: (608) 204-0422
patrick@ffrf.org


/s/ Richard L. Mast, Jr.
Mary E. McAlister VSB # 76057
Richard L. Mast, Jr. VSB # 80660
Liberty Counsel
P.O. Box 11108
Lynchburg, VA 24506
(434) 592-7000 Telephone
(434) 592-7700 Fax
court@lc.org email.
Attorneys for Defendant