IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION

| | |
|---|---|
| Doe 1 and Doe 2,<br><br>             Plaintiffs,<br><br>vs.<br><br>School Board of Giles County,<br><br>             Defendant. | 7:11-cv-00435 |

PROCEEDINGS HELD BEFORE

THE HONORABLE MICHAEL F. URBANSKI, JUDGE
May 7, 2012
2:05 p.m. to 3:00 p.m.
Roanoke, Virginia
Motion for Summary Judgment

Appearances:
        ACLU of Virginia
        530 East Main Street, Suite 310
        Richmond, Virginia  23219
        BY:  Rebecca Kim Glenberg, Esq.
             Thomas O. Fitzpatrick, Esq.
        804-644-8080
        Counsel on behalf of the plaintiffs

        Liberty Counsel
        1055 Maitland Center Commons
        Maitland, Florida  32751
        BY:  Mathew D. Staver, Esq.
        800-671-1776
           And

REPORTED BY:                    JANELLE A. MUNDY
                                PO Box 8206
                                Roanoke, VA 24014
                                (540) 342-2547

1    APPEARANCES CONT.

2

3

4        Liberty Counsel

5        100 Mountain View Road

6        Lynchburg, VA  24502

7   BY:  Stephen M. Crampton, Esq.

8        Richard L. Mast, Jr., Esq.

9        601-680-3886

10       Counsel on behalf of the defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(May 7, 2012, 2:05 p.m.)

P R O C E D D I N G S

THE COURT:  Good afternoon everyone.
Please call the case.

MR. CLERK:  Doe 1 and Doe 2 vs. School
Board of Giles County, civil action 7:11-cv-00435.

THE COURT:  All right.  Good afternoon,
Ms. Glenberg.  Nice to see you folks again.  All
right.  I appreciate all the papers that you
submitted.  I can assure you that I've read all of
them.  I read all the depositions.  I have looked
at all the document entries including the briefs
that you filed on Friday, Ms. Glenberg.  I looked
through all the documents that you filed on the
record, and I have a very good familiarity with
both the facts and the law.

I have read, if not all, most all of the
cases that you-all cited in your briefs as well.
So I have a number of questions for you all.  It
seems to me Doe 1 and Doe 2 filed summary judgment
first, so I would like for them to argue first, and
you should feel free to argue in your argument to
deal with the motion to strike that was filed by

1    Giles County, and then we'll hear from the folks

2    from Giles County.  Then we'll, like I said, I do

3    have many, many questions that I would like to talk

4    to you about today, but we'll take it up there.  We

5    want to make sure that everybody has a full chance

6    to argue your position.  So with that, Ms.

7    Glenberg.

8            MS. GLENBERG:  Your Honor, no federal

9    court has upheld a display of the Ten Commandments

10   in a public school.  Courts are particularly

11   vigilant in monitoring compliance with the

12   Establishment Clause in elementary and secondary

13   schools.  Indeed in the VanOrden case both

14   (inaudible) and Justice Breyer's opinion were

15   careful to distinguish that case from the school

16   context.

17           The Court has said more than once that the

18   Ten Commandments in the Bible may be

19   constitutionally integrated into the curriculum.

20   But this is not that case and this is not the case

21   that should be the first to uphold the Ten

22   Commandments on the law of a public school because

23   the purpose is religious, the effect is religious,

24   the display is government not private speech and

25   the display is not integrated into the curriculum.

1      THE COURT: A large part of the argument

2 that Giles County makes in this case is that it is

3 secular, it's tied to the SOLS in the curriculum.

4 In fact, they have a long affidavit from the

5 superintendent with lots of attachments. They have

6 cited some examples in which a reference to the Ten

7 Commandments appears in a textbook or maybe two

8 textbooks. Which leads to the question, if the Ten

9 Commandments are in a textbook in the Giles County

10 that's used in the Giles County public schools,

11 therefore, it is to that extent part of the

12 curriculum. Why can it not be posted on a school

13 wall along with a host of other documents?

14      MS. GLENBERG: Well, Your Honor, I think

15 that that begs the question: What does it mean to

16 integrate the Ten Commandments within the

17 curriculum?

18      THE COURT: Certainly the Ten Commandments

19 are not mentioned in the SOLS, that much is clear.

20 I think maybe in one of the world history SOLS

21 there is a reference to the spread of Judaism but

22 the Ten Commandments are not mentioned in the

23 economics, civics, the government SOLS. So the

24 question is: If it can be in a textbook and there

25 is a reference to it in a textbook, why can't it be

on the wall?

      MS. GLENBERG:  There are several reasons. First of all, to integrate does not mean simply to take this element and put them in the same place and just post them.  It means to create a comprehensive whole out of this element and the display fails to do that because it fails to draw any connection between the Ten Commandments, a religious ancient document, and these other documents that were all European or American in origin and secular.

      Furthermore, the page that we are talking about from the one textbook in which is labeled Roots of Democracy, it contains a representation of the Ten Commandments, not the Ten Commandments, themselves, and it also has a number of --

      THE COURT:  Is there a difference between a representation of the Ten Commandments and the Ten Commandments, themselves?

      MS. GLENBERG:  Your Honor, I think that there might be just because in referencing the Ten Commandments, and having a picture of it in the textbook, the textbook is not telling the students what the Ten Commandments are, just that it's a document.

1         THE COURT: But there is a textbook that

2  has the Ten Commandments set out in it, is there

3  not?

4         MS. GLENBERG: There is; that's a world

5  history text.

6         THE COURT: It is.

7         MS. GLENBERG: I would argue not relevant

8  on the question of whether in this display the Ten

9  Commandments is properly integrated.

10        THE COURT: You're saying it's okay to

11  talk about it in connection with world history but

12  not as a foundational document of the United States

13  or our Government?

14        MS. GLENBERG: Well, I think it's

15  appropriate in the world history class because it's

16  talking about the development of a civilization and

17  what principles were important. Whereas, first of

18  all, I would like to make clear that I'm not

19  conceding that the textbook, itself, is okay.

20        THE COURT: I was going to ask you that

21  but go ahead.

22        MS. GLENBERG: Whereas, in both the

23  textbook and display, there is no explanation for

24  how the Ten Commandments or the principles in it

25  are relevant.

1        THE COURT:  Why wouldn't it be okay in a

2   world history textbook?  I think in the Stone

3   opinion they specifically talk about the -- even in

4   Stone they say, you know, we're not going to

5   prohibit the teaching of the Bible or the Ten

6   Commandments under all circumstances.

7        MS. GLENBERG:  Oh, I agree with you as to

8   the world history textbook, Your Honor.  What I

9   find is not okay is where the American history page

10  would be from the Roots of Democracy.  Again, I

11  said this in our brief, but we object to the

12  inclusion of all those world history texts which we

13  did not get until we got the brief.

14       THE COURT:  Well, okay, you object to some

15  things and they object to some things, but I will

16  sort that out.  But go ahead.

17       MS. GLENBERG:  The question is whether the

18  facts of these elements as represented in the

19  textbook means that it's okay to post them on the

20  wall.  There are several problems with the

21  proposition that you just transfer the things in

22  the textbook onto the wall.  First of all, that

23  isn't actually what happened here because the Roots

24  of Democracy display talks about enlightenment

25  thinkers and their influence.  It talks about

Greco-Roman history and its influence.

THE COURT:  That's the <u>Roots of Democracy</u> from the page in the textbook.

MS. GLENBERG:  Yes, and that is the only example from the curriculum or the Standards of Learning that they have of the Ten Commandments being mentioned in connection with American history.

So it's just -- it's odd that the SOLS mention a variety of influences on American inspired and American government and exclude the Ten Commandments.  It's odd --

THE COURT:  Well, they don't exclude it, it's just not there.  They don't say these are the foundations of American government and the Ten Commandments are not foundations of American government.  It's just not listed in any American government or civics SOLS.  It's just not there.

MS. GLENBERG:  It's not there and my point is, I think the list is comprehensive and it's not there.  So just as it's odd to claim that this is tied to the SOLS when the display does not have anything related to Montesquieu or Black or the Roman or Athenian democracy.  It's odd that they would claim this textbook page as their link to the

1    curriculum without any representation of those

2    other major influences on American thought.

3            THE COURT:  It's also odd to me that the

4    reference, the explanation accompanying the Ten

5    Commandments, in this case, provide the moral

6    background for the Declaration of Independence and

7    the foundation of our tradition.  It's odd to me

8    that that, as in this case, that position was

9    abandoned by the counties in McCreary.  The

10   McCreary court decided by the Supreme Court, at

11   footnote 21, the county abandoned their claim that

12   the Ten Commandments provided the moral background

13   for the Declaration of Independence, yet they're

14   asserting that in this case.

15           MS. GLENBERG:  They are asserting that.

16   In fact, the entire display is reflective of the

17   McCreary display which the Supreme Court --

18           THE COURT:  The third McCreary display.

19           MS. GLENBERG:  Correct, Your Honor.

20           THE COURT:  Do you think the fourth

21   display in this case, and I'm going to call it

22   Pastor Wilburn's display, the one that was put up

23   in January of 2012.  Do you think that display is

24   more troubling from a religious perspective than

25   the display that was approved on June 7, 2011,

because it presents more of a Christian viewpoint
than the one that was approved on June 7, 2011?

MS. GLENBERG:  Yeah, I think that's a
difficult question to answer because it does have
more documents that consistently display the
Christian viewpoint.  At the same time it doesn't
have a document like the Ten Commandments that is
expressly a religious document.

THE COURT:  The explanation of Thomas
Jefferson's view in Pastor Wilburn's 2012 display
presents a particular viewpoint about Thomas
Jefferson, yet fails to mention that he had his own
Bible in which he excerpted parts, parts that he
didn't like.  There is no reference to the
Jefferson Bible in there.  But yet it tends to
present a particular viewpoint that Jefferson
really didn't believe in separation of church and
state.

Do you think that under Rosenburger that
is impermissible viewpoint discrimination that the
2012 display and the viewpoint that's presented
about Jefferson?

MS. GLENBERG:  Well, I don't know that I
can say that it's viewpoint discrimination unless
someone tried to present and alternate view and was

rejected. I think that because the school board
has the ultimate and unlimited authority to decide
which historical documents are included, that the
potential for viewpoint discrimination is certainly
there and that's all that's required to say that
something is not a public forum. A public forum
must have clear standards and unlimited discretion.

THE COURT: Do you think it's appropriate
for the school board of Giles County to approve
willy-nilly whatever Pastor Wilburn wants to put on
the walls of Giles County?

In 2012 he proposes 18 documents that are
edited by counsel for the defendants in this case,
and they go up on the wall; no discussion, just put
up there. Do you think that's exercising their
constitutional obligation to support and defend the
Constitution by putting up on the wall whatever
Pastor Wilburn wants?

MS. GLENBERG: I think that they are
abandoning that obligation by putting up a set of
documents that have as their common thread this
Christian viewpoint and displays a document that
has this viewpoint about Thomas Jefferson that's
intended to justify the endorsement of religion by
the school.

1          I think that it certainly contributes to

2     the idea that improper purpose that Pastor Wilburn

3     donated the first display, they put it up without a

4     problem, he donated the last display, they put it

5     up without a problem.  I don't know if that by

6     itself is an abandonment of their constitutional

7     obligation.

8          THE COURT:  It's just a question.  Like I

9     said, I have lots of questions.  But I want to get

10     back to the other question, because I led you down

11     a path.  I don't want you to loose the train of

12     your argument.  You were talking about integration

13     with curriculum.  Their argument is that this

14     display in this public school is okay under Stone

15     and under McCreary and under Lemon because it's

16     integrated with the curriculum, and I asked you the

17     question about, look, it's in the textbook and

18     therefore why is it any different.  You were, I

19     think you were there before I asked you some other

20     questions.  So I think that's an important point.

21          MS. GLENBERG:  Yes.  So first there were a

22     couple of observations about the process of

23     translation, if you will, between that book and the

24     display.  One of them being the omission of other

25     significant influences on American thought.  The

other --

THE COURT: Athenian Democracy,
Greco-Roman history and that kind of stuff.

MS. GLENBERG: If it's the case that the
school board can simply take what's written in the
textbook and plant it on the wall, that textbook on
that same page also talks about the influence of
the teaching of Jesus on American government.
Again, with no explanation as to what that
influence is. But the suggestion, I think it would
follow, that they could have included, instead of
the Ten Commandments, a cross. Or, they could have
put up a display of a picture of Jesus along with
Patrick Henry and Washington and Jefferson and
Madison. I think that that highlights the way in
which putting something on the wall endorses it in
a way that the textbook, at least my explanation,
does not.

THE COURT: Do you think it's different
putting it on the wall of the hallway of the school
versus on the wall of a classroom?

MS. GLENBERG: I do not think that's
different.

THE COURT: You don't think there is any
difference there. But you do think there is a

difference in terms of endorsement between putting

it on the wall of the school and just having it as

mentioned in a textbook?

MS. GLENBERG:  Yes.  Again, Your Honor, I

do want to make clear that I'm not conceding the

propriety of that page in the textbook.  Again, I

don't know that the integration there where there

is no explanation of why the Ten Commandments are

the teachings of Jesus are relevant to American

thought.

Here is where a textbook is different from

the wall.  When a teacher is teaching from a

textbook, a teacher can provide that context and

make clear that the Ten Commandments are being

mentioned in context, explain what the relevance is

of the Ten Commandments and insure that it's taught

in a neutral fashion so there is not any mistake

about whether the school is endorsing the Ten

Commandments, itself.

Whereas as on the wall, it's devoid of

that context.  Furthermore, Stone I think

explicitly draws a distinction between the

curriculum and the wall and the quote is:  This is

not a case in which the Ten Commandments are

integrated into the school curriculum or the Bible

1  being constitutionally to use in an inappropriate

2  study of history, civilization, ethics, comparative

3  religion or the like.  Posting a religious text on

4  the wall serves no such educational function.

5        I think that is significant because

6  posting documents on the wall without a teacher to

7  provide the context, without an explanation, except

8  for the one that was sort of poked fun of by the

9  Supreme Court and abandoned by McCreary, the

10  message that it sends is, we, the school think

11  these are important documents.

12        THE COURT:  Well, are there any

13  circumstances in which the posting of the Ten

14  Commandments in a public school would be

15  constitutionally permissible?

16        MS. GLENBERG:  I think that the context

17  would have to be absolutely clear.  So, perhaps, if

18  the Ten Commandments were posted and a display that

19  says significant developments in the history of

20  religion and provided a number of documents from a

21  number of religions and said here is the

22  significance of each one.  Or, if the Ten

23  Commandments have some relationship to the

24  Constitution or the Declaration of Independence,

25  which we don't see.  If that influence were made

explicit along with all of those other influences
deemed significant by the SOLS and the title was
Significant Influences on American Thought and
there is an arrow from the Ten Commandments to
whatever document it influenced, say, the Ten
Commandments was significant to the thought behind
this document because.  What was significant to the
Declaration of Independence.

THE COURT:  Would you find it
unconstitutional if the school board posted the
page from the textbook called the Roots of
Democracy textbook?

MS. GLENBERG:  I would for two reasons.

THE COURT:  The textbook adds some of the
things you are saying as missing.  It adds Athenian
Democracy, Greco-Roman influences.  It adds some
other influences.  What is wrong with that page, if
they put that page up there?

MS. GLENBERG:  It doesn't explain why the
Ten Commandments or Christian thought is
significant to American history.  That's why I
question the page as a whole.

THE COURT:  There have been a number of
courts following McCreary which have allowed the
foundations display to be posted and have held

1    those to be constitutional.  Foundations display

2    similar to the display approved by the school board

3    on June 7, 2011.

4         Now, none of those cases, Mercer, and the

5    others, none of those cases involve public schools.

6    They involve other public buildings, courthouses,

7    principally courthouses.  Why should the Court

8    recognize a distinction there between a public

9    school and a public building, such as a courthouse,

10   or in the case of VanOrden the Texas state house

11   grounds that was decided the same day as McCreary.

12   There is language in McCreary that talks about,

13   look, the same display are not to be held

14   unconstitutional by one court and constitutional by

15   another.  Generally without more, the language is,

16   without more it should be the same.  So the

17   question is:  Why are public schools different, if

18   you believe they are?

19        MS. GLENBERG:  The difference is -- there

20   are several differences.  There is the

21   impressionability of children and the likelihood

22   that they will perceive a document on the wall as

23   an endorsement of that document.  There is the

24   degree of influence that a school has over its

25   students that make students both feel they should

adopt the positions of the school and that they

shouldn't complain about them.  There is the fact

that --

THE COURT:  Could Giles County name its

mascot, its football team, the fighting

commandments and put little things on their

football helmets?

MS. GLENBERG:  I don't think so.  I think

that would be a pretty explicit endorsement of

religion.

THE COURT:  If this happened in the Giles

County courthouse instead of the Giles County

public schools, same history, but it's in the

courthouse instead if the public schools, would you

view there to be a difference of constitutional

dimension here?

MS. GLENBERG:  I think that it would be a

harder case but still --

THE COURT:  A harder case for you?

MS. GLENBERG:  Yes, exactly.  Because the

history is significant.  The fact that we started

with a display of the Ten Commandments with only

the Constitution.  That's one reason.  Another

reason is if you include the expressed perceptions

of the community and the history of that was all

the same, too, I think that adds a great deal of evidence that the effect is religious. Finally --

THE COURT: The second prong.

MS. GLENBERG: Yes.

THE COURT: Effect/endorsement.

MS. GLENBERG: Effect/endorsement. I think that's also relevant as to the purpose but especially as to the effect. If that evidence were still in place, then I think that would show a religious effect.

THE COURT: So you think even if this had happened in the circuit court for Giles County that you believe it would be also unconstitutional, the same instrument?

MS. GLENBERG: I do and for one additional reason, as well. Because, again, in McCreary the court in looking at the almost identical display said that there was no coherent theme, that it would be baffling to a reasonable observer, that a reasonable observer would throw up their hands and conclude that this was just a way to continue posting the Ten Commandments.

THE COURT: But the Court in Mercer allowed it after that.

MS. GLENBERG: I think --

1          THE COURT:  It was the same display.

2          MS. GLENBERG:  I think that there are

3    several distinguishing factors in Mercer besides

4    the public school context.  First of all, I think

5    that Mercer and Grayson were incorrectly decided in

6    light of that very clear language from the Supreme

7    Court, which they basically ignored.  Interestingly

8    there is dissent in Mercer that says that exact

9    same thing.  Five judges said that, look, the panel

10   just ignored the clear language and ignored what

11   the Supreme Court had to say about the meaning or

12   lack thereof of these displays.  So that's one

13   thing.

14          But as to distinguishing Mercer and

15   Grayson, in addition to the public school context

16   there is the expressed absence of any history like

17   we have here where we start with the

18   unconstitutional display and I can get into that

19   also.

20          THE COURT:  Why do you think that the --

21   Giles County argues a lot that this case is

22   distinguishable from McCreary because McCreary

23   started with a stand alone display just the Ten

24   Commandments.  This case is distinguishable because

25   there was always another document with the Ten

Commandments.  For example, in this case for a
number of years there was the Constitution.  So
does that make a difference?

MS. GLENBERG:  It does not, Your Honor,
because I would argue that although that certainly
makes this display different --

THE COURT:  Well, Mercer said whatever is
left of Stone is limited to circumstances involving
public displays of the Ten Commandments in
isolation.  That's what the panel said in Mercer.
So is it okay to put the Ten Commandments up?  If
it's not okay to put the Ten Commandments up on the
wall of a school by, itself, that's clear.  Stone
says you can't do it.  So putting it up with the
Constitution, does that change the calculus?

MS. GLENBERG:  The answer is that it does
not change the calculus for several reasons.  One,
as the Court said in McCreary, Stone stressed the
importance of integrating the commandments into
secular scheme.  And, if as I argued, the revised
display didn't do that, this display certainly
doesn't.  There is no reference to any part of the
curriculum.  There is no expression of any kind of
theme or any reason for putting these two documents
together.  So the addition of the Constitution does

1    not in anyway obviate the religious purpose or

2    effect.

3              THE COURT:  What about the -- I think it

4    was the Seventh Circuit in Ashbook that talks

5    about, and I may have my circuits mixed up because

6    it's one of those states, Indiana, but what about

7    the fact that in that case the court actually had

8    some trouble.  In fact, great trouble with the fact

9    that the Ten Commandments were put up.  It was in

10   Judge DeWeese's courtroom.  He had on one side of

11   the wall the Bill of Rights and on the other wall

12   he had the Ten Commandments.  They said, look, you

13   can't do it because it's equating and sort of

14   giving more -- it's building up the Ten

15   Commandments because it's equated to the Bill of

16   Rights.  It's putting an equipoise and therefore

17   it's a bigger constitutional problem or at least as

18   significant a constitutional problem as putting it

19   by itself.  There is that argument as well, is

20   there not?

21             MS. GLENBERG:  Absolutely, Your Honor.

22   And not only in that Ashbrook case but also the

23   O'Bannon case that was the one out of Indiana but

24   it involved --

25             THE COURT:  O'Bannon was a monument case.

1        MS. GLENBERG:  But it made the same point

2   about a monument that had on one face the Ten

3   Commandments and other face was a secular document.

4        THE COURT:  But I think Books v. Elkhart

5   has the same issue.  That was an eagle on the

6   monument.  So it's O'Bannon and Ashbook.

7        MS. GLENBERG:  Both of them made that same

8   point, that putting the two in equipoise, as you

9   say, puts them on a par with each other and

10  suggests that religion is linked to our government.

11  Suggests that that link is a good thing.  Suggests

12  that the government holds both these documents in

13  equal importance and in the same way.  So, yes,

14  that is certainly another problem with the original

15  display.

16       The other problem is, Stone said that the

17  other statement about the effect is anything it

18  would be to read and revere and venerate the Ten

19  Commandments.  How does adding the Constitution

20  change that?  It adds another document that can be

21  read, revered and venerated and that's a

22  permissible objective with respect to the

23  Constitution.  It is not with respect to the Ten

24  Commandments.  I don't know how adding the

25  Constitution makes that calculus any different as

to how students are going to react to seeing the
Ten Commandments.  If anything, they are going to
read and perhaps take on those calculuses,
themselves.

THE COURT:  Under Learner you, as the
plaintiff, have the burden to demonstrate that the
display is unconstitutional, right?

MS. GLENBERG:  Yes, Your Honor.

THE COURT:  Now, as to prong one, what is
your burden?  Must you show that there is no
secular purpose or do you have to show that the
purpose is predominately religious or are they
pretty much the same thing?

MS. GLENBERG:  I think they are not the
same thing.  I think that prior to McCreary, at
least, there was this notion that any secular
purpose would do.  But McCreary made it clear that
the religious purpose could not predominate over
the secular purpose.  If the religious purpose
predominates, then that's still unconstitutional.

THE COURT:  Don't we have to give some
deference to the board's resolution in this case?
Do we have to give some deference to the fact that
the purpose for the June 7th display is as they say
it is?

1          MS. GLENBERG:  Well, several things about

2     that, Your Honor.  First of all, yes, a certain

3     degree of deference is always appropriate to a

4     state of legislative purpose.

5          However, in this case, first of all, the

6     purpose as stated in the resolution is somewhat

7     mixed.  It states that these are important

8     documents in our history and have educational

9     value.  It also says we are interested in

10    implicating moral values and instilling desirable

11    qualities in our students.

12         THE COURT:  There is that.

13         MS. GLENBERG:  Additionally, then you add

14    into the history which was so dispositive in

15    McCreary and in this case we have not the identical

16    history, I acknowledge, but something very similar

17    where we start with the unconstitutional display

18    where the display is removed because of fear of

19    litigation and the school board then finds

20    something to replace it.  I think if you add to

21    that and the fact that it's very clear that the

22    school board was reacting to a context in which

23    people were vigorously expressing religious

24    objections to the removal of the Ten Commandments,

25    I think that adds to the demonstration of purpose.

I think that in addition to that --

THE COURT: Is there anything in the record, and I am going to ask Mr. Staver this, too, to which you can glean a secular purpose from the board's vote on January 20, 2011, where the motion was to rehang the Ten Commandments and where the community who was there was thanked for their support of the Ten Commandments? Is there anything there from which you can glean any secular purpose?

MS. GLENBERG: Are you talking about January 20th?

THE COURT: Yes.

MS. GLENBERG: No, there is no clear secular purpose expressed by any member of the board. The vote came not because it was on the agenda but in direct response to all of these citizens speaking for religious reasons. I think that even if you believed that the original purpose for hanging that original display was secular, which I don't believe, but if you believe that, nonetheless, the rehanging of the Ten Commandments was taken with no evidence of a secular purpose.

THE COURT: All right. Let me ask you this question then and this is where I see the issue in this case and that is in the history,

because <u>McCreary</u> says you've got to look at
history.  You've got to consider whether it's a
shame or whether or not it's a true secular
purpose.

In this case we have four displays.  We
have the 1999 to December 2010, Pastor Wilburn and
the Ten Commandments and the display he put up and
the Constitution.  That's in all the Giles County
schools.  It comes down.  Superintendant Arbogast
takes it down, advises the board.  The board takes
no action in December.  January 20th, it's not on
the agenda and there's a public outcry and the
minutes reflect nothing but religious reasons for
putting the Ten Commandments back up.  There is no
mention of SOLS, no mention of curriculum, no
nothing, and they vote to rehang the Ten
Commandments.  Okay.

If you assume from that, that the Court
finds that there is a predominately religious
purpose to the vote to rehang the Ten Commandments
on January 20th, does that mean that from thence
forward as the events rolled out in the spring and
the Bobby Lilly display is put on the wall later on
June 7th, does that mean that that display is
tainted as well?  Is there a change of a

constitutionally significant event that took place?

And, you know, it's a tough question because McCreary, itself, says -- so the question is: Let's assume for the sake of argument that the Court finds that what happened before December the hanging of the Ten Commandments and the Constitution has no secular purpose, and I'm not saying how I'm going to rule this case but let's just assume for the sake of argument, and then the vote on January 20th the evidence is there is no secular purpose. What about what happens after that?

If all you have was the evidence beginning on February 15th when Bobby Lilly first comes to the board, and you exclude everything that goes before that, is this display constitutional? In other words, if Bobby Lilly comes up and the very first time starts talking about SOLS and curriculum and that's in the board minutes, does that raise any constitutional concern? And can the Court in this case parcel it into two separate events or is it all so much together that I can't do that?

MS. GLENBERG: First of all, I think it's one big sequence of events. And I think that the record is clear that it was because the original

1    display was taken down that this new display was

2    considered and approved.

3          THE COURT: In fact, the Bobby Lilly

4    display was first discussed a week before the Ten

5    Commandments display was taken down. The vote was

6    to take it down. Bobby Lilly first approached the

7    board on February 15th and the board met on

8    February 22nd and voted to take it down, right?

9          MS. GLENBERG: That's correct; although,

10    it was before it was taken down, it was after the

11    public controversy had erupted over the first

12    removal of the Ten Commandments and Bobby Lilly

13    said, you know, I've been following these

14    discussions, I am interested in this controversy,

15    so I have come up with this proposal. And after

16    the display was taken down, the original display

17    was taken down permanently that's when you get the

18    support for Bobby Lilly's proposal.

19          THE COURT: But if we just had the

20    foundations display posting in the public school

21    with these other historical documents, and you

22    don't have the history that goes before, given

23    Mercer and these other cases, would that display be

24    constitutional?

25          MS. GLENBERG: Well in your hypothetical,

Your Honor, is there the degree of public

expression as to the perception of the purpose that

we have here?  In other words, when Bobby Lilly --

THE COURT:  You exclude that everything

that happens before February 15, 2011, and you go

forward.  Is that constitutional or not?

MS. GLENBERG:  It's not, Your Honor

because --

THE COURT:  Why?  Mercer said it would be.

MS. GLENBERG:  Again, I disagree with

Mercer and it's distinguishable.

THE COURT:  That's a courthouse not a

school.

MS. GLENBERG:  Yes.  And it upheld that

display despite the clear language of the Supreme

Court about how that display made no sense

whatsoever.

THE COURT:  So you think Mercer and

Grayson County were wrong?

MS. GLENBERG:  I think they were wrong and

distinguishable.  Additionally --

THE COURT:  I want to know what the

constitutional problem with the foundations display

is, if you have no history before February 15th.

MS. GLENBERG:  The problem is that the Ten

Commandments sticks out like a sore thumb because there is no plausible explanation for its inclusion in this display.

THE COURT:  Well, you would agree that the Mercer Court and Grayson Court don't agree with you on that.

MS. GLENBERG:  I certainly agree with that.  And certainly, if you take the Mercer and Grayson Court at their word, then without the history it's a closer question but there is still the school context.  And one other piece of evidence that I neglected to mention, as to the content of the display, is that in the text of the Ten Commandments, itself, we don't just have the Ten Commandments but there is a little sort of blurb at the end which says:  According to ancient scripture the Hebrews were kept out of Egypt by the Pharaoh and made to wander through the desert in search of the promised land.  God spoke to the prophet Moses on Mount Sinai, the Egyptian desert, where he ordered Moses to take His commandments to His people so they could live according to his wishes.

These laws form the basis of modern religion.  The modern religion of Judaism and

1    Christianity.

2         THE COURT:  What's your problem with that?

3         MS. GLENBERG:  My problem with that is

4    that it states and assumes as true and endorses a

5    particular reading of the Bible and it has nothing

6    to do with the founding of the United States.

7         THE COURT:  All right.  Let me ask you

8    this question:  So your position is even if the

9    history before February 15th didn't exist, this

10   display, the foundations display with the history

11   that started with Bobby Lilly, is unconstitutional.

12   That's your view because it sticks out like a sore

13   thumb, it's in a school, and you don't like the

14   language at the bottom.  Is that fair?

15        MS. GLENBERG:  That's fair.

16        THE COURT:  Now, let me ask you this:

17   There is no dispute, although, Giles wants to

18   exclude evidence of purpose from deposition

19   testimony, things like that.  Later on, Giles wants

20   the Court to consider what Pastor Wilburn says the

21   purpose was and what Mr. McCracken said the purpose

22   was back to 1999 when these display were put up.

23   So they are a little talking out of both sides

24   their mouth, but we'll get to that in a minute.

25        Let's accept Pastor Wilburn at his word

1   and let's accept Mr. McCracken at his word; and

2   that is, the reason why we put up the Ten

3   Commandments is because of Columbine and because of

4   the shootings in Columbine we didn't want that to

5   happen in Giles County.  Now, given Pastor

6   Wilburn's concern in 1999 over the Columbine

7   shootings, would the posting of just the last six

8   commandments reflect a secular purpose and be

9   constitutional?

10         MS. GLENBERG:  Well, it's harder and

11   closer, but I think it would still be

12   unconstitutional because what you're posting is not

13   just the direction people shouldn't kill and

14   shouldn't steal.

15         THE COURT:  Nothing about God in thou

16   shalt not kill and steal and honor thy father and

17   mother and the last six deal with -- it's the first

18   four that mentions God.

19         MS. GLENBERG:  It is the first four that

20   mention God.

21         THE COURT:  The first four is where your

22   big problem is.

23         MS. GLENBERG:  Yes.

24         THE COURT:  Right.

25         MS. GLENBERG:  I would say --

1          THE COURT:  What if Giles County today

2     decided to avoid all of this mess and just say from

3     the Ten Commandments posted the last six?  Wouldn't

4     that eliminate all this turmoil, because, I mean,

5     there is nothing wrong with putting something on a

6     school wall saying thou shalt not kill, is there?

7          MS. GLENBERG:  The thou shalt not --

8          THE COURT:  We don't want kids killing.

9          MS. GLENBERG:  But the thou shalt not

10    implies the direction from the Devine being.

11    That's why I say don't kill is fine.  Thou shalt

12    not kill, which everyone knows is from the Ten

13    Commandments, is not fine.  However, Your Honor, I

14    take your point and I think that obviously it's

15    much more problematic with those first four.

16          THE COURT:  And maybe it was the Supreme

17    Court decision that it talked about the Ten

18    Commandments, have talked about the fact that first

19    four and the second six are different.

20          MS. GLENBERG:  Yes, Your Honor.

21          THE COURT:  They do it in this context.

22    There is no secular basis or moral code for the

23    first four.  It's the Divinity of God and

24    recognition of God.  It's the second six where you

25    want Kindergartners to see thou shalt not kill,

don't lie, don't steal, honor your mom and dad;
those kinds of things.  I just wonder, really, in
this room if there is some common ground on the
second six.  If Giles County decided to change
their display a little bit, we could resolve this
matter without --  I understand the ACLU has a
point of view and Mr. Staver and Liberty Counsel
have a point of view, but Giles County has an
obligation to the citizens of Giles County.  If you
win this case, you're going to ask for hundreds of
thousands of dollars in attorneys fees, right?

            MS. GLENBERG:  I would think so, Your
Honor.

            THE COURT:  Right.  The Court has the
discretion to award it.  So why wouldn't it make
sense if, indeed, the issue is not about God; if,
indeed, the issue is secular and historical; and,
indeed, the issue is about preventing shootings
like Columbine, why wouldn't it make sense for
Giles County to say let's go back and we'll just
post the bottom six.  These are excerpted from the
Ten Commandments.  And won't that go a long way
toward settling this huge community dispute and
resolving the uproar, if it's not really about God?
But if it's really about God, then they wouldn't be

1       willing to do that.  Go ahead.

2               MS. GLENBERG:  Well, Your Honor, I'll

3       agree that that's a compromise and one, of course,

4       I would go back to my clients with.

5               THE COURT:  I'm not asking that you make

6       that decision today.  I have been reading all these

7       cases.  There are a million Ten Commandments cases

8       out there, and you've got a point of view and

9       Liberty Counsel has a point of view, but I'm not

10      sure that point of view is in the best interest of

11      Giles County and its citizens.  That's not a

12      decision for the Court to make.  I can just decide

13      a case that's presented to me constitutional or

14      not.  I think the folks who are on the two sides of

15      this case ought to think about whether or not there

16      is a reasonable way to eliminate the risk that

17      Giles County is going to get tagged with a huge

18      attorneys fee and think about resolving this case.

19              All right.  I have a few other questions.

20      Now, is the display as it existed on June 7, 2011,

21      or now as it exists, a limited public forum?

22              MS. GLENBERG:  No, it's not, Your Honor.

23      And the reason for that is -- there are several

24      reasons.  First of all, in a limited public forum,

25      the government does not decide what the first group

1    of documents is going to be in the forum.  They

2    don't say we are having a limited public forum and

3    it's going to consist of these documents and that's

4    what the resolution expressly says that the display

5    will initially include, shall include, additionally

6    the following document, shall include a brief

7    explanatory document.

8         THE COURT:  In those cases where the

9    government holds the ability to say yea or nay and

10   where the government doesn't set out any criteria,

11   it just, I mean, right now it's in the unfettered

12   discretion of Giles County school board as to what

13   goes on the wall.  Is that a square peg in the

14   round hole of the limited public forum cases?  All

15   those cases came up in the context of free

16   expression but the Establishment Clause has

17   (inaudible) as well.

18        MS. GLENBERG:  Yes, Your Honor.  And Your

19   Honor, an unfettered discretion is inconsistent

20   with either a traditional public forum or a limited

21   public forum.  The Supreme Court made it clear in

22   cases like the Forsyth Nazi case that you can't

23   have unfettered discretion over public forum.  The

24   Fourth Circuit has said we used the same rules in a

25   limited public forum as to discretion.

So, yes, it's inconsistent for the school
board to hold that authority and call it a limited
public forum.

THE COURT:  Does a <u>Lemon Test</u> in the
holding of <u>McCreary</u> allow me to find that the
purpose changed after February 15, 2011 and that a
display as to which the original purpose was
religious and therefore unconstitutional can later
become secular and constitutional based on the
evidence in this case?

MS. GLENBERG:  Not based on the evidence
in this case, Your Honor.  I would say that given
<u>McCreary's</u> language that perhaps the taint doesn't
last forever.  There are cases where you might find
a later display to be constitutional.  The history
is close enough in <u>McCreary</u> that it shows the
religious purpose.

THE COURT:  In <u>McCreary</u> there were
comments made by the judge executor, there was a
pastor and there was a ceremony at the beginning of
<u>McCreary</u>.  That's different from this case.

MS. GLENBERG:  It's different.  Those are
not elements that the court strongly relied on in
<u>McCreary</u>.  The court also did not say this is the
minimum amount of history that you need.

1           Did you have more questions, Your Honor?

2           THE COURT:  I think you've exhausted my

3     questions.

4           MS. GLENBERG:  Then there are a few things

5     that I would just like to touch on.  I think we

6     talked pretty comprehensively about purpose, but I

7     think it's important not to neglect the effect/

8     endorsement prong.  Many of the pieces of evidence

9     that we talked about overlap as to purpose and

10    effect.  The reasonable observer would observe all

11    of this history and observe the lack of a secular

12    purpose of the original display and the fact that

13    this new display simply was intended to replace the

14    old one.  They would observe the lack of a cohesive

15    message in the display as a whole.

16           But in addition, the effect prong or

17    endorsement prong is where the evidence about the

18    community's responsive controversy really comes to

19    the floor.  The speakers at the board meeting on

20    January 20th, they were expressing their perception

21    of what that original display meant.  The people

22    who were wearing Ten Commandment T-shirts to the

23    May 19th meeting where Bob Lilly presented his

24    documents were expressing what they thought that

25    display was about.

1   The letters to the editor in which the

2 vast majority of writers appear to view the

3 controversy in a religious light, whether they

4 supported it this way or not is, again, a direct

5 expression, direct evidence, of how this community

6 views the display.  Same with the lawn signs and

7 car magnets, with additional people that Pastor

8 Creger said joined his church as a result of this

9 controversy.

10   All the evidence is that the community

11 perceived this as an endorsement of religion.  All

12 of those pieces of evidence, the comments of the

13 speakers, T-shirts, lawn signs, etcetera, not only

14 are direct evidence of the perception of the

15 community, they also circle back and contribute to

16 the perception of the community.  So that

17 reasonable observer who didn't write a letter to

18 the editor is observing all of these lawn signs,

19 and observing the letters to the editor, and

20 observing, at least, of a walkout at Giles high

21 school and the subsequent rally.  The evidence as

22 to effect, I would argue, is overwhelming.

23   I also wanted to make sure I address a few

24 other issues as to the public forum.  One of the

25 things that has been claimed is that the school has

1    always had a public forum and it was just more

2    closely defined by this resolution.  As I said, I

3    don't think the resolution, itself, creates a

4    public forum.  I also don't think there was any

5    forum to begin with.  The evidence that's relied on

6    for the forum is that Doctor McCraken, the former

7    superintendent, said quote:  Tons of community

8    things are posted in the schools on a regular

9    basis.

10          That statement just is not evidence of the

11   existence of a public forum.  Because in order to

12   analyze a forum, you need to know what the

13   parameters are.  What parts of the school are the

14   forum.  What topics is it limited to.  And most

15   importantly, do people have to go through some sort

16   of review before posting the documents and does

17   that review consist of neutral criteria.

18          So just saying tons of community things

19   are posted at the school on a regular basis, is

20   perfectly consistent with there being no public

21   forum where the principal or the superintendent has

22   complete discretion to decide what things will be

23   posted and what will not.

24          THE COURT:  So you would, based on what

25   you're telling me, if Giles County decided they

1    wanted to move this Ten Commandments over to

2    another display that says history of world

3    religions, you wouldn't have any problem with that

4    and had some references to other world religions?

5         MS. GLENBERG:  As long as the context was

6    clear.  As long as it was clear that we are looking

7    at the Ten Commandments as its role in this larger

8    picture.

9         THE COURT:  Even though it was on the

10    wall?

11         MS. GLENBERG:  Yes, I think even though it

12    was on the wall.

13         THE COURT:  All right.  They can put the

14    Ten Commandments on the wall.  They just have to do

15    it in a different context, is what you're saying?

16         MS. GLENBERG:  Yes, Your Honor, in a

17    context where the purpose of the Ten Commandments

18    is apparent and it's apparent that it's a secular

19    purpose.  So for example, if you put up the Ten

20    Commandments along with Theorem and E equals MC

21    squared, that doesn't change the religious affect

22    of the Ten Commandments.

23         THE COURT:  But if you put it up there

24    with maybe something from Mohammed or something

25    from Confucius or Buddha or something like that,

world religions, they can do that?

MS. GLENBERG:  I think they could do that,
Your Honor.  I would like to see in addition a
disclaimer that the school doesn't endorse any of
the beliefs that are on the wall, but I think they
probably could do that.

THE COURT:  A disclaimer like there was in
the Fourth Circuit Bible case the Peck v. Upshur
case.

MS. GLENBERG:  Precisely, Your Honor, and
that was the other thing I wanted to mention about
public form and the private/public speech.  In all
of those forum cases that were cited, there were
additional indicia of private speech as opposed to
government speech.  None of them involved a
permanent display or activity at the school.  The
clubs were meeting after school hours.  The Bible
distribution had the disclaimer and it was only one
day out of the year.  For all of these factors, it
made it very difficult to view this private
activity as an endorsement of religion.  Where
there is nothing like that in this case that would
say to a person just looking at the display, oh,
that's private speech.  The government isn't
endorsing this thing they put on the wall.

1          THE COURT:  If you put a display that says

2    history of world religions and you have Buddha and

3    all this stuff, would that be an endorsement of

4    religion over non-religion?  Would that be

5    unconstitutional for that reason?

6          MS. GLENBERG:  I think that's why I would

7    be more comfortable with a disclaimer.  I think

8    that it's possible to acknowledge the importance of

9    religion in the history of the world without it

10   being an Establishment Clause problem.

11         Your Honor, I think those are all the

12   points that I wanted to address.

13         THE COURT:  We'll ask Mr. Staver to make

14   his argument and then I'll give you a chance to add

15   anything afterwards.  Mr. Staver, good afternoon.

16         MR. STAVER:  Good afternoon, Your Honor.

17   I was going to have Steve Crampton address any

18   history regarding the evidence before you.  I can

19   go ahead and begin, and if you have any questions

20   regarding the motions to strike he will address

21   those aspects, whatever the Court's pleasure;

22   otherwise, I can go ahead and begin.

23         THE COURT:  I'm flexible.  However you

24   want to do it.

25         MR. STAVER:  I might just say at the very

1    end for him to do that.

2              THE COURT:  That would be fine.

3              MR. STAVER:  Thank you, Your Honor.  This

4    issue is one I think that this Court already

5    recognized specifically driven or specifically

6    controlled by the facts.  While there is no case

7    that deals with the Ten Commandments display in a

8    public school that's been upheld, there has been

9    very few --

10             THE COURT:  Shouldn't we just stop right

11   there.  Shouldn't the Court just say, look, Stone

12   says you can't do it, McCreary and all its progeny

13   are courthouse cases.  Public schools are

14   different, therefore, we should just stop right

15   there.

16             MR. STAVER:  No, Your Honor, because if we

17   take Stone seriously, and certainly we do, it says

18   also that there could be the integration of the Ten

19   Commandments in the curriculum.

20             THE COURT:  Is there any integration of

21   the Ten Commandments prior to the Bobby Lilly

22   discussion on February 15, 2011?  Where is the

23   evidence?

24             MR. STAVER:  The evidence is in both the

25   SOLS as well as the curriculum.

1    THE COURT:  No mention of the SOLS in the

2    minutes.

3    MR. STAVER:  There is not a mention of the

4    Ten Commandments but there is the mention of the

5    Hebrews and history of Judaism and certainly any

6    discussion of Hebrews and the development of

7    Judaism, whether in world religions or world

8    history or other places wouldn't necessarily have

9    to include the Ten Commandments.

10   THE COURT:  Is there any discussion in the

11   board minutes or any discussion in what Pastor

12   Wilburn and Doctor McCraken did before February 15,

13   2011 of SOLS or curriculum in the board's minutes?

14   There isn't any, is there?

15   MR. STAVER:  There is in the January

16   hearing.

17   THE COURT:  January 20th, there is nothing

18   in there about curriculum.

19   MR. STAVER:  There is with Mr. Wilburn.

20   He's not obviously a board member but he brought up

21   the SOLS and curriculum that go back all the way to

22   the original display.  Since he was part of that

23   discussion with former Superintendent McCracken in

24   the January 15th hearing where the vote was to put

25   the --

THE COURT:  January 20th hearing.

MR. STAVER:  The vote to put the display back up there's a discussion about midway down where there is a Shahn Wilburn, about midway in that page, where he's discussing the original display and that he and McCracken discuss the SOLS in the curriculum.  So it's part of that record that it was before this.

THE COURT:  I don't see it.  I've looked.  Maybe I missed it.  He talks about calling the Department of Education.

MR. STAVER:  It -- he's talking about the Department of Education.

THE COURT:  Right, I see that.  It was the guidelines from the Virginia Department of Education and the attorney general.  I don't see any reference to SOLS or curriculum.

MR. STAVER:  Well, calling the Department of Education, if you go back to McCracken, is one of the things that McCracken -- and by the way, as it relates to Wilburn, the Court mentioned that at one time you want to exclude some testimony and at another time you want to rely upon Wilburn.  We're not relying upon Wilburn, we're relying upon McCracken.  He was the only one, since there was no

1    board resolution or no board vote back in 1999.  He

2    put it up himself after consultation with a number

3    of people, Wilburn being one, but also he went to

4    the Virginia Department of Education.  He looked at

5    the Virginia attorney general opinion, and he also

6    was looking at the development of the SOLS that

7    were in the process.

8          THE COURT:  Nothing in this board minutes

9    before February 15th about the SOLS or curriculum.

10   You just have to admit it because it's not there.

11         MR. STAVER:  Not in the board minutes

12   because the only board action regarding that

13   original display was the January 20th display.

14         THE COURT:  At which the board voted to

15   rehang the Ten Commandments and the board member

16   said I want to thank the community for supporting

17   the Ten Commandments.  Isn't that an endorsement of

18   religion?

19         MR. STAVER:  No, it's not, Your Honor.

20   Because, you know, in this discussion that we just

21   looked at with regards to Wilburn, he harkens back

22   to what happened when McCracken originally put them

23   up.  That there was discussion with the attorney

24   general and the Department of Education.  At this

25   point in time what we have, is we have an 11-year

1    history from 1999 to December of 2010 with

2    absolutely no controversy.

3            THE COURT:  You're right about that.

4            MR. STAVER:  Doe 1 knows about those Ten

5    Commandments and the Constitution which the

6    Constitution was much larger, the Ten Commandments

7    was below it, and much smaller than the

8    Constitution and doesn't complain to anyone; no

9    friends, not to the parents or to the school.

10           Doe 2, the parent, knows about them going

11   all the way back to 1999-2000.  Doesn't complain at

12   all and everything was going on with virtually no

13   one even knowing they exist.  Some of the board

14   members don't --

15           THE COURT:  That doesn't matter.  That

16   doesn't change just because nobody complained.

17           MR. STAVER:  I think it goes back to that

18   VanOrden.  We don't know what the timeframe is that

19   VanOrden mentions.

20           THE COURT:  VanOrden is not a public

21   school.  VanOrden is a monument built on the Texas

22   state house grounds along with a bunch of other

23   monuments.  It also says this is donated by the

24   Eagles.  It doesn't say I've got the stamp of the

25   government on this.  I've got Giles County school

board putting its stamp on the Ten Commandments.

Isn't that an endorsement on religion?

MR. STAVER:  No, Your Honor, because they are not putting their stamp of approval on the Ten Commandments.

THE COURT:  They're not?  When a board member at a public meeting says:  I want to thank you all for supporting the Ten Commandments.  That's not an endorsement of religion?

MR. STAVER:  The deposition testimony doesn't recall that in the minutes.

THE COURT:  It's in the board minutes.

MR. STAVER:  What the issue was is if they had taken down the Constitution, they'd be voting on putting the Constitution back up.  What happened is after 11 years of controversy --

THE COURT:  No.  Look, here is the issue in this case.  It is clear to me, it is clear to me, that the Ten Commandments as put up with the Constitution violates Stone.  It is clear to me when the board voted there was only one thing on their mind on January 20th and that was God.  That was an endorsement of religion.  That's what all the speakers talked about.

Here is the issue in this case.  Is what

1     happened after that, is what happened after

2     February 15th and the Bobby Lilly display, in the

3     words of the McCreary court, a change of

4     constitutionally significant dimension such that

5     the display that exists there now is

6     constitutional?  That's what I'm really interested

7     in, because I think restrained credibility, to

8     argue, before you got in this case, before

9     February 15th, that this was nothing but an

10    endorsement of religion.  I can't see it otherwise;

11    that is, the board voting to put back up the Ten

12    Commandments in response to an outcry from the

13    community where it was Ten Commandments, Ten

14    Commandments, Ten Commandments.  They voted to put

15    it back up.  I'm struggling to see where that's not

16    an endorsement of religion.

17         Where the real rub in this case is the

18    issue, I think, of, okay, can they change?  Is

19    there something different that's happened?  Is the

20    display that exists now sufficiently different, a

21    constitutionally significant dimension, that it's

22    okay?  That's where you can help me because that's

23    where I'm struggling.

24         MR. STAVER:  I think --

25         THE COURT:  I'm not asking you to

1  discontinue your earlier argument.  I'm just

2  telling you what the Court is thinking.  You can

3  agree to disagree with me at a higher level.

4       MR. STAVER:  The first one is not really

5  challenged anyway.  It's the foundations display

6  that came February 15th and after, that's really

7  what was at issue in the complaint.  So I think

8  it's a fundamental change and fundamentally

9  different than has gone on before.

10       In that particular hearing before the

11  board, there clearly is the discussion about the

12  SOLS.

13       THE COURT:  Starting on February 15th,

14  Bobby Lilly mentions SOLS.  I think SOLS and

15  curriculum are mentioned at every other meeting

16  until the June 7th vote.

17       MR. STAVER:  They are.  Even the chairman

18  of the board, Chair Buckland, mentioned the SOLS,

19  too.

20       THE COURT:  But on June 7th Chair Buckland

21  said I never wavered from my vote on January 20th,

22  which one can infer that he is back to voting for

23  God.

24       MR. STAVER:  Well, I think what we

25  ultimately have here is from February 15th on a

1    significant change in course.

2         THE COURT:  Given McCreary's history, how

3    can I find, you know, Doctor Webb says all these

4    other documents are a smokescreen.  Ms. McMahon

5    says at the 6/7/11 meeting that the battle that you

6    have called and referred to as the Ten Commandments

7    has been won.  Mr. Gollehon testified that I voted

8    that way because it was the right thing to do as a

9    Christian.

10        Given that evidence, how can the Court

11   find that there is a significant change in

12   constitutionally significant dimension?

13        MR. STAVER:  Well, two of those three

14   voted against.  They were part of the three to two

15   dissenters.  Webb, in his deposition, indicating

16   that he had no information from the board's direct

17   information or statements that it was for religious

18   purposes and board member McMahon also dissented as

19   well.  However, what we ultimately have though is

20   from February 15th on is a significant and ongoing

21   discussion regarding the SOLS, regarding the

22   curriculum.  And there was a directive or at least

23   a suggestion by the Chair that it ought to be tied,

24   it would be important to tie these to the SOLS into

25   the curriculum.

1        So Lilly looks at both sides of these

2 things. He says it doesn't seem to be -- and he is

3 doing this on his own -- appropriate that you can

4 never have these kinds of displays. It doesn't

5 seem to be appropriate that you can indoctrinate

6 these kinds of displays. So he harkens back to his

7 own history growing up in Virginia and even going

8 to the schools. Then he talks about the SOLS, and

9 he actually does research with members of the bar

10 and even calls the University of Virginia seeking

11 to connect with one of the constitutional law

12 professors and connects with a librarian there, and

13 researches McCreary and he researches the statute

14 in Georgia and he throws out the "In God We Trust"

15 because he thought that crosses the line.

16        THE COURT: That only applies to

17 courthouses at this moment.

18        MR. STAVER: Correct.

19        THE COURT: There is a proposal to change

20 it to all public buildings.

21        MR. STAVER: Yes, I understand. But he is

22 researching all of this and comes to the conclusion

23 as to why he wants to add this particular display,

24 and he looks at the various curriculum and proposes

25 it. In his display the Declaration of Independence

is central.  That's the central piece.  Then he

looks at things that went on before and after.  So

he looks at the Mayflower Complex, the Magna Carta,

and Ten Commandments that were before and then

after the Statute of Religious Freedom, the

Declaration of Rights, the Bills of Rights,

etcetera, and then the contemporary manifestations

are the Lady Justice, which does harken back to

some of the Greco-Roman and is actually in the

textbooks and then also the Star Spangled Banner,

are some of the principles that are in this

display.  That's what he ultimately comes back with

and ultimately presents those documents, and I

think that's the difficulty there because if you

look at McCreary the history probably would be

rarely repeated because what you have is a stand

alone and then there was a suit.  What McCreary did

is they jumped from the frying pan into the fire.

They went with the second display.  The second

display was specifically excerpted, so only the

religious components of the statement, so instead

of the Declaration of Independence it's only the --

THE COURT:  Isn't the second McCreary

display more like the fourth Pastor Wilburn display

is this case?  Where the Pastor Wilburn display,

1　　the one from 2012, even expressed more of a

2　　viewpoint of separation of church and state, that's

3　　different.  Don't the 2012 displays have much more

4　　of a viewpoint as opposed to some of the things

5　　that were proposed by Bobby Lilly?

6　　　　　　MR. STAVER:  I think the reference

7　　regarding Jefferson in the separation of church and

8　　state presents the issue of Jefferson's view on

9　　separation of church and state.

10　　　　　　THE COURT:  Presents one side of the

11　　issue.  That's Pastor Wilburn and Liberty Counsel's

12　　view of Jefferson's view of separation of church

13　　and state.  For goodness sakes, it's one side.

14　　It's just one side.

15　　　　　　Isn't that more like McCreary, too?

16　　　　　　MR. STAVER:  Yes and no; that display is

17　　not presently challenged is my understanding.

18　　　　　　THE COURT:  The last time you were here

19　　you were telling me this whole thing is evolving.

20　　　　　　MR. STAVER:  The display with the Ten

21　　Commandments in it is at issue before the Court,

22　　and I think that from going through the deposition

23　　testimony there appears to be no objection to

24　　anything other than the one frame which is the Ten

25　　Commandments.

1          THE COURT:  Do you think that Giles County

2     school board should put up on its wall anything

3     that Pastor Wilburn says is okay because he has got

4     a church that has got 600 or 700 members?

5          MR. STAVER:  Certainly not.

6          THE COURT:  Isn't that what happened this

7     year?

8          MR. STAVER:  The record doesn't really

9     reflect a lot of what happened.

10          THE COURT:  You're exactly right.  Pastor

11     Wilburn proposes it, runs it by Liberty Counsel,

12     they make some changes, boom, on the wall of the

13     Giles County public school.  Is that exercising

14     their constitutional obligation?

15          MR. STAVER:  I don't know exactly what the

16     board did in terms of looking at that individually.

17          THE COURT:  Did they do any study?  Did

18     they commission a study to look at the curriculum,

19     to look at the SOLS to see if these particular

20     documents are focused on that?  No.  They just did

21     whatever Pastor Wilburn wanted them to.

22          MR. STAVER:  Well, I don't think the

23     record reflects that, and I think that these

24     particular board members interestingly have been in

25     this position for a very long time.

1          THE COURT:  I know.

2          They have all been there 20 or 30 years.

3          MR. STAVER:  I have never seen a board

4     that has this longevity.  So they have been through

5     all of the SOLS and development of the SOLS and

6     very familiar with the curriculum that's there.

7          THE COURT:  Let me ask you the question

8     again.  It goes back to what I'm particularly

9     focused on and that is this:  Assume for the sake

10    of argument that, I mean, do you believe that a

11    school board today could, without all this history

12    of having the Ten Commandments up and taking them

13    down and the public outcry and all the statements

14    and billboards and signs on tractor trailers and

15    the T-shirts and school walkouts and all that,

16    could a school board say we want to put up a

17    display of historical documents and look to our

18    history teachers and relate this to the curriculum

19    and SOLS and do a study and come up with a

20    framework and that these documents make sense and

21    are tied into the curriculum and put it up there

22    including the Ten Commandments, if it's done the

23    right way as opposed to responding to a religious

24    fervor?  If it's done the right way, do you think

25    it's within the Constitution?

1      MR. STAVER:  Yes, I do, Your Honor,

2   because Stone says it can be and there's not any

3   other decision even in McCreary that reiterates

4   some of that language within Stone.  In this

5   particular case, Doe 2 does not object to the

6   presentation of the same information in the

7   textbooks.  But Doe 2's objection is Doe 2's

8   understanding of the fact that First Amendment

9   cases have not upheld the Ten Commandments on a

10  wall in a school going back to Stone taking it down

11  from the classrooms.

12      Certainly there's no objection by Doe 2 to

13  having it integrated into the curriculum.  If it

14  can be integrated into the curriculum, which Stone

15  and others say it can be, there is no reason why

16  you can't manifest that same assemblage of

17  documents on a wall.

18      THE COURT:  Is there an argument,

19  therefore, that the Ten Commandments, as part of a

20  historical display, can be put up on a school wall

21  but the history of this case just doesn't allow it

22  to happen in this case, because of the way Giles

23  County went about it, frankly, before you got

24  involved in the case because of the January -- I am

25  just concerned the evidence shows that the

January 20th meeting displays no secular purpose.
That's what concerns me.  I don't see it.

So if it's not there, and there's no
secular purpose and if the effect is endorsement,
it fails under Lemon and then we've got what comes
afterwards.

I just wanted -- my point to you is:
There maybe a way to do it but just not under these
facts.  I just wonder that out loud.  I have got to
deal with the facts that are here, and you've got
to deal with the facts that are here, too.

You look at McCreary and you look at
Mercer and you look at McCreary and Grayson County.
One time it's okay; one time it's not.  What's the
difference?  The history; the facts.  I am just
afraid that the history in this case because of the
way the Giles County school board went about it by
voting on January 20th to put it back up displays a
predominantly religious purpose.

MR. STAVER:  I know we will not agree on
this but let me just touch on it a little bit.  On
the face --

THE COURT:  I want you to say whatever you
want to say.  That's a very interesting nuance
issue.

1    MR. STAVER:  I want to address the areas

2  that this Court has questions on so I don't want to

3  take up the Court's time on what the Court doesn't

4  need.

5    On the January 20th hearing board meeting,

6  I understand it has people coming, no question

7  about it.  But that alone can't infer why they did

8  what they did.  The record is silent.  That's

9  Mercer County.  Mercer County said that the record

10  was silent.  There was no information as to why it

11  was put up.  There is no statements in the record.

12  It was just a vote, put it up.  That's goes back to

13  McCreary.

14    THE COURT:  Except for this.  In Mercer

15  County it was a vote to put up the historical

16  display.  On January 20th it was a vote to rehang

17  the Ten Commandments.  That's the difference.  The

18  other thing that's different, and I think it's

19  really significant from January 20th is the

20  statement by the board member that says:  Thank you

21  all for coming and supporting the Ten Commandments.

22    If that isn't an endorsement, then hit me

23  in the head with a two-by-four.

24    MR. STAVER:  I think also that was

25  explained by the board member in the deposition

1    because so many people --

2            THE COURT:  What the board member said is,

3    it was Drema McMahon, said in her deposition, I

4    think the word thrilled was used.  I can't imagine

5    the other members of the board -- she said I don't

6    really remember it because it was while ago, but I

7    can't imagine the other members using the word

8    thrilled.  I may have said historical documents.  I

9    may have said Ten Commandments but the minutes say

10   Ten Commandments.

11           MR. STAVER:  That's correct; the minutes

12   say that but under her oath it doesn't say that.

13           THE COURT:  She says she doesn't remember.

14           MR. STAVER:  That's correct; but she also

15   says that when there's a lot of people that show

16   up, she and other board members appreciate the fact

17   they are taking an interest in whatever the issue

18   is.  When they came to that hearing they didn't

19   know what was going on.  They wondered why all

20   these trucks were outside there.

21           THE COURT:  If the board on January 20th

22   had done this, instead of voting to rehang the Ten

23   Commandments, if they had said, golly, this is a

24   really touch issue.  We need to study this, get

25   with counsel.  We'll let you know.  Then the very

1   next thing that happens is Bobby Lilly and the

2   foundations display.  It's a different case.

3          MR. STAVER:  I think it certainly

4   representative of a different set of facts, but I

5   don't think that that difference is significant

6   enough to make what happened and then Bobby Lilly

7   from February 15th on a completely unconstitutional

8   situation.

9          If you go back to McCreary, McCreary says

10  specifically there maybe times, I'm going back to

11  January 20th and Mercer, although a different

12  display, but McCreary said that there maybe times

13  where people, board members, legislatures, actually

14  don't reveal what's on their mind and just the mere

15  silence can ultimately impact.  That was actually

16  the situation in Mercer.

17         If you look over at McCreary, the

18  significant difference was that second display and

19  that second display was completely different than

20  Wilburn's 2012 display.  The reason that it was

21  completely different is that it had a resolution

22  along with all the excerpts.  The resolution spoke

23  about Prince Jesus or King Jesus or something like

24  that.

25         THE COURT:  Prince of Ethics.

1          MR. STAVER:  Prince of Ethics and it

2     mentioned Jesus Christ.  That was part of the Bible

3     and part of an excerpt in Abraham Lincoln's speech,

4     the Declaration of Independence.  Everything was

5     excerpted and only the religious quotes were there,

6     and then you have this long resolution about Jesus

7     being the Prince of Ethics.

8          There is no way that that is anywhere

9     similar to the January 20th meeting here.  It's

10     significantly different.  It was indisputable based

11     upon the face of the documents, itself.  Without

12     even psychoanalyzing what was going on in the minds

13     and the reason why they voted one way or another.

14          THE COURT:  Well, the Court says you can't

15     psychoanalyze.  We can certainly look at their

16     testimony from the framework of the reasonable

17     observer, correct?

18          MR. STAVER:  Correct.

19          THE COURT:  When the reasonable observer

20     at the June 7th meeting hears Drema McMahon say the

21     battle has been won -- the battle of the Ten

22     Commandments is done and it has won.  Doesn't the

23     reasonable observer think this is all about posting

24     the Ten Commandments and not about historical

25     documents?

1        MR. STAVER:  I don't think so.  The

2    reasonable observer would know she was in the

3    opposition.

4        THE COURT:  Even though she's in the

5    opposition she is saying this is about the Ten

6    Commandments.

7        MR. STAVER:  The opposition can't

8    ultimately destroy the purpose of the legislative

9    intent or the history of the text because otherwise

10   opposition can always do that.

11       THE COURT:  When Mr. Gollehon says I voted

12   for this on June 7th, because I'm a Christian and

13   it was the right thing to do.  Mr. Buckland says, I

14   didn't change my mind from January 20th.  I never

15   wavered, were his words in his deposition or maybe

16   in the minutes.

17       So, again, given those statements on

18   June 7th, is what happened in between of

19   constitutionally significant change?

20       MR. STAVER:  I think it is because the

21   resolution specifically indicates what this

22   particular display is about and that resolution

23   also specifically allows other individuals from the

24   community to come forward and finance privately the

25   display they were voting on or put in other

displays that have historical significance.

      THE COURT:  Do you view this display as it exists on June 7, 2011, do you view it as being principally secular and historical?

      MR. STAVER:  Yes.

      THE COURT:  If so, why wouldn't it be appropriate for part of the Ten Commandments to have just the last six commandments there? Wouldn't it be perfectly reasonable if it's secular and historical and this dispute is not about God, why not let Giles County post the second six and resolve this matter?

      MR. STAVER:  I think Giles County could and certainly think it would make it an easier case, but I don't believe that's required to make it constitutional.  The reason is you have the same display held up by other places but it's not predominately reasonable for my argument.

      THE COURT:  That's really about God, isn't it?  That's why.  You don't want to take the top four out because this is all about God.

      MR. STAVER:  I am saying that Giles County can certainly do that and it's another fact that would have to be considered.  On the other hand, the Magna Carta mentions God and no one

complained --

THE COURT:  But the Magna Cara doesn't say there shall be no God before me.

MR. STAVER:  It does mention God.

THE COURT:  There are lots of historical documents that mention God but not one that says you shall have no God before me and what the first four say, and I guess my question is this:  You understand that if you loose this case that the ACLU is going to file a petition for attorneys fees that's going to be in the hundreds of thousands of dollars, and they are going to be asking Giles County to pay for it, right?

MR. STAVER:  Correct.

THE COURT:  Why wouldn't it make sense for Giles County to sit down with you folks and see if there is a way to resolve this by posting the secular parts of the Ten Commandments, the bottom six, if it's not really about God?

MR. STAVER:  Certainly I am not opposed to that.  That's not a discussion that has come up before.

THE COURT:  It's going to come up today.

MR. STAVER:  I understand.  It already has.  I am sure we'll get together.

1          THE COURT:  I'm going to order it.

2          MR. STAVER:  Then we will get together and

3     discuss.

4          THE COURT:  It just occurred to me that

5     your argument is about, for example, Pastor Wilburn

6     says I put it up there in 1999 because of

7     Columbine.  Nobody wants a Columbine.  I mean, it's

8     a terrible thing.  Nobody wants kids to kill each

9     other.  If it's really about the commandment of

10     thou shalt not kill, take the first four out and

11     put it up on the wall.  ACLU shouldn't have a

12     problem with it, you should be happy with it, Giles

13     County saves potentially hundreds of thousands of

14     dollars in legal fees.  I just wonder if that isn't

15     a reasonable compromise.

16          I know, Mr. Staver, that both you and Ms.

17     Glenberg both have your own viewpoints.  Liberty

18     Counsel advocates a viewpoint.  ACLU advocates a

19     viewpoints.  I am not sure those two viewpoints are

20     necessarily what the Giles County school board

21     ought to be focusing on.  That's for them to

22     decide.  So I think I have said that to you and to

23     her.

24          At the close of today's session, I am

25     going to enter an order directing you-all to go to

mediation with the magistrate judge. I'm going to
ask him to come down and sit down in a room with
you and see if there might be a possible way to
resolve this. I do believe in today's economic
climate with school boards as taxed as they are
were dollars and dollars, that the large attorneys
fee award, and I understand that. I think it was
Mr. Buckland, at the June 7th meeting, you know, I
know what happened at the June 7th meeting, Charlie
Henderson, who is a big supporter of Giles County
public schools says, I'm backing you physically,
spiritually and financially and some of the members
of the school board said we are taking you to the
bank. We are voting for this.

Every case, lawyers and their parties,
ought to think about whether there's a way to
resolve it, short of taking it to the mat. If you
want to take it to the mat with me, that's my job.
The Fourth Circuit that's their job. The Supreme
Court that's their job. I'm saying I would like
you-all to sit down and have a conversation.

MR. STAVER: Sure. We will certainly do
that, and I think probably this would be something
that we would address at mediation is whether or
not the school were agreeable, what they would face

1    for doing that in attorneys fees.

2          THE COURT:  No, no.  I agree with you;

3    that's the tradeoff.

4          MR. STAVER:  Okay, very good.

5          THE COURT:  Let me ask you -- I've got

6    some other questions that I would like to ask you

7    about with regard to this case, but I also don't

8    want to interrupt your argument.

9          One of the things that I was thinking

10    about when I was thinking about this case and the

11    history that happened here.  I asked you could it

12    be done differently.  If the Giles County school

13    board said let's not vote, let's think about it and

14    do something differently.  That would be a

15    different case.

16          But really and truly, given the fact we

17    are dealing with children, can, given what Stone

18    has said, given what they said in VanOrden about

19    schools being different and all those cases talking

20    about schools, is there ever a circumstance that

21    the Ten Commandments can be put up in a public

22    school?  Ms. Glenberg said, yeah, in a display with

23    world history.  I take it you would take issue with

24    that saying it's perfectly acceptable in the

25    context in which it's presently shown.

1          MR. STAVER:  I think it could be displayed

2     in a context with world religion.  I don't think

3     that that, itself, would be a violation of religion

4     over non-religion depending upon how it was done.

5     It could if you did it one way and wouldn't if you

6     did it in a neutral and broad perspective way.

7          But I also think that in the context of

8     law, the government or American history or world

9     history, it can also be displayed as well.  I think

10    if it can be taught in the curriculum, which it

11    can, we know that the Supreme Court has

12    acknowledged and stated that it can.  Even in the

13    Bible as a whole could be as well.  Then it makes

14    no logical sense that you couldn't have an

15    objective display also as manifested on the wall

16    that reflects some of or all of the teachings

17    within that school textbook curriculum from a

18    historical standpoint.

19         When we look at the Ten Commandments, it

20    has had a significant influence on the government

21    and law.  It has obviously created a system of what

22    has been known as ethical monotheism where instead

23    you have multiple Gods waring against each other,

24    you have order that comes out of a monotheistic

25    ethical reactions that you have ethics that come

1    out of the fact that there are not Gods waring

2    against each other and you're just a pawn in the

3    system.

4          Throughout history it has had a

5    significant influence.  It is the very first

6    document in The Book of Dooms published as the very

7    first compilation of common law in world history.

8    It starts off with the Ten Commandments and from

9    there it goes to common law.  The Book of Dooms is

10   the first time it's ever been compiled.  The reason

11   is because of the influence that it had.

12         THE COURT:  The Supreme Court didn't buy

13   that argument in McCreary.  You don't even have the

14   14th Amendment in here and you have the Ten

15   Commandments and these other documents.

16         You tried that argument in McCreary and it

17   didn't work.

18         MR. STAVER:  But McCreary is, I think,

19   focused more on the unique history of McCreary.

20         THE COURT:  Isn't the specific unique

21   history of this case much more like McCreary than

22   Mercer or Grayson County?

23         MR. STAVER:  No, because I recall in

24   Grayson, if I remember, certainly it was the pastor

25   who ultimately made the presentation.  I'm trying

to recall in Grayson whether or not it started as a
stand alone brief and then it went to the larger
and then Mercer just --

THE COURT:  I believe that's right.  I
believe Mercer was simply the foundations display.
I think in McCreary, no, Grayson it was stand
alone, it was taken down, and then they put a
foundations display after McCreary was decided.

MR. STAVER:  That's right.  Then the
person who presented it to the board was a minister
and there was an attempt by the attorneys in the
case to argue that was significant and the Sixth
Circuit rejected that.  So I think we are more like
Grayson, if anything.  We are certainly not like --
when you have three different kinds of parameters,
and they are really on two different extremes and
there is one that's more different.  You've got
McCreary with a stand alone and the second display,
and they really focused on that second display
because that was significant in its overtness.  You
couldn't help but see what was happening in that
second display and the resolution confirmed any
suspicion, if for some reason you didn't see it.

THE COURT:  The resolution was withdrawn.

MR. STAVER:  The resolution was withdrawn

up on appeal. But one of the arguments for the
first time, in fact, the resolution wasn't even
really talked about until the actual argument and
then at that point in time, I think it was in a
brief that was raised, so it had never been
withdrawn. So at the time of oral argument it
hadn't been withdrawn. Subsequent it was
withdrawn. But it was sort of like the Santa Fe
case. Santa Fe had multiple or different
iterations of the football game prayer, but they
had one policy that ultimately empowered the
speaker and that original policy and speaker was
only going to speak about praying. So when they
changed it and it was the same people from the
original policy, it was really no difference.
McCreary is very similar to that.

Then you have on the other hand Mercer
County where it just begins as the foundations
display and no comments and then you have Grayson
begins with a stand alone and then it's presented
by a minister and that's upheld just like Mercer.

THE COURT: You know, Stone, take no Ten
Commandments in public schools, then no reading of
the Bible or the Lord's prayer. You've got Santa
Fe with the football game. You've got Lee v.

1    _Weisman_, even to the extent that was a prayer by a

2    Rabbi at a middle school graduation, no

3    nonsectarian prayer.  You've got _Epperson_, you've

4    got _Kitzmiller_, you've _Johnson vs. Poway,_ the

5    teacher in California putting things on his

6    bulletin board.  You've _Edwards v. Aguillard_, the

7    Louisiana Creationism Act.  You've got the

8    _Washegesic_ case.

9            All of those cases are Established Clause

10   violations against schools.  Can you give me one in

11   which a federal court said it's okay for the

12   Establishment Clause to agree with you?  Can you

13   give me one case in which a federal court said it's

14   okay to put the Ten Commandments up in a public

15   school?

16           MR. STAVER:  I think you go back to _Stone_

17   and _Stone_ says it can be integrated and _McCreary_

18   cites _Stone_ that it can be integrated into the

19   curriculum.

20           THE COURT:  _Stone_ says putting it on the

21   wall violates the Constitution.

22           MR. STAVER:  But it wasn't integrated in

23   that case.

24           THE COURT:  You are asking me, as the

25   first federal court, to find posting of the Ten

1    Commandments on a school wall is constitutional?

2    Because I haven't found one that says it is.

3         MR. STAVER:  There is no case that has

4    dealt with upholding the Ten Commandments in a

5    public school.  The ones that I know of would be

6    Stone but Stone says it could be integrated into

7    the curriculum and McCreary cites Stone and

8    reiterates that same aspect of it.  And then there

9    is the Harlan County school board case, which also

10   looked at purpose.  It had the same singular second

11   display and the foundations display that McCreary

12   and Pulaski have.  That went up and ultimately was

13   dismissed later for lack of standing.

14        THE COURT:  Last time we had this

15   discussion it was denied in that case and came back

16   down and was mooted.

17        MR. STAVER:  I think it was GVR, but

18   definitely they didn't take the case and then it

19   came back down along with McCreary and Pulaski.  It

20   went through the courts, McCreary and Pulaski went

21   back up with essentially the same history.

22        THE COURT:  McCreary and Pulaski were

23   courthouse cases and Harlan County was a school

24   case.

25        MR. STAVER:  Yeah, and Harlan County was

dismissed.

THE COURT: You're asking me for the very first time to declare that the posting of the Ten Commandments in a public school does not violate the Establishment Clause?

MR. STAVER: Under the circumstances of this case, yes.

THE COURT: Tell me why up think this Court should reach that conclusion.

MR. STAVER: There are a couple of different reasons. First, we talked a little bit about -- I have never seen any other case or heard of any other case where it has an integration curriculum like this. So I think we have a classic iteration of Stone.

THE COURT: Is this integration in the curriculum or is this in Dr. Webb's words a smokescreen?

MR. STAVER: Doctor Webb also said he had no proof. That was just his own personal view, and he was one of the dissenters of it, but I don't think that carries a lot of weight with regards to intent.

THE COURT: Isn't the recognition of a smokescreen doesn't that make some sense given the

history of January 20th?

MR. STAVER:  Well, you know, someone might say that like Mr. Webb, and I'm not going to take issue with him.  I don't think he is very strong on that position in his deposition or has any evidence that that, in fact, is a smokescreen.  He has never gotten any information from his fellow board members and these board members get along very well, and they communicate all the time.  They have been with each other for many, many years.  He knows this so he doesn't have any information that suggests there is really a smokescreen.

THE COURT:  There was actually a surprising lack of communication between the board members on this issue before the vote, at least from the depositions.

I want to read all the depositions.  I like to do that generally.  There was a lack of communication between them but that's not surprising before the January 20th meeting.

MR. STAVER:  They didn't know what was going on.  I think it's integrated into the curriculum in a unique way.

I know, Your Honor, you were asking that question back in the fall of last year about

1    whether this was integrated in the curriculum.  I

2    think the evidence shows it's integrated in

3    multiple different ways; world history, American

4    government.  In fact, it's the American government

5    book that one should know about and was recently

6    taught.  So it's in that book.  We know about those

7    through previous instructions of other children and

8    so forth.  So I think it's integrated in a unique

9    way.

10            This is a manifestation of those

11    particular documents that are taught in the

12    curriculum.  And Doe 2 specifically says that Doe 2

13    would agree with the statements in the textbook

14    actually even reciting the textbook quotes, and

15    said I agree with that.  But the only reason why

16    Doe 2 opposes this is because in Doe 2's mind there

17    is no First Amendment case that has allowed this in

18    a school on a wall.

19            Other than the actual concepts of it, Doe

20    2 doesn't have any objections to it.  The other

21    thing that's different is we do a forum in this

22    particular case.  I know --

23            THE COURT:  How can there be a forum if

24    the school board just says we are going to approve

25    it, and they don't establish any criteria and they

have unfettered discretion?  How can it be a

limited public forum?

MR. STAVER:  I don't think they have

unfettered discretion and whether they do or not is

not before the Court.  It would have to be a

challenge if somebody were wanting to come there,

post it, they're denied, and then they have an

unfettered discretion challenge.  We don't have

that.

It could be explained more but certainly

what they have is that the documents have to be

historical and relevant to history.  So there

review is fairly limited but it is a review so that

it is consistent with the limited purpose of the

forum.

They can create a limited forum, and they

did and that forum is for historical documents and

there's no problem with creating a limited forum.

THE COURT:  Is there a case that you can

cite me that involves a limited public forum

involving putting documents on a wall as opposed to

-- the limited forum cases are a Christian group

that wants to show movies after school hours about

family values.  That was the Lamb's Chapel case, I

think.  And then there is the one, The Good News

Club.  I think you were involved in that case.  It
was about a Christian group that says we want to
have a Christian group after school just like they
have another group.  The school said, no, there is
an Establishment Clause problem there and the court
said, look, free expression.  People have the
Access Act.  You can't exclude them simply because
they are religious.  What about the school board --
in all those cases and even the Upshur case, where
they handed out Bibles, in all those cases the
school board took pains to say we are not putting
our stamp of approval on this.  We are not going to
sanction the content of any particular club.

          But here they are putting their stamp of
approval.  They are posting it on the wall of the
Giles County public school.  Isn't that a deference
with these limited public forum cases?

          MR. STAVER:  Well, there is not a case
that I'm aware that has a limited public forum on a
wall in a school.

          THE COURT:  So you are asking me to do
that for the first time, too?

          MR. STAVER:  There always has to be a
first time, that's correct.  Even in the public
forum cases, we've litigated a number of them and

they are the first of their kind in the country.
Because all of these are different configurations
of facts in public forums like, for example, The
Goods News Club in 2001.  The question is whether
or not that's just for access to a space and courts
have flushed that out and said, no, it's not just a
space and facility but also the time of the meeting
as well.  You can't have everyone meeting at a
certain time and then have you meet much later in
the evening.

There is also access to announcements, in
terms of getting information out.  That was after
the 2001 cases.  That's also equal access.  I think
there are a lot of different iterations that came
out of that, and I think this is an iteration that
has come out of the Ten Commandments.  The Ten
Commandments litigation historically other than
Stone, between Stone and I think there is a 1970
case or so, there is only a couple of Ten
Commandment cases ever decided before 1999 and if
you look at the chart of them --

THE COURT:  Is that all because of Judge
Moore?

MR. STAVER:  No, he came after that.

THE COURT:  When you look at the cases,

did you start all of these?

        MR. STAVER:  No, I didn't start them.  If
you go back and look at the original lawsuits, most
of those were started or filed by the ACLU.

        THE COURT:  A lot of the cases seem to
start around 1999.

        MR. STAVER:  1999 was the first case.
That's when, I think, 2000, 2001 is when we were
first contacted and they had already started.  Then
in 2005 they hit a peak and then they sort of
tapper off again.  There are different iterations
that have happened over the time frame.  So this is
one of those iterations.

        When you put all of this together and
while there is not this Court precedent that says
you can do exactly what you're doing, there is a
lot of other court general precedent that says this
is, in fact, permissible.  The curriculum and the
public forum is another.

        So in the public forum analysis, what they
have done is they've actually posted a resolution
so if anybody wonders whether they are going by and
they're seeing 29 frames, and I think 27 pictures
of former graduates of the school that are right
next to it but there are 29 of these frames now.

1     So if somebody goes by and says I wonder if this

2     has got the school's stamp of approval how can I be

3     involved in it, there is a resolution that actually

4     tells you how to do it.  And, in fact, there are a

5     few who might even do it after this case dies down.

6     So it is open for anyone and the only criteria is

7     fairly a limited one; that is, it has to be

8     historic.

9          THE COURT:  And subject to the board's

10    approval.

11         MR. STAVER:  Right.  But then equal access

12    is subject to the approval process as well.  That

13    it be limited to equal access for organizations

14    that are providing a benefit for some kind of open

15    access to the students.  And so if you don't meet

16    that criteria, if you are having a Tupperware party

17    or Amway meeting, the school or government can say,

18    no.  In this particular case they limited it to a

19    limited topic and that is the topic of historical

20    documents.  The reason is that based upon the

21    history of February 15th on, that the SOLS and

22    teaching history are important, and they want to

23    make sure they are integrated in.

24         Now, with regards to the 29 documents that

25    are there, or the 29 different frames, all of those

1    at one point or another are somewhat into this

2    curriculum.  So they have a connection to what is

3    actually being taught in the public school.

4          THE COURT:  Don't you think the

5    explanation of the Jefferson documents flies in the

6    face of the 14th Amendment of the United States

7    Constitution, where it talks about the states can

8    do whatever they want with religion?  That's what

9    the import of the Pastor Wilburn Liberty Counsel's

10   spin on Jefferson is the states can do whatever

11   they want with religion.  The 14th Amendment

12   prohibits that.

13         MR. STAVER:  I understand.

14         THE COURT:  It's a viewpoint on separation

15   of church and state that is inconsistent with the

16   Constitution.  How can Giles County have put that

17   on the wall?

18         MR. STAVER:  It's not inconsistent with

19   Jefferson, himself.

20         THE COURT:  It's not inconsistent with

21   that little piece of Jefferson that you-all chose

22   to focus on.

23         MR. STAVER:  I agree that there could be

24   other information or maybe that could even be --

25         THE COURT:  There is no discussion of

Jefferson staying up late at night with his razor
cutting out the parts about the Bible, about the
miracles and virgin birth and all that stuff, he
didn't believe in.  He didn't believe in all of
that.  He wrote that book The Moral Teachings of
Jesus Christ where it's actually called the
Jefferson Bible.  There is no mention of that in
there.

        MR. STAVER:  I understand but even --

        THE COURT:  My bigger problem is the 14th
Amendment.

        MR. STAVER:  I understand that the 14th
Amendment obviously incorporates whatever was
applicable to the federal government is applicable
also to the states.  There is no question about
that.  You certainly are not going to get any
argument from me on that.

        THE COURT:  I'm not going there.  It just
occurred to me, what about the 14th Amendment.

        MR. STAVER:  I think and maybe it could be
rewarded but I'm not necessarily arguing one way or
another on it but what I'm saying is as it relates
to --

        THE COURT:  It just strikes me as
providing in a limited public forum a particular

1   viewpoint.

2           MR. STAVER:  That is certainly not

3   something that we want as a school to do.

4           THE COURT:  That's what I was wondering.

5   That's the whole point of my question:  Why would

6   the Giles County school board just allow Pastor

7   Wilburn and Liberty Counsel to do whatever they

8   wanted because it expresses a viewpoint that is not

9   necessarily consistent with either history or the

10  law?

11          MR. STAVER:  Well, you know, I don't want

12  to say that's a Liberty Counsel display.

13          THE COURT:  Well, Mr. Mast, the discovery

14  of this case is Pastor Wilburn sent it to Liberty

15  Counsel, he substantially edited it, sent it back

16  and it was on the wall without discussion.

17          MR. STAVER:  I don't know how much of it

18  was done but it didn't originate with Mast.

19          THE COURT:  No, it didn't.

20          MR. STAVER:  I understand but it didn't

21  originate there.

22          At any rate, my point, though, is that

23  what we have are the limited public forum documents

24  and this Court is very familiar with all of those.

25  What we have here is a limited public forum; that

is, so there's two things that really set this case

apart, I believe, are the integration to the

curriculum which there is no other case that I know

of that is anything like this and also the limited

forum for historical documents.

THE COURT:  Let's play devil's advocate

for a minute.  There is no integration in the

curriculum before January 20th, none whatsoever.

Let's just say for the sake of argument

that I view a limited public forum as a square peg

in a round hole.

Does the Court after McCreary have the

power, the ability to parcel the history and say,

look, Giles County you did it wrong before this but

after February 15th you got it right or is it too

mixed up?

MR. STAVER:  Yes, the Court can parcel.

THE COURT:  That's a factual finding.

MR. STAVER:  Yes, but I think the Court

can definitely parcel.  As it relates to the forum,

square round peg and so forth, at least it also

goes towards adding to the secular purpose.  In

addition to the multiplicity of documents, in

addition to the integration, the school board

provided opportunities for others that are not like

this.  So at least it goes as another notch towards
a secular purpose.

I think this Court can parcel <u>McCreary</u>,
itself, says that the court can parcel.  Even in
that particular case where that significant
religious display that's the second with the
resolution, the court was very clear to say that
they were issuing their order on that preliminary
phase on the purpose prong and that they did not
say, by doing so, that this would forever taint
future displays.

THE COURT:  But how can I parcel it, just
for the sake of argument, when Bobby Lilly proposes
his display while the Ten Commandments is still up
with the Constitution and it wasn't until a week
later that they vote to take it down.  The history
is so intertwined it's kind of hard to parcel,
isn't it?

MR. STAVER:  No; certainly it could be
clearer, but I think it's very clear that what
Bobby Lilly proposed and, in fact, what this
Court -- what the board -- we don't have any
indication of the legislative votes.

THE COURT:  We do have what the minutes
say and Drema McMahon says the Ten Commandments

have won.  So how is it any different from
January 20th to June 7th, if she's saying the Ten
Commandments have won.  How is it any different?

MR. STAVER:  I think you cannot use an
objector to ultimately undermine the purpose.

THE COURT:  Well, she says, if you read
her deposition, she was in favor of putting the Ten
Commandments on the wall.  She was just concerned
about the resources the schools would pour into the
litigation.  That was a big concern of hers.

MR. STAVER:  I understand.

THE COURT:  That's a legitimate certain of
any reasonable board member.

MR. STAVER:  There is no question that was
a legitimate concern of hers, but she is in the
opposition in that vote.

THE COURT:  Mr. Gollehon is not in the
opposition.  He said I voted to put it up because
I'm a Christian.  It was the right thing to do.

MR. STAVER:  I think what you have to do
is look at what they did at the time.  There is
nothing on the face of that in the February vote
that they are ultimately taking it down for -- we
don't know other than the fact that there was a
unanimous vote to put it up and a unanimous vote to

1    take it down.

2         THE COURT:  It was clear it was taken down

3    on January 22nd because you-all said you couldn't

4    support the Ten Commandments in their current form.

5    You couldn't defend it so they voted to take it

6    down.  That's what they said in the depositions.

7         MR. STAVER:  It's unclear exactly, but

8    certainly they had advice from counsel, no question

9    about that.  That's in the record.

10         But at any rate, there is nothing in the

11   record that suggests they are anticipating doing

12   something with Bobby Lilly or nothing in the record

13   that says let's backup and undo this.  Let's go

14   back and reconsider Bobby Lilly.  There is nothing

15   in the record to that effect.  We do have Bobby

16   Lilly that predates by about a week that vote but

17   there's nothing in there that connects those two

18   together.

19         THE COURT:  It's a shame we don't have

20   real board meeting tapes as opposed to -- but it is

21   what it is.  It's the board minutes and it's the

22   evidence, and we have the depositions and we'll

23   just do it.

24         MR. STAVER:  The one thing I would say,

25   Your Honor, is the Bobby Lilly display is different

than anything that went on before it. It's
fundamentally different because there is definitely
an attempt to integrate it into the curriculum.

THE COURT: I think that's your best
argument, and I hear you. I am going to study the
issue and we'll come up with a ruling that, you
know, my rule as district court is to follow the
law. That's what I will do. I will follow the law
that's set down and if the Court of Appeals or the
Supreme Court wants to change it that's their
prerogative, but I will follow the law. That's my
job.

MR. STAVER: That's all we are asking you
to do. If I might, if you have further questions
about this maybe Mr. Crampton can answer them.

It's in our motion for statement of
undisputed material facts, and I can send this to
you but I can say it as well. If we go through
paragraphs one through five, we didn't find any
objection to those paragraphs or proposal.

Paragraph six, no, substantive objection
other than in terms of how it's worded.

Paragraph seven through 14, no objections
to it.

Paragraph 15, there is some objection to

1    it so we are not --

2         THE COURT:  I'm sorry, the ones you said

3    there are some concerns.

4         MR. STAVER:  I will go through and give

5    you no objection.  Paragraphs one through five, no

6    objection.

7         Paragraph six, partial, at least

8    objection.

9         Paragraph seven through 14, no objection.

10        Paragraph 15, partial objection to it.

11        Paragraphs 16 through 27, no objection.

12        Paragraph 28, there is an objection.

13        Paragraphs 29 through 65, no objection.

14        Paragraph 66, there is an evidentiary

15   objection by plaintiffs.

16        Paragraph 67, also an evidentiary

17   objection.

18        Paragraphs 68 through 76, no objection.

19        Paragraph 77, an objection.

20        Paragraphs 78 through 81, I don't think

21   there is any objection.  I think there might be

22   some quibbling on 82.

23        Paragraphs 83 through 86, no objection.

24        Paragraph 87, they take issue with whether

25   or not we misquoted Doe 1.

1          Paragraph 88, there is an objection.

2          Paragraphs 89 through 96, no objection.

3          Objections as to 97 through 99.

4          No objections from 100 through 108.

5          Partial objection to 109 and objections

6     from 110 to 117.

7          THE COURT:  Anything further?

8          MR. STAVER:  No, I think that's all, Your

9     Honor.

10          THE COURT:  Do you want Mr. Crampton to

11     make any argument at this time?

12          MR. CRAMPTON:  If I may, Judge, I have a

13     very short statement.

14          THE COURT:  Sure.  Mr. Staver, I'm going

15     to let Ms. Glenberg follow up and then I'm going to

16     give you a chance to conclude with anything else

17     you want to say.

18          MR. CRAMPTON:  Your Honor, may I say I

19     very much appreciate your candor as well as

20     indulgence here.  I will try to keep it brief.  I

21     just want to hit a few of the evidentiary

22     highlights and sort of back it up.  I know in many

23     respects the horse having already been out of the

24     barn but McCreary, itself, makes it very clear that

25     where the analysis begins for legislative purpose

is an objective test.  It's legislative purpose not

individual motives.  You don't pierce that veil, as

it were, as the Court put it Establishment Clause

analysis does not look to the veil psyche of

government officers, unless the objective evidence

on the surface actually indicates something

impermissible, something amiss.  Now, we would

argue that all the way through those January

minutes and the hearing thereto, there was no such

thing.  But His Honor has indicated that he did

find that something that caused him unease with the

January meeting.  Let's consider if that is His

Honor's pleasure.  Even then, what you do is you

then do look behind the veil and consider some of

that testimony, but only then.  But when you do so,

it's afforded very limited weight according to the

United States Supreme Court.

Now, what happens here?  You have the

testimony of Ms. McMahon and that unfortunate

comment that His Honor pointed out in the minutes

of January 20th.  In her deposition, however, that

page 20, and I quote:  I'm almost sure that I did

not say the second sentence.

That's the sentence about thank you for

your support of the Ten Commandments.

1        THE COURT: Somebody did. That's what's

2  in the minutes.

3        MR. CRAMPTON: I understand that. To the

4  extent you want to consider the individual

5  testimony of the board members, Ms. McMahon said

6  she didn't say that.

7        THE COURT: Someone else may have.

8        MR. CRAMPTON: I would say that's true.

9        THE COURT: She said she thought she was

10  the only one she knew of that would use the word

11  thrill. That's what she said in her deposition.

12        MR. CRAMPTON: I understand. That's why

13  she thought that was her comment.

14        There has been a great deal of discussion

15  regarding Pastor Wilburn and his expressions and

16  his purpose for the donations and so forth. Well,

17  the Fourth Circuit, itself, in _Peck_ made it very

18  clear that the religious motives of a constituent

19  cannot be imputed to the official who simply

20  responds to his request.

21        THE COURT: What about footnote 10 of

22  _Greene_ where it says: Where the board simply acts

23  following a religious motive and simply acts on it

24  without anything more it's appropriate for the

25  court to infer religious motive. That's footnote

1  10 of Greene.  That's also, I think, in footnote 10

2  of Grayson County.

3          MR. CRAMPTON:  I believe that was cited by

4  the ACLU, Your Honor, but you maybe right.

5          THE COURT:  It's cited by you as well.

6          MR. CRAMPTON:  But even so, when you're --

7  depending upon which meeting we're talking about,

8  there is no impermissible suggestion at the June

9  7th meeting as far as I know.  I don't think there

10  has even been a suggestion by the ACLU that Mr.

11  Lilly was motived by some illicit religious motive.

12          THE COURT:  There is religion throughout

13  the entire spring of 2011.  It's there throughout

14  all these meetings.

15          MR. CRAMPTON:  I would respectfully

16  suggest that His Honor has set aside that rule of

17  deference that he made reference to in the

18  beginning.

19          THE COURT:  Okay, let me just ask you:

20  January 20th, where is there any secular purpose

21  shown?

22          MR. CRAMPTON:  Mr. Buckland's comment.

23          THE COURT:  On January 20th?

24          MR. CRAMPTON:  Yes, sir.  I am sorry I

25  don't have those minutes before me.  But, again, I

believe what he was talking about is, again, the

financial concern right after the mention of the

vote.  He was the chairman.  Mr. Buckland stated,

no board member wanted to do this but we have an

attorney who advised us.  We tried to abide by the

law.  We want our children to understand that there

are laws in this country, and he is talking about

financial -- we understand and we've had assurance

from Giles County board of supervisors --

THE COURT:  Yeah, that's Mr. Gentry from

the board of supervisors that says:  We would

rather fight the ACLU or whoever would come up than

have one anonymous coward who would not even sign

the letter come in and tell us how to run our

schools.

That's what he's talking about.  Then

we've got a board member stated they were thrilled

with the attendance at the meeting, everyone was

thanked for their supporting the Ten Commandments.

What Mr. Buckland is talking about is, we

are sorry we took it down to start with but the

attorney told us to do it.

Where is the secular purpose in putting it

up back up on January 20th?

MR. CRAMPTON:  I would submit, Your Honor,

that, again, you have to consider the context and
history here. When the original display went up,
Doctor McCracken was unequivocal and supported also
by Mr. Buckland's testimony in his deposition.
This was a return to foundations and return to
basics.

To put up something that the board in good
faith believed was a foundations display, not a Ten
Commandments display, is not an impermissible
purpose. Moreover, that fact that some of the
crowds people showed up and talked about the Ten
Commandments is perfectly understandable, again, in
the context of what document was taken down. The
Constitution wasn't removed. The Ten Commandments
were removed. So they are talking about the Ten
Commandments because that's the missing link, as it
were, in this display.

THE COURT: So this is not about religion?
This is about historical documents, is that what
you're saying?

MR. CRAMPTON: That's exactly what I'm
saying.

THE COURT: Why doesn't Giles County just
post the second six? Why do they have to have the
first four that refer to God? If it's not about

God, then why are we having this argument?

MR. CRAMPTON:  For the same reason that as Mr. Staver eluded to, you don't sensor out the word God in the Declaration of Independence, Your Honor. If this were an artistic creation, a movie of some sort --

THE COURT:  This whole thing has gotten all blown out of proportion because it is about God.  That's why this whole thing -- that's why we are here.

MR. CRAMPTON:  I would submit, Your Honor, that that is what motivates the lawsuit having been filed in the first place and the press that reports upon it and enjoys a good dispute and controversy.

THE COURT:  Shouldn't the reasonable observer, who is watching all this that happened in the spring of 2011, shouldn't the reasonable observer when you're looking to the effect or the endorsement test, the second prong of Lemon, shouldn't the reasonable observer be entitled to consider that as Greene said in footnote 10 as Grayson County says in footnote 10?

MR. CRAMPTON:  I think that is a distinct minority position.  There is no US Supreme Court case that holds to that effect.

1          THE COURT:  Epperson.

2          MR. CRAMPTON:  Epperson was a purpose

3     case, I believe.

4          THE COURT:  Yeah, you're right.  In

5     Epperson the Supreme Court considered deposition

6     testimony of someone as to purpose and that was

7     considered in Epperson because that is noted in

8     footnote 10 of Greene.  You-all want to consider

9     the purpose as set forth by Doctor McCracken

10    because you like the purpose.  But then when the

11    purpose is from the school board members when they

12    voted on this because they are Christian, you want

13    me not to consider it.  You're talking out of both

14    sides of your mouth.

15         MR. CRAMPTON:  I would take issue, as Mr.

16    Staver eluded to, there were no board members when

17    Doctor McCracken said --

18         THE COURT:  But you want me to consider

19    his purpose.

20         MR. CRAMPTON:  If this Court wanted to be

21    perfectly consistent and consider none of their

22    purposes, we would be just fine with that because

23    the deference -- the presumption of

24    constitutionality.

25         THE COURT:  I think the Supreme Court

requires me to consider purpose, it requires me to

consider history, it requires me to consider

context, and I think I would be doing what was

asked of the Supreme Court in McCreary to turn a

blind eye to history, if I ignored what happened in

Giles County.

MR. CRAMPTON: If I may quote from

McCreary citing the various cases where this

pierces the veil. In each case the government's

action was held unconstitutional only because

openly available data supported a common sense

conclusion that a religious objective permeated the

government's action. Certainly you've got to

pierce that initial veil.

THE COURT: Open available data, would you

agree with me that what happens at a board meeting

is openly available data?

MR. CRAMPTON: Absolutely. That's all I

have unless His Honor has other questions. Thank

you.

THE COURT: Let's hear what the ACLU has

to say. Anything further?

MS. GLENBERG: I would just like to

address a few of the specific points raised by Mr.

Staver. First of all, in consideration of the

statements that were made in the depositions by

Doctor Webb and Ms. McMahon, that Your Honor noted,

where Doctor Webb said that the documents were a

smokescreen and Ms. McMahon said the Ten

Commandments wouldn't stay here.  The school board

suggests that because these two school board

members were opponents of the display their

testimony should be discounted.

I would point out that in addition to

being school board members, these two people are

reasonable observers who had a front row seat of

all the history that happened here and their

perception is that the documents were a smokescreen

and that the Ten Commandments won the day.

I wanted to briefly address what was said

about limited public forums and the discretion of

the school board.  Mr. Staver said that the school

board had criteria that it uses to decide which

documents to put up and that criteria is whether

it's a historic document.  But there is no criteria

as to when the school board can reject a particular

historical document and that's what makes it an

exercise of unfettered discretion.  If two people

offer different historical documents, they can

accept one and reject another for any or no reason

at all.  That's what defines the unlimited

discretion of a school board and the public forum

argument.

THE COURT:  What do you say about his

curriculum point?  He says after February 15th the

Bobby Lilly display is all about curriculum and

SOLS and doesn't that meet the exceptional

circumstances under Stone, which would allow

consideration of the Ten Commandments in a public

school?

MS. GLENBERG:  But it fails for a number

of reasons.  One is the Supreme Court's express

statements that this display is not integrated in

the sense of having a coherent theme, a lesson that

can be understood from the entire display as a

whole.  The Ten Commandments are not integrated.

They are a religious document among all of these

documents relating to American --

THE COURT:  The only religious document

among all the other documents.

MS. GLENBERG:  That's correct, Your Honor.

THE COURT:  Does that give it less or more

significance?

MS. GLENBERG:  I think that in this case,

combined with the fact that there is no explanation

of why the Ten Commandments are there, it makes the Ten Commandments stand out more. That they are the sole religious --

THE COURT: There is an explanation set forth that says it's the moral foundation for the Declaration of Independence. It says that right in the explanation that goes along with it.

MS. GLENBERG: The Supreme Court says that explanation makes no sense. It would make the reasonable observer throw up his hands. So I don't think that the display succeeds in integrating with the curriculum, and I think that the discretion of the SOLS and the fact that the Ten Commandments were plucked from a different SOL than all of the rest from the documents.

THE COURT: Where does the Supreme Court say it has to be integrated?

MS. GLENBERG: In Stone. And in McCreary's characterization of Stone, specifically. Stone talks about the Ten Commandments can be used if it's integrated. McCreary says Stone emphasized the need to integrate the Ten Commandments in order to demonstrate the secular purpose.

THE COURT: Page 867, Stone stressed the significance of integrating the commandments into a

secular scheme to forestall the broadcast of an
otherwise clearly religious message and for good
reason, the commandments being a central point of
reference in the religious and moral history of
Jews and Christians.

There is your integration.

MS. GLENBERG:  That was exactly the
quotation I was looking for.

THE COURT:  Does not leave room for an
argument that secular education is explained.

Of course, that's the initial display.
That's the initial display, itself.  Mr. Staver
says this case is different from McCreary and
stands strongly in stark contrast because of the
second McCreary display.  He says that was so
blatantly religious that it was plainly in
violation of the Establishment Clause.  This case
is different because it doesn't have the second
display.  What do you say about that?

MS. GLENBERG:  Well, several things.
First of all, certainly the second display added a
lot to the history in McCreary and made it very
clear the religious purpose.  However, again the
court did not say here is the minimum of historical
evidence that you need.  You look at the entire

story and whether the story tells of a purpose
that's religious or secular. So I think that
missing a particular step is not necessarily
constitutionally significant.

THE COURT: The court called the display
that's in place in Giles County now in McCreary the
third display, he called it a litigation point.
But it was pretty focused on the second display.

Mr. Staver is right, it had a resolution
that went along with it and talked about the Prince
of Ethics and all that stuff. Isn't McCreary more
egregious than this case?

MS. GLENBERG: In terms of the sequence of
events regarding the types of displays, yes,
certainly and certainly that second display is
important.

This case has other elements and
specifically the context in which all of these
school board meetings took place in which the
religious furor was very prominent. So, yes,
McCreary is different in one way but also different
in another way.

I think regarding the evidentiary
questions, I will rest on the briefs unless the
Court has specific questions.

1    THE COURT:  When I was looking at the

2    issue of the use of other sources, I noted footnote

3    16 in Epperson made reference specifically to ads

4    and letters to the editor there in that case about

5    the purpose of the Arkansas anti-evolution statute

6    in that case.  I looked at the district court in

7    Kitzmiller, the Pennsylvania Intelligent Design

8    case where the Court said and I quote:  Letters and

9    editorials are relevant to and provide evidence of

10   the Dover communities collective social judgment of

11   ethic curriculum change.  The purpose of the

12   private sponsor is relevant under Greene footnote

13   10, Grayson County footnote 10.  The Court

14   considered an affidavit of Judge McGinnis as to the

15   purpose of putting up the display in that case.

16        So I understand Giles' argument about the

17   proper role of the Court and not wanting to

18   psychoanalyze or find any hidden motive, but I

19   think there is plenty of precedent that gives the

20   Court the ability to look to the objective facts

21   that have been revealed in discovery and that are

22   set forth in the board minutes, at least from these

23   cases I have found.  Obviously, I'm going to study

24   it more.

25        MS. GLENBERG:  Your Honor, unless there

1    are more questions, I'm finished.  Thank you.

2          THE COURT:  Mr. Staver, she says you're

3    not integrated.  What do you say about that?

4          MR. STAVER:  I would say the federal

5    courts give deference to schools in terms of how

6    they want to run their curriculum.

7          THE COURT:  Federal courts aren't supposed

8    to run schools.  School boards are supposed to run

9    schools.

10          MR. STAVER:  Right, correct, and this

11    school board has a long history of expertise and

12    they know the SOLS, and they know the curriculum

13    and they've proved this and even directed that be

14    consistent.

15          THE COURT:  Let me ask you a question

16    because I'm not real clear on this.  Just in terms

17    of the history, the foundations display that was

18    put up on June 7th, was that put up in all the

19    schools of Giles County or just put up in Narrows

20    high school?

21          MR. STAVER:  Just in Narrows high school.

22          THE COURT:  The 18 additional documents

23    that Pastor Wilburn proposed, were those also put

24    up at Narrows high school.

25          MR. STAVER:  Yes, sir.

THE COURT: As you stand here today, is
the Ten Commandments up in any other school in
Giles County other than Narrows high school?

MR. STAVER: No.

THE COURT: That's the only place?

MR. STAVER: That's correct.

THE COURT: I just wasn't clear about
that. The other thing that might help the Court
and I don't know if you can do this or not. The
pictures that are in the record of the existing
displays has some discovery of some things, I would
like to see exactly what is on the wall because the
pictures in the record you can't really read
everything. Is there a way that you could file a
supplemental exhibit with the text of the displays
as they existed on June 7th and then Pastor
Wilburn's 18 more documents?

MR. STAVER: We can. I believe they are
attached to Mr. Arbogast's affidavit.

THE COURT: His affidavit was very long
and he had all kinds of things in it.

MR. STAVER: I will put it together.

THE COURT: If it's already there just
tell me where it is. If it's not already there, I
just seen pictures of it. The pictures are helpful

1      because they show the nature of the display.  I'm

2      not sure -- you certainly can't read all of the

3      words in all of the documents.  I have the

4      descriptions that are below, but I'm not sure I

5      have got all of the words on the documents.  I can

6      look them up on-line.

7              MR. STAVER:  I can supplement it, too.

8              THE COURT:  Certainly.

9              MR. STAVER:  Your Honor, the Arbogast

10     affidavit exhibit A32 begins with the written

11     portion of the Bobby Lilly's foundations display.

12             THE COURT:  Do you have a docket number

13     for that?  Is it 37?

14             I understand that's the written

15     explanation but is what is displayed on the walls

16     of Narrows high school more than that?  In other

17     words, are there the words from the Magna Carta?

18             MR. STAVER:  We have those.  That's the

19     explanation.  Then if you move over, and I can go

20     quicker if you want me to just give this to you.

21     But it begins with A34, 35 is the actual words of

22     the individual document all the way over to, I

23     believe, A42.

24             THE COURT:  I have those for the Pastor

25     Wilburn 2012 display.

1          MR. STAVER:  Yes, the written ones begin

2     on A44, and I believe that's the explanation.  Then

3     A45 through, I think it's A54, are the individual

4     words.

5          THE COURT:  That's great.  I don't need

6     anything else from you.  He has a lot of pages on

7     his affidavit.

8          MR. STAVER:  Also just for the Court as

9     well, on A90 is a display of foundations.  Then

10    also there is additional displays and all of them

11    are together all the way to 88.  That's a view or

12    several different views.  A86 which is the view of

13    just the Wilburn, 87 just one way looking down the

14    hall and 88 looking the other way down the other

15    hallway.

16         THE COURT:  They are all on that one

17    hallway?

18         MR. STAVER:  Correct.  That's where you

19    see the pictures of the individuals.  You can't see

20    who they are but people in addition to the displays

21    on the walls.

22         THE COURT:  All right.  I think I was

23    asking you about integration because Ms. Glenberg

24    says that's what this lacks, it's integration.

25    What do you say to that?

1       MR. STAVER: Well, Ms. Glenberg has not

2 given any reason why it lacks integration. In

3 fact, what we are talking about is integrating into

4 the curriculum and this is a manifestation or parts

5 of the curriculum.

6       THE COURT: Who's decision is that?

7       MR. STAVER: It's the school boards. I

8 think that's where the deference has to be

9 otherwise we micromanage the school boards and

10 certainly the courts are not in the business of

11 doing that. So the school board's decision is

12 looking at the curriculum, that they directed Lilly

13 to do, at least through the chairman, on

14 February 15th said it would be good to integrate

15 this into the curriculum.

16       THE COURT: He just said it would be good

17 if we could do that. Wouldn't the facts be better

18 for you, instead of on January 20th the Giles

19 County school board just saying let's put them back

20 up, if they had said let's study our curriculum and

21 get a committee to look at this and study our

22 curriculum and decide what documents make sense to

23 have on the wall and then they come back with a

24 report and a study and they put it up and the Ten

25 Commandments is one of them. Wouldn't those facts

1    be better for you?

2          MR. STAVER:  Yes, they would be better.

3    If we could recreate the facts, that certainly

4    would be better.  I think what you ultimately have,

5    here you have an Establishment Clause issue that

6    even the courts struggle with.  Even a number of

7    Supreme Court justices have requested that they

8    revisit this.

9          So all of us are having to deal with this;

10   this court, we have to, this school board, even

11   school board members and administrators have to

12   deal with it from a nonlegal perspective.  So you

13   go along for 11 years and there is no problem.

14   Then there is a problem and all of a sudden there

15   is this reaction and then the dust kind of settles

16   and then they move forward.  I think that's what

17   you ultimately have.  No problem, they are going to

18   get sued if they don't do something, they react,

19   they go back, they take it down again, and then the

20   dust settles.

21         When you look at from the time of June 7th

22   until the present, there is no controversy.  There

23   is no yard signs, no bumper stickers, no testimony.

24         THE COURT:  There is this lawsuit.

25         MR. STAVER:  True, but nothing that is

going on in the community.

THE COURT:  Pastor Wilburn said this whole thing is the best thing that ever happened to his congregation since he's been there.  It put people in his seats.  That's what he says.

MR. STAVER:  Well, that may or may not be. I'm not here to say.

THE COURT:  That's what he says in his deposition.

MR. STAVER:  I understand but that doesn't have anything to do with the school board.  In terms of the controversy, it has basically died down other than an article here or there.  So it's basically along the pre-December 2010 where things are going on as normal.  There is no controversy, no lobbying, there is nothing.

So I think that makes a significant difference as well, that this display has not caused that separation or that angst in the community.  A lawsuit, itself, or a letter that was pre-lawsuit cannot, itself, be the cause of actually stirring up the division and then look at that division and say obviously there is a religious purpose.

When you look at some of the objective

1    things here and how normal people would have

2    reacted, they did the best they could with the

3    information they had and the advice they were given

4    from counsel.  They did the best they could as a

5    school board, and I think they are governing in

6    that way.

7         I would say that it is integrated.  I

8    think that is their decision to do it, and I think

9    there is plenty of evidence before this Court.

10        One thing I would say, just in closing, is

11   that dealing with the -- oh, by the way, I want to

12   say that the advertisement in Epperson wasn't from

13   a community member it was from a sponsor.  So that

14   adds a little bit more credibility towards the

15   evidence as opposed to somebody in the community.

16        THE COURT:  But there were also letters to

17   the editor.  There were separate letters to the

18   editor as well in Epperson.  As I said awhile ago,

19   there is some credit to your argument that the

20   Court needs to be careful and not psychoanalyzing

21   the motive of the board members.  I think I do have

22   to look at the whole history, the whole context to

23   do the proper analysis under McCreary.

24        MR. STAVER:  I understand.  One point on

25   that, and I will conclude with my final point; and

this is, if all of the letters and the editorials
are going to be relevant in this or any other case,
then these things can just simply turn on a letter
writing campaign.  We don't know who wrote those
letters.  We've not deposed them or cross-examined
them.  For all we know it's somebody that is trying
to settle the case.  I'm not saying that it is but
if we start putting weight on letters to the editor
it ultimately cuts to our situation.

THE COURT:  To be clear I haven't focused
on that so much as I focused on the statements by
the board members in depositions, what is said in
the board minutes, themselves, and I think that's
pretty good evidence.  I've been more focused on
that.  To be honest with you, I haven't made any
decision with regards to all those letters to the
editor that are out there.  There are so many cases
and you have given me so much to read that I've
done the best I can.  I haven't gotten all the way
down the rabbit's road on that one.

There is something to be said about being
concerned about paying a great deal of evidentiary
value to willy-nilly letters to the editor and
e-mails and blogs and all that kind of stuff that
goes on.

1          So I hear you, and I'm going to pay close

2     attention to that.

3          MR. STAVER:  Thank you.  One final point.

4     It's on the issue of standing.

5          THE COURT:  There's no standing in your

6     briefs.

7          MR. STAVER:  We raised it in one of our

8     briefs, I think in our opposition, and that is the

9     issue is redressability in part for Doe 1.  We

10    raised that matter in the brief.  Doe 1 states that

11    Doe 1 feels ostracized or not a member of the

12    community.  Doe 1 points not to the Ten

13    Commandments but to the Bible bus.  So if you were

14    to remove the Ten Commandments, there is nothing in

15    that evidence that would show this could be

16    redressed with the concern that Doe 1 has.

17         Doe 2 on the other hand says that the

18    actual statements about the Ten Commandments, Doe 2

19    agrees with in the curriculum and believes it's

20    permissible to put in the curriculum what you have

21    on the wall.  The only reason Doe 2 objects is that

22    Doe 2's understanding of Stone doesn't allow them

23    on the wall.  That doesn't give standing.  When Doe

24    2 agrees with substance but only objects, not

25    because Doe 2 disagrees with the substance, but

believes that the Supreme Court doesn't allow it.
That's not standing.  For those reasons we believe
that there is a serious standing issue as well and
at the end of the day the case should be dismissed
for lack of standing.

THE COURT:  Thank you, Mr. Staver.  I
appreciate it.

Anything else the ACLU wants to say on
behalf of Doe 1 and Doe 2?

MS. GLENBERG:  Your Honor, if the Court is
inclined to take this issue very seriously I would
like an opportunity to brief it.  But just as an
additional matter in these religious display cases
the Fourth Circuit has made it very clear that the
injury that is standing to the plaintiff is that
caused by unwelcome direct contact with a religious
display which appears to be endorsed by the state.

There is no question that that's what
happened here.  Doe 1 has made it clear that he
objects to the Ten Commandments.  He believes they
promote a religious viewpoint.  That's all he needs
to have standing.

THE COURT:  I think he said the Bible bus
caused him greater concern but he did object to the
Ten Commandments as well.

1          MS. GLENBERG:  That is a red herring, Your

2    Honor.  First of all, the Bible bus was mentioned

3    in Doe 2's deposition and not in Doe 1's.  She

4    mentioned it as an additional thing that he was

5    concerned about.  He never said it's really the

6    Bible bus not the Ten Commandments.  The Bible bus

7    concerned him when he was in elementary school when

8    the Bible bus was an issue.  The Bible bus is no

9    longer an issue.  He's in high school and there is

10   no reason to think that this lawsuit is about the

11   Bible bus rather than the Ten Commandments.

12          Doe 2's feeling that the statements in the

13   textbook are permissible.  Does not deprive Doe 2

14   of standing.  Doe 2 is very clear that it's a

15   parent's role to educate the kids and that the

16   placement of the Ten Commandments on the wall had

17   an indoctrinating affect that interfered with the

18   parent's right to provide the religious instruction

19   for the child.

20          So, Your Honor, there is simply nothing in

21   the record to indicate that Doe 1 and Doe 2 will

22   not be adequately redressed by the removal of the

23   Ten Commandments on the wall.

24          I would be happy to answer any questions

25   on that issue.

1          THE COURT:  If I need additional briefing

2     I will let you know.  Anything further from the

3     Giles County folks?

4          MR. STAVER:  No, Your Honor, other than I

5     think one of the places that we mentioned standing

6     is in our reply brief in support for motion for

7     summary judgment pages 25 and 26.

8          THE COURT:  I don't know if it

9     specifically said standing, but I remember seeing

10    the issues that you raised with regards to Doe 1

11    and 2.

12         I will deal with that.  Now, before we

13    adjourn, what I would like to do is ask counsel and

14    if there are any members of the school board here

15    for Giles County, perhaps the superintendent of

16    schools, if the superintendant is here, to go into

17    the jury room.  I am going to ask the magistrate

18    judge to speak to you all for a minute about

19    convening a mediation in this case.

20         If there is nothing further, I'll ask the

21    marshal to declare a recess.

22         (Proceedings concluded at 3:00 p.m.)

23

24              *   *   *   *   *

25

CERTIFICATE OF COURT REPORTER

I, Janelle A. Mundy, Notary Public in and for the Commonwealth of Virginia at Large, whose commission expires July 31, 2012, certify that I reported verbatim the proceedings in the United States District Court for the Western District of Virginia, at Roanoke, Virginia, in the captioned cause, heard by the Honorable Michael F. Urbanski, Judge of said court, on May 7, 2012.

I further certify that the foregoing transcript, to the best of my abilities, constitutes a true, accurate and complete transcript of said proceedings.

Given under my hand and notarial seal on this 1st day of June, 2012.


_____
/s/ Janelle A. Mundy
Notary Public for the
Commonwealth of Virginia